## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PTC Alliance Corp., *et al.*, | ) | Case No. 09-13395 (___) |
| | ) | Joint Administration Requested |
| Debtors.[1] | ) | |
| | ) | |

## AFFIDAVIT OF THOMAS W. CROWLEY IN SUPPORT OF
## THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY ORDERS

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) | |
| | ) | ss: |
| COUNTY OF ALLEGHENY | ) | |

THOMAS W. CROWLEY being duly sworn, depose and state:

1.      I am the Chief Financial Officer of PTC Alliance Corp. ("PTC"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). PTC is the direct or indirect parent company of all of the other Debtors herein and their respective non-debtor affiliates. As a result of my work with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team and employees, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have

---

[1]      The Debtors in these cases, along with the last four digits of their federal tax identification numbers are: PTC Alliance Corp. (2395), with a principal executive office located at 6051 Wallace Road Ext., Suite 200, Wexford, PA 15090; Alliance Tubular Products Co. (7185), with a principal executive office located at 640 Keystone Street, Alliance, OH 44601; PACD Acquisition LLC (3405), with a principal executive office located at 4400 West 3rd, Beaver Falls, PA 15010; Enduro Industries, Inc. (4669), with a principal executive office located at 2001 Orchard Avenue, Hannibal, MO 64031; PTC Tubular Products, LLC (9342), with a principal executive office located at 23041 E 800 North Road, Fairbury, IL 61739-8824; Mid-West Mfg. Co. (0660), with a principal executive office located at 475 East 16th Street, Chicago Heights, IL 60411; and PT/VW Corporation (9385), with a principal executive office located at 6051 Wallace Road Ext., Suite 200, Wexford, PA 15090.

personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

2.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors intend to continue in possession of their properties and manage their business as debtors in possession in accordance with Bankruptcy Code sections 1107 and 1108. Further, to enable the Debtors to minimize any adverse effects of the chapter 11 filing on their businesses, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Motions").

3.     I submit this Declaration in support of the Debtors' chapter 11 petitions and the First Day Motions.[2] Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, employees, and board of directors, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions. If I were called upon to testify, I could and would testify competently to the statements set forth herein.

4.     Part I of this Declaration describes the Debtors' business and the circumstances surrounding the commencement of its chapter 11 case. Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith. Part III summarizes the Debtors' objectives in these chapter 11 cases.

---

2     Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion.

# I. BACKGROUND

## A. Background and Current Business Operations

5.     PTC Alliance Corp. ("PTC") and its subsidiaries (collectively, the "Company")
are leading manufacturers and marketers of welded and cold drawn mechanical steel tubing and
tubular shapes, chrome-plated bar products, fabricated parts, and precision components.  PTC
was formed in 2000 by the merger of Pittsburgh Tube Company and J.H. Roberts Industries, Inc.
Today, the Company is comprised of (i) Alliance Tubular Products Co. ("Alliance"), PTC
Tubular Products LLC, Enduro Industries, Inc., and PT/VW Corporation, each a wholly-owned
subsidiary of PTC (the "Direct Subsidiaries"); (ii) PACD Acquisition LLC, and Mid-West Mfg.
Co., each a wholly-owned subsidiary of Alliance and an indirect subsidiary of PTC (the "Indirect
Subsidiaries" and together with the Direct Subsidiaries, the "Domestic Subsidiaries"); and (iii)
Wiederholt, GmbH, PTC Alliance Precision Products (Asia) Private Limited, and PTC Alliance
(UK) Limited (the "Foreign Subsidiaries" and, together with the Domestic Subsidiaries, the
"Subsidiaries").  The Debtors are PTC and the Domestic Subsidiaries.  The Debtors have
operations in seven states:  Pennsylvania, Ohio, Missouri, Illinois, Indiana, Kentucky, and West
Virginia.

6.     The Company is one of the largest, independent manufacturers of engineered
drawn-over-mandrel (DOM), a finishing process used for specific applications, tubular steel
products and chrome plated bar.  It is the only producer offering both products globally.  The
Company further offers value added services ranging from cutting and machining, to fabricated
parts and components.  Typical end uses for the Company's tubular products include hydraulic
cylinders, tubes and rods for earth moving equipment, dump trucks, forklift trucks, mining
equipment, agricultural machinery, and automobiles, among other things.

7.     In North America, the Company primarily sells to three types of customers: (1) steel service centers (55% of sales); (2) original equipment manufacturers (30% of sales), and (3) tier 1, 2, and 3 automotive suppliers (15% of sales). The Company maintains a diverse customer base including a wide variety of "blue chip" companies. Major customers include Caterpillar, John Deere, Daimler, Chrysler, Volkswagen, NACCO, Hendrickson, BMW, Volvo, Delphi, JCB, Marmon/Keystone, Earle M. Jorgensen, and Ryerson. Many of these customer relationships span many decades.

8.     The Debtors' net sales for year ending December 31, 2008 were $378.6 million and EBITDA of $57.4 million. As of December 31, 2008, the Debtors' books and records reflected assets totaling approximately $274 million, and liabilities totaling approximately $293.5 million. For the eight months ended August 31, 2009, the Debtors' net sales were $90.3 million with an EBITDA loss of $24.8 million.

9.     As of December 31, 2008, the Debtors had 849 active employees in North America. As of the Petition Date, the Debtors had 579 active employees in North America. Specifically, the Debtors employed 579 individuals in seven states, of which 577 were full-time employees and 2 were part-time employees. As of the Petition Date the Debtors had 275 employees who were represented by unions.[3]

## B.     Prepetition Capital Structure

10.     As of the Petition Date, the Debtors' total consolidated funded debt obligations were $180,868,883.88 and consisted of, among other things, revolving credit, term loans, and secured notes payable to Black Diamond affiliated entities, including Black Diamond Commercial Finance, L.L.C. (as Agent under the ABL Credit Agreement, as defined below);

---

[3]     The Debtors' union employees are represented by the United Steelworkers, the Teamsters, and the Metal Fabricators.

BDC Finance, L.L.C.; BDCM opportunity Fund, L.P.; Black Diamond International Funding LTD (collectively, "Black Diamond"); The CIT Group Business Credit, Inc.; Grand Central Asset Trust, BDC Series; and The Bank of New York Mellon (f/k/a The Bank of New York) (as Agent under the Term Loan (A) Agreement and Term Loan (B) Agreement, each as defined below) (collectively, the "Prepetition Lenders"). The major components of the Debtors' consolidated funded debt obligations are described in greater detail below.

      a.     ABL Credit Facility. On July 25, 2006, PTC and each of the Debtors, as borrowers, the institutions from time to time party thereto as lenders, and Black Diamond Commercial Finance, L.L.C., as administrative agent for the lenders, entered into that certain Credit Agreement (as amended and modified prior to the date hereof, the "ABL Credit Agreement"), providing for a credit facility in the aggregate principal amount not to exceed $70,000,000, which credit facility consists of (i) a revolving credit facility in an aggregate principal amount not to exceed $40,000,000, including a letter of credit subfacility of $5,000,000 and (ii) a term loan facility in an aggregate principal amount not to exceed $30,000,000. The ABL Credit Agreement is secured by a lien on substantially all of the assets of the Debtors, with a first priority lien on current assets of the Debtors. As of the Petition Date, outstanding principal obligations (including outstanding letters of credit) under the ABL Credit Agreement were $41,279,000.00.

      b.     Term Loan (A) Agreement. On July 25, 2006, PTC, each of the Debtors, other than PT/VW Corporation, as borrowers, the institutions from time to time party thereto as lenders, and The Bank of New York Mellon (f/k/a The Bank of New York), as administrative agent for the lenders, entered into that certain Term Loan (A) Agreement (as amended and modified prior to the date hereof, the "Term Loan (A) Agreement"),

providing for term loan promissory notes in the original principal amount of $76,524,688.82 governed by the terms and conditions set forth in the Term Loan (A) Agreement. The Term Loan (A) Agreement is secured by a lien on substantially all of the assets of the Debtors, other than PV/VW Corporation, with a first priority lien on fixed assets of the Debtors, other than PT/VW Corporation. As of the Petition Date, outstanding principal obligations under the Term Loan (A) Agreement were approximately $76,524,688.82. Black Diamond affiliated entities hold all debt outstanding under the Term Loan (A) Agreement.

      c.    <u>Term Loan (B) Agreement</u>. On July 25, 2006, PTC and each of the Debtors, other than PT/VW Corporation, as borrowers, the institutions from time to time party thereto as lenders, and The Bank of New York Mellon (f/k/a The Bank of New York), as administrative agent for the lenders entered into that certain Term Loan (B) Agreement (as amended and modified prior to the date hereof, the "<u>Term Loan (B) Agreement</u>"), providing for new term loan promissory notes in the original principal amount of $46,112,163.30 governed by the terms and conditions set forth in the Term Loan (B) Agreement. The Term Loan (B) Agreement is secured by a third priority lien on substantially all of the assets of the Debtors, other than PT/VW Corporation. As of the Petition Date, outstanding principal obligations under the Term Loan (B) Agreement were $63,065,194.47. Black Diamond affiliated entities hold all debt outstanding under the Term Loan (B) Agreement.

    11.    Three shareholders, including two Black Diamond affiliated entities, own 100% of the stock of PTC. The equity in PTC is owned as follows: BD PAC Holdings LLC (66.09%); BD PAC Holdings 2 LLC (31.247%); and Peter Whiting (2.656%).

C.   **The 2006 Bankruptcy Case**

12.   On May 10, 2006, PTC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "2006 Case") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Western District of Pennsylvania Bankruptcy Court"). The 2006 Case was necessary in order to restructure the Company's balance sheet. At the time, PTC had four outstanding classes of preferred stock and two classes of common stock. Prior to the filing of the 2006 Case, PTC reached a consensual agreement with its primary secured lender and preferred equity holder, Black Diamond Commercial Finance, L.L.C., to restructure the balance sheet and simplify PTC's equity structure. Black Diamond acted as the debtor-in-possession financing lender and plan sponsor for PTC's assets in a structure whereby Black Diamond's secured loans and matured preferred interests then due would be converted in large part to common equity and in part to new operational term loans, and Black Diamond's existing equity would be cancelled. PTC's employees were not affected by the 2006 Case and the collective bargaining agreements with the unions were wholly unaffected. Unsecured creditors were either paid in full or their claims were reinstated during the 2006 Case. The pre-negotiated chapter 11 plan in the 2006 Case was accepted by 100% of the voters in the classes entitled to vote on it, and was confirmed by the Western District of Pennsylvania Bankruptcy Court on July 14, 2006.

D.   **Events Leading to Chapter 11 Filing**

13.   The goals of the 2006 Case were realized and the reorganized business was initially a success. In the two years following the 2006 Case, the Debtors grew their business from an EBITDA of $41.7 million at the end of 2006, to $44.1 million in 2007, and up to $57.4 million in 2008.

14.     While the reorganization accomplished in the 2006 Case was a success, the reorganized company could not anticipate the severity and effect of the global recession on the automotive, manufacturing, mechanical, and construction industries, the core of the Company's customer base. As a direct consequence of the global recession, beginning in the fourth quarter of 2008, the Debtors' revenue fell dramatically. Net sales fell from an all-time high of $378.6 million in 2008 to a projected $135.5 million in 2009. Further, the Company was saddled with surplus inventory.

15.     In an effort to address the economic challenges it faced, the Company took significant actions to reduce expenses. For example, the Company idled plants in Hopkinsville, Kentucky; Jane Lew, West Virginia; and East Chicago, Illinois. The Debtors reduced their employee head count from 849 to 579 between December 31, 2008 and August 31, 2009. As part of the reduction in its labor force, the Debtors reduced management positions. As a result of workforce reductions, the Debtors realized significant savings.

16.     In addition to workforce reductions, the Debtors undertook a comprehensive program to reduce costs across their organizations. Through salary reductions and reductions in gainsharing, bonuses, fringe benefits, and overtime pay, the Debtors reduced their costs by more than $14.5 million in 2009. By making difficult decisions, realizing and capitalizing on efficiencies, halting capital expenditures, and undertaking a thorough review of their costs, the Debtors were able to achieve a total savings of nearly $35 million in 2009.

17.     Notwithstanding the Debtors' ability to achieve impressive cost savings, they have not been able to overcome the impact of the severely decreased revenues. Moreover, many of the Debtors' obligations could not be reduced and remained unchanged or increased. As of the Petition Date, the Debtors are burdened with approximately $61 million in pension liabilities,

of which approximately $25 million is currently unfunded. The Debtors also have $40 million of OPEB (unfunded post-retirement medical benefits) liabilities. Approximately $4.2 million and $5.5 million of pension funding requirements are scheduled for fiscal years 2010 and 2011, respectively. This compares to no funding requirement in fiscal years 2008 and 2009.

18. The Debtors have defaulted on certain covenants under the ABL Credit Agreement, further compounding the Debtors' financial difficulties. Despite extensive discussions with the Debtors' lenders, the Debtors were unable to achieve any long-term relief under its loan obligations. Accordingly, the Debtors began exploring all available options to save the enterprise, including a sale of the Company. To date, comprehensive marketing efforts by the Debtors and their advisors and investment bankers have not led to a buyer that would be willing to pay a sufficient amount for the enterprise to pay all of the Debtors' obligations.

19. As set forth above, Black Diamond entities are involved in all areas of the Debtors' capital structure, and Black Diamond has worked closely with the Debtors to address their ongoing financial difficulties. Nonetheless, the Debtors have defaulted on their secured debt covenants and will soon lose the ability to use cash collateral to pay their creditors and employees. As of the Petition Date, the Debtors' liabilities exceeded their assets by approximately $64.7 million.

20. As set forth in the Debtors' motion to sell substantially all of their assets (the "Sale Motion"),[4] the Debtors have carefully considered all of their options and have concluded

---

[4] See Motion Pursuant To 11 U.S.C. §§ 105(A), 363, 365 and Fed. R. Bankr. P. 2002, 6004, 6006 For (I) Entry Of An Order (A) Establishing Bidding And Auction Procedures Related To The Sale Of Substantially All Of The Debtors' Assets; (B) Approving Bid Protections; (C) Scheduling An Auction And Sale Hearing For The Sale Of The Debtors' Assets; (D) Permitting Credit Bidding Pursuant To Bankruptcy Code Section 363(K); (E) Establishing Certain Notice Procedures For Determining Cure Amounts; (F) Approving Form And Manner Of Notice Of All Procedures, Protections, Schedules And Agreements; And (H) Granting Certain Related Relief; And (II) Entry Of An Order (A) Approving The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests; And (B)
Continued on following page

that proceeding with a sale of their businesses as a going concern with Black Diamond as a stalking horse presents the best opportunity for the Debtors to maximize the value of their estates. Black Diamond has agreed to provide financing for these Cases to allow for an orderly sale process, and has agreed to procedures to allow the Debtors to continue to market their businesses and conduct an auction process to further test the market. Moreover, the sale of the Debtors' businesses as a going concern, either to Black Diamond as a stalking horse or to another successful bidder, would preserve the jobs of a substantial portion of the Debtors' employees and will avoid further deterioration in the value of the Debtors' employees and will avoid further deterioration in the value of the Debtors' assets through a prompt sale. In order to maintain sufficient liquidity to continue their operations and effect an efficient sale of their businesses as a going concern, the Debtors had no viable alternative but to seek relief under chapter 11 of the Bankruptcy Code.

## II.     FIRST DAY MOTIONS

21.     In furtherance of the objective of successfully reorganizing, the Debtors have filed a number of motions and applications (collectively, the "First Day Motions"), and respectfully request that the Court consider entering orders granting such First Day Motions. I have reviewed each of the First Day Motions (including the exhibits thereto) and can attest to the truth of the facts set forth therein. Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a

---

Continued from previous page
    Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, filed concurrently herewith.

minimum of interruption or disruption to its businesses, or loss of productivity or value, and

(b) constitutes a critical element in achieving the Debtors' successful reorganization.

## A.    Administrative and Procedural Matters

### 1.    Consolidated List of Top 30 Creditors

22.    The Debtors respectfully request that the Court authorize the Debtors to file a consolidated list of the Debtors' thirty (30) largest unsecured creditors.  The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents in these cases.  The Debtors believe, and I concur, that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents, as contemplated by Local Rule 1007-2.  Accordingly, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors and equity security holders in the format or formats currently maintained in the ordinary course of the Debtors' business.

23.    Moreover, as more fully described below, the Debtors are also filing a motion seeking the appointment of Logan & Company, Inc. ("Logan") as claims, noticing and balloting agent in these chapter 11 cases.  If the Claims, Noticing, and Balloting Motion is granted, Logan will, among other things, (a) assist with the consolidation of the Debtors' computer records into a creditor and security holder database, and (b) complete the mailing of the Notices to the parties in these databases.  After consultation with Logan, the Debtors believe that filing the lists in the format or formats currently maintained in the ordinary course of business will be sufficient to permit the Agent to notice promptly all applicable parties as required by Local Rule 1007-2.

24.    The Debtors submit, and I concur, that a single consolidated list of their combined thirty (30) largest unsecured creditors in these cases would be more reflective of the body of

unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors. Therefore, the Debtors respectfully request authorization to file a single consolidated list of their thirty (30) largest unsecured creditors in these cases.

### 2. Joint Administration

25.     These chapter 11 cases involve seven affiliated Debtors. Many, if not all, of the motions, applications, and other pleadings that will be filed in these chapter 11 cases will relate to relief jointly sought by all of the Debtors. Joint administration of these chapter 11 cases will therefore promote efficiency and ease the administrative burden on the Court and all parties in interest. It will permit the Clerk of the Court to utilize a single docket for all of the cases, creating a centralized location for the numerous documents that are likely to be filed and served in these cases and for all notices and order entered by the Court. Joint administration will also enable parties-in-interest in each of the chapter 11 cases to stay apprised of all the various matters before the Court.

26.     Because these chapter 11 cases involve seven individual Debtors, joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, will render the completion of various administrative tasks less costly, and will minimize the number of unnecessary delays. Moreover, the relief requested by this Joint Administration Motion will simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.

27.     For these reasons, the Debtors believe, and I agree, that the relief requested in the Joint Administration motion is in the best interests of the Debtors and their estates, will reduce the administrative burdens on the Court and all parties in interest, and therefore should be granted.

### 3. Claims / Noticing Agent

28. In connection with the Claims Agent Motion, the Debtors have evaluated several potential candidates to serve as Claims, Noticing, and Balloting Agent. Following that review, and in consideration of the number of anticipated claimants and other parties-in-interest, the nature of the Debtors' businesses, and the scope of the tasks for which the Debtors will require the assistance of a claims, noticing, and balloting agent, the Debtors believe, and I agree, that the appointment of Logan is in the best interests of the Debtors' estates, their creditors, parties-in-interest, and this Court.

29. Based on Logan's considerable experience in providing similar services in large chapter 11 cases, the Debtors' believe, and I concur, that Logan is eminently qualified to serve as claims, noticing, and balloting agent in these chapter 11 cases. In addition, Logan assisted with the 2006 Case, and is therefore familiar with the Debtors and its management team. A detailed description of the services that Logan has agreed to render and the compensation and other terms of the engagement are described in the engagement latter and affidavit of Logan President Kathleen M. Logan, attached as exhibits to the Claims Agent Motion. Based upon these terms and representations, the Debtors believe, and I agree, that the Debtors' estates, creditors, parties-in-interest, and this Court will benefit as a result of Logan's experience and cost-effective methods.

### B. Business Operations of the Debtor

#### 1. Prepetition Wages, Compensation and Benefits

30. _Wages, Salaries, and Commissions._ As of the Petition Date, the Debtors' workforce consisted of 579 employees. Approximately 33% of the Debtors' workforce consists of salaried employees. The remaining 67% of the Debtors' workforce is paid on an hourly basis.

The Debtors' salaried Employees are paid either (i) twice monthly, on the 15th and the last day of the month, or (ii) every other Friday. Hourly Employees are paid either weekly or bi-weekly, depending upon location. In addition, during the course of the year, Employees accrue vacation, earned leave, personal time, holiday pay, and commissions which may be paid in the ordinary course of the Debtors' business during the calendar year.

31.     Automatic Data Processing, Inc. ("ADP") processes the Debtors' payroll by drafting payroll checks and depositing payroll into Employees' bank accounts. The Debtors fund their payroll approximately two (2) days before each pay date when ADP withdraws the necessary amount to cover the Debtors' payroll from the Debtors' operating account via ACH reverse wire transfer. Though the Debtors have remained current on their payroll, as of the Petition Date, the Debtors owed its Employees compensation in the form of accrued but unpaid wages and salaries in the aggregate amount of approximately $2,500,000. The Debtors seek authority to pay such accrued compensation as it becomes due and owing in the ordinary course of the Debtors' business operations.

32.     Reimbursement Obligations. It is the Debtors' policy to reimburse Employees for certain expenses within the scope of their employment, including expenses for travel, lodging, meals, supplies, and other miscellaneous expenses. The Debtors estimate that, as of the Petition Date, less than $50,000 was owed to Employees on account of outstanding reimbursable business expenses. The Debtors request the authority to pay such accrued prepetition reimbursement amounts.

33.     Severance. The Debtors offer a severance program to their Employees (the "Severance Benefits"). Although the severance payments vary on a case-by-case basis per Employee, generally, the payments consist of one week's pay for each year of employment. As

of the Petition Date, the Debtors have no outstanding severance obligations. By this Motion, the Debtors request authority to maintain the Severance Benefits program for the benefit of the Employees, at their sole discretion.

34.    Employee Benefits. The Debtors offer Employees many standard employee benefits under their employee benefit programs (the "Employee Benefit Plans and Programs"). The Debtors' full-time Employees are offered a choice of medical plans, prescription drug, dental, vision, life insurance, accidental death & dismemberment, long-term disability, flexible spending accounts, COBRA, and a 401(k) program.

35.    The Debtors self-insure medical benefits for the first $250,000 in claims per person per year for most Employees. The Debtors' claims administrator and stop-loss insurance carrier is Highmark Blue Cross Blue Shield ("Highmark"). In addition to paying the cost of the actual medical claims up to the stop-loss amount, the Debtors also pay Highmark administrative fees in the approximate amount of $75 per employee per month, which includes additional fees for special services such as short-term disability, claims processing, large case utilization reviews, and stop loss premiums. In addition to the medical plan, the Debtors also self-insure prescription drug coverage. Highmark, through Medco ("Medco"), acts as the third party administrator (the "TPA") for the prescription drug plan. The Debtors also offer their Employees vision and dental benefits (and together with the medical and prescription drug plans, the "Self-insured Employee Benefit Plans"). The Debtors pay monthly premiums to the providers of the dental and vision plans.

36.    Under the medical and prescription drug benefit plans, Employee expenses are submitted to Highmark, which aggregates these expenses into one weekly claim, and each week the Debtors wire the aggregate expense to Highmark from the Debtors' operating account.

Highmark issues payments to the various medical or other benefit providers for expenses incurred under the benefit plans. Given the nature and timing of the method by which claims are submitted under the Self-Insured Employee Benefit Plans, it is difficult to estimate the amount of such claims that were incurred prior to the Petition Date. Accordingly, the Debtors seek authority to honor all obligations, including claims incurred prior to the Petition Date, under the Self-Insured Employee Benefit Plans. The chart below summarizes the Debtors' average monthly obligations for their Self-Insured Employee Benefit Plans:

| BENEFIT | TPA | AVERAGE MONTHLY COST |
|---------|-----|----------------------|
| Medical PPO | Highmark Blue Cross Blue Shield | $800,000 (average) |
| Prescription Drug | Highmark Blue Cross Blue Shield | (Included in above) |
| Vision | Vision Benefits of America | $4,000 (premium) |
| Dental | Guardian Life Dental | $30,000 (premium) |

55. The Debtors also maintain a 401(k) retirement program in which many current and former Employees participate. The program is administered by Wells Fargo Fund Management LLC ("Wells Fargo") in exchange for a fee of $8 per participant per year (or approximately $7,500 in the aggregate, paid in quarterly installments) plus a base fee of $2,500. The Debtors withhold Employee contributions for the 401(k) plan on a per pay period basis and Wells Fargo sweeps the funds via ACH transfer approximately one to two business days after the pay period ends. In certain of the Debtors' plants, the Debtors match union and non-union Employee contributions in various amounts, up to a maximum of 8% (varying by location) of the Employee's contribution. In other locations, the Debtors do not match contributions made by the Employees.

56.     Pension Plan and Retiree Benefits.  The Debtors provide and maintain various

programs for their retired employees.  Specifically, the Debtors fund the PTC Alliance Corp.

Pension Plan (the "Pension Plan"), a qualified pension plan made up of three sub-plans.  The

Debtors also participate in certain multi-employer pension plans for its retired employees at its

Jane Lew and Fairbury facilities.  The Debtors make routine contributions to the Pension Plan as

required.

57.     The Debtors also provide certain retiree medical and prescription benefits (the

"Retiree Medical Plan).  The benefits provided under the Retiree Medical Plan vary depending

upon the age and location of the retiree-participants.  The Retiree Medical Plan is self-insured

and funded by the Debtors.

58.     Workers' Compensation.  In each of the jurisdictions in which the Debtors

operate it is required by state law to provide workers' compensation insurance.  In all states in

which they do business, except West Virginia and Ohio, the Debtors fully insure workers'

compensation insurance through St. Paul Travelers Insurance Company ("Travelers").  An

upfront premium and pre-funding amount is paid to Marsh USA Inc. ("Marsh") for the benefit of

Travelers prior to the beginning of each new policy year based upon estimated employee hours

for such policy year.  Following completion of the policy year, the premiums are audited against

actual hours worked and claims made, and the reconciled amount may result in an additional

payment to or refund from Travelers.  For the current policy year, the Debtors paid an upfront

premium and pre-funding payment in the amount of $355,887 to Marsh, for the benefit of

Travelers, in January 2009.  In addition, the Debtors make nine monthly premium and pre-

funding payments in the amount of $110,020.  With respect to West Virginia, the Debtors pay

premiums to Brick Street Mutual Insurance Company.  The premium is paid in advance at

various times throughout the year in an aggregate annual amount of approximately $100,000. With respect to Ohio, the Debtors pay administration fees to the State of Ohio, and they self-administer the claims through Wells Fargo Employers Service, a third-party administrator ("Wells Fargo"). The Debtors keep a $25,000 account balance with Wells Fargo, who invoices the Debtor monthly in order to replenish the $25,000 balance if workers' compensation claims are paid from the account during the month.

59.     It is critical that the Debtors be permitted to continue their workers' compensation program and to pay any reconciled balances and premiums for the new policy year, because alternative arrangements for workers' compensation coverage would almost certainly be more costly, and the failure to provide coverage might subject the Debtors and/or their officers to severe penalties. In addition, failure to pay workers' compensation claims might result in Employee attempts to compel payment through litigation or similar means and jeopardize the Debtors' ability to conduct business in certain jurisdictions. Accordingly, the Debtors seek authority to continue and pay premiums related to workers compensation ("Workers Compensation Claims and Premiums").

60.     In sum, the Debtors seek to pay to, or for the benefit of, its Employees certain Prepetition Employee Obligations and Employee Benefits and to continue the Debtors' Employee Benefit Plans and Programs in effect immediately prior to the filing of this case. If the Debtors fail to pay or honor the Employees' prepetition compensation, reimbursement procedures, and employee benefits, the Debtors believe, and I concur, that the Employees will suffer extreme personal hardship and in many cases will be unable to pay their basic living expenses. This would undermine Employee morale and result in unmanageable Employee turnover during the critical early stages of the Debtors' chapter 11 cases. The Debtors submit

that any significant deterioration in morale at this time would substantially and adversely impact the Debtors and their ability to reorganize, thereby resulting in immediate and irreparable harm to the Debtors and their estates.

61.    The Debtors believe, and I agree, that the amounts to be paid to the Employees pursuant to this Motion are reasonable compared with the importance and necessity of preserving Employee loyalty and morale and with the difficulties and losses the Debtors likely will suffer if those amounts are not paid.  Accordingly, the Debtors seek authorization to pay the Prepetition Employee Obligations (or to maintain accrued levels of benefits where payment is not yet due) all in accordance with the policies, plans and programs in place prior to the Petition Date.

### 2.    Prepetition Sales and Use Taxes

62.    In the ordinary course of business, the Debtors are required to collect an assortment of sales, use, gross receipts and federal excise taxes ("Sales and Use Taxes"), state, local, and federal employment and withholding taxes ("Employment and Withholding Taxes"), and certain other taxes, including, among others, personal property, corporate franchise, property, business license, and *ad valorem* taxes (the "Other Taxes" and, together with the Sales an Use Taxes and the Employment and Withholding Taxes, the "Taxes") and must remit these Taxes to the various governmental entities of the jurisdictions in which the Debtor conducts business.  As of the Petition Date, the Debtors estimate that the aggregate amount of Taxes due and owing to various taxing authorities is approximately $750,000.  The Debtors estimate that $150,000 of this amount will become due and payable during the remainder of 2009.

63.    The Debtors, in the ordinary course of their business, are required to collect an assortment of sales, use, gross receipts, and federal excise taxes in connection with its sale of goods to its customers and must remit these taxes to the various governmental entities of the

jurisdictions in which the Debtors conduct business. The process by which the Debtors remit such Sales and Use Taxes varies, depending on the nature of the tax at issue and the taxing authority to which the relevant tax is paid.

64.     The Debtors, in the ordinary course of their business, accrue state, local, and federal employment and withholding taxes as wages are earned by the Debtors' employees, and these taxes are calculated based on statutorily mandated percentages of earned wages. I am informed that the Debtors historically have paid timely all federal, state, and local Employment and Withholding Taxes to the relevant Taxing Authority by check or automated transfer as required, which is usually on a monthly or quarterly basis, or immediately prior to, on or within a specified number of days of, each payroll date.

65.     In addition, the Debtors, in the ordinary course of their business, incur various other tax liabilities, including, among others, personal property, corporate franchise, property, business license, and ad valorem taxes. The process by which the Debtors remit such Taxes varies, depending on the nature of the Tax at issue and the Taxing Authority to which the relevant tax is paid.

66.     I have been advised that the federal government and many states in which the Debtors operate have laws providing that, because Taxes constitute "trust fund" taxes, the Debtors' officers or directors, or other responsible employees could, under certain circumstances, be held personally liable for payment of such Taxes. To the extent any accrued Taxes of the Debtors are unpaid as of the Petition Date in these jurisdictions, the Debtors' officers and directors could be subject to lawsuits during the pendency of these chapter 11 cases. I believe that this would be extremely distracting for the Debtors' directors and officers, whose full-time focus must be on the Debtors' businesses and their reorganization. Consequently, I believe it is

in the Debtors' best interests, and the best interests of their creditors, to eliminate the possibility of such time-consuming and potentially damaging distractions by authorizing the Debtors to pay any undisputed prepetition Taxes obligations to the respective Taxing Authorities in the ordinary course of business.

**3.    Insurance and Insurance Premium Financing**

67.    In connection with the operation of their business, the Debtors maintain multiple insurance policies (each an "Insurance Policy" and, collectively, the "Insurance Policies"). The Debtors maintain the Insurance Policies in amounts and types of coverage in accordance with the state and local laws governing the multiple jurisdictions in which the Debtors do business, as well as in accordance with their numerous contractual obligations. The Insurance Policies provide coverage for, among other things, real property, directors and officers, general liability, automobile liability, crime insurance fiduciary liability, flood insurance, umbrella/excess liability, and employment practices liability. For the policy period ending in 2009, the total annual premiums under the Insurance Policies were approximately $2.8 million. The Insurance Policies are listed as an exhibit to the Insurance Motion, along with the corresponding insurance carriers (the "Insurance Carriers") and individual annual premiums.

68.    Policies with Financed Premiums. A portion of the Debtors' Insurance Policies (for policies relating to fire, casualty, and risk insurance) are financed through a commercial premium financing agreement (the "Premium Financing Agreement") with AFCO Credit Corporation ("AFCO"). Under the Premium Financing Agreement, the Debtors pay an initial down payment and monthly installments thereafter to AFCO, in exchange for the AFCO's agreement to pay the full annual insurance premiums, in advance, to the Insurance Carriers. The Debtors finance insurance premiums in the aggregate amount of $924,090 under the Premium

Financing Agreement, including a $231,023 down payment. The financed amount is payable in nine (9) monthly installments of $78,183, and the remaining payments due for the policy period as of the Petition Date is one (1) payment of $78,183.

69.     The Debtors' obligations under the Premium Financing Agreement are secured by all unearned premiums or dividends payable to the Debtors under each of the Insurance Policies that are covered by the Premium Financing Agreement. Under the Premium Financing Agreement, in the event of non-payment by the Debtors, AFCO is appointed as attorney in fact for all named insureds under the Insurance Policies and is granted the authority to, among other things, cancel the Insurance Policies.

70.     The Debtors have made all installment payments that came due under the Premium Financing Agreement prior to the Petition Date. The Debtors are required to pay the next installment due to AFCO under the Premium Financing Agreement on September 30, 2009. By this Motion, the Debtors seek authority to pay all remaining installment due under the Premium Financing Agreement, which total is equal to $78,183.

71.     Policies Without Financed Premiums. The Debtors' remaining Insurance Policies are not financed through AFCO. For these Insurance Policies, the Debtors are required to pay premiums to their insurance broker, Marsh, Inc. ("Marsh"), based upon a fixed rate established and billed by each Insurance Carrier. Annual insurance premiums (the "Insurance Premiums") are paid by the Debtors either in advance in a lump sum payment or in periodic installments in arrears. The Insurance Premiums total approximately $1.87 million in the aggregate on an annual basis. As of the Petition Date, the Debtors have a final installment payment due to Marsh of $148,504 on account of the Insurance Premiums.

72.     The Debtors believe that they have satisfied their financial obligations under those Insurance Policies.  However, out of an abundance of caution, and in order to prevent any disruption of the Debtors' Insurance Policies and any attendant harm to the Debtors' businesses that such disruption would cause, the Debtors seek authorization to make, in their discretion, any necessary prepetition premium payments and to perform any other prepetition obligations that may be necessary to maintain the Insurance Policies.

73.     The Debtors believe, and I agree, that they have compelling business reasons for seeking to keep their Insurance Policies in effect.  The insurance coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many cases, such coverage is required by various regulations, laws, and contract that govern the Debtors' business operations.

74.     If the Debtors did not continue to perform their obligations under the Insurance Policies and the Premium Financing Agreement, their coverage under the Insurance Policies could be voided  Disruption of the Debtors' insurance coverage would expose the Debtors to serious risks, including:  (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Providers under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Insurance Policies; (c) the possible loss of good-standing certification to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (d) the possible inability to obtain similar types of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.  I believe that any or all of these consequences could be seriously harmful to the Debtors' business and restructuring efforts, as they would expose the

Debtors to higher costs and an increased risk of loss. To avoid those potential consequences, the Debtors believe, and I agree, that the relief requested in the Insurance Motion should be granted.

75.     The Debtors believe, and I agree, that any interruption in insurance coverage caused by the Debtors' inability to pay prepetition claim amounts or to generally satisfy their obligations as they come due under the Insurance Policies and the Premium Financing Agreement would cause immediate and irreparable harm to the Debtors' estates. The Debtors therefore believe, and I concur, that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Insurance Policies and the Premium Financing Agreement is in the best interests of the Debtors, their estates, and their creditors. Accordingly, the Debtors seek authority to make all remaining payment under the Premium Financing Agreement and the Insurance Policies as they come due.

**4.     Utilities**

76.     In the ordinary course of business, the Debtors regularly incur expenses for water, sewer, electricity, gas, local and long-distance telephone service, cellular phone service, internet service, and other utility services provided by approximately 85 service providers (the "Utility Providers"). The approximate average monthly charges for the utility services provided by the Utility Providers totals $1,024,000 over the last 12 months. The provision of utility service by the Utility Providers is governed, in some instances, by applicable federal or state tariffs, and by service agreements.

77.     On a monthly basis, the Debtors pay amounts due to the Utility Providers. As of the Petition Date, however, the Debtors may have: (i) pre-petition accounts payable to certain Utility Providers; (ii) outstanding checks issued to certain Utility Providers in payment for pre-petition charges for utility services that had not cleared the Debtors' bank account prior to the

Petition Date; or (iii) liabilities for pre-petition utility services for which the Debtors have not been billed.

78.     The Debtors request that the Court enter an order (i) prohibiting the Utility Providers from altering, refusing, or discontinuing services; (ii) approving the Debtors' establishment of a deposit account to be held by Bank of America in the amount of $362,000 (the "Deposit") as affording the Utility Providers with adequate assurance of payment, as the term is defined in Section 366(c)(1)(A) of the Bankruptcy Code, and deeming the Utility Providers to have received adequate assurance of payment pursuant to Section 366(b); (iii) establishing procedures and mechanisms under which the parties may determine adequate assurance of future payment; and (iv) authorizing the Debtors to supplement, as necessary, the list of Utility Providers and providing that any newly added Utility Provider will be subject to the terms of the order.

79.     Such relief is necessary to enable the Debtors to continue their business operations uninterrupted by threats of potential termination of, or suspension or interruption in their utility services. Because the Utility Providers administer essential services to the Debtors' facilities, any interruption in utility services could be devastating. In fact, the temporary or permanent discontinuation of utility services at any of the Debtors' facilities could irreparably disrupt the Debtors' business operations and, as a result, fundamentally undermine the Debtors' reorganization efforts.

80.     The Debtors fully intend to pay all post-petition obligations owed to the Utility Providers in a timely manner and expect that they will have sufficient funds with which to satisfy fully all their post-petition utility obligations. The Debtors believe that their available cash will

enable the Debtors to pay promptly all of their respective obligations to the Utility Providers for post-petition utility service on an ongoing basis and in the ordinary course of business.

81.     Nevertheless, to provide additional adequate assurance of payment, the Debtors propose to provide the Utility Providers with adequate assurance by funding the Deposit, a sum equal to fifty percent of the Debtors' estimated monthly utility costs, into a segregated, interest bearing account.

### 5.     Cash Management, Bank Accounts, and Business Forms

82.     Description of the Debtors' Cash Management System.  The Debtors have utilized a certain centralized cash management system in the day-to-day operations of their businesses for many years (the "Cash Management System").  The Cash Management System is described in detail below.

83.     As is common with affiliated corporations, the Debtors utilize a consolidated cash management system into which deposits are combined into one or more bank accounts for purposes of collections and disbursements.  A description of the Cash Management System is set forth below and reference is made to the Prepetition Cash Management System Chart (Exhibit "A" to the motion).

84.     Cash Collection and Concentration.  The Debtors maintain one master concentration account ("Concentration Account").  Each day receipts of the Debtors were deposited into the Concentration Account.

85.     Disbursements.  The Cash Management System includes nine (9) accounts from which disbursements were made, as depicted on an exhibit to the Cash Management Motion. Additionally, some of the Debtors' plants have petty cash accounts established for convenience.

86. <u>Disbursements to be made from the Operating Account (Prepetition and Postpetition</u>. Automated Data Processing, Inc. ("ADP") is the third-party administrator for the Debtors' payroll. Accordingly, prior to issuance of payroll checks, an ACH transfer will be made from the Operating Account to ADP in an amount adequate to cover the Debtors' payroll for the respective pay period.

87. Similarly, Highmark Blue Cross Blue Shield ("Highmark") is the third-party administrator for the Debtors' self-insured medical benefit programs. Accordingly, on a periodic basis, the Debtors will initiate an wire transfer to Highmark from the Operating Account in respect of obligations incurred under the self insured medical benefit program.

88. Finally, all payments made by wire transfer to vendors of the Debtors are made from the Operating Account.

89. PTC manages the consolidated cash on behalf of its debtor-subsidiaries. Based on the DIP Financing, the Debtors anticipate that the cash management will continue after the Petition Date and will include cash obtained under the DIP Financing Order to fund the ongoing operations of the Debtors.

90. The Debtors maintain records of all cash transactions, and perform a monthly reconciliation of transactions between and among the Debtors.

91. <u>Description of Debtors' Intercompany Transactions</u>. In addition to the Cash Management System, the Debtors frequently engage in other arms-length intercompany financial transactions and transfers in the ordinary course of their respective businesses. Discrete transfers in appropriate intercompany accounts are made on account of the intercompany transfers and transactions, which are often in the nature of payment for goods and services between the Debtors. Several examples of ordinary intercompany transactions include: (a) PTC, through its

operating account, pays for all steel purchases of PTC, Mid-West, and Alliance; and (b) PTC facilities routinely supply Alliance Tubular with processed steel that Alliance Tubular sells to its customers.

92.    The Debtors maintain records of all intercompany transactions, and perform a monthly reconciliation of transactions between and among the Debtors.

93.    <u>Request for Authority to Continue Cash Management System and Intercompany Transactions</u>. If the Debtors were forced to abandon their established Cash Management System and required to set up new and separate accounts and systems, the Debtors' estates would be burdened unnecessarily with additional costs. The implementation of a new cash management system at this time could result in confusion and unnecessary delays in collecting accounts receivables and paying administrative expenses, and possible deterioration of operations, all to the detriment of the Debtors' estates.

94.    The Debtors propose to continue using their existing, consolidated Cash Management System and the current practice of keeping records of the separate assets and liabilities of the Debtors.

95.    The Debtors seek authority to continue their ordinary course transactions among and between themselves, including those encompassed by the Cash Management System and those transactions and transfers described above, and all arms-length transactions among or between each of the Debtors (the "Intercompany Transactions").

96.    The Intercompany Transactions permit the Company to operate as an integrated enterprise and thereby reduce the administrative costs incurred by the Debtors. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administration would be disrupted to the detriment of the Debtors. Moreover, the Intercompany

Transactions are essential to (a) ensure that the Debtors are adequately funded to maintain operations, and (b) preserve the value of these operations for the benefit of the Debtors. Accordingly, the Debtors submit that the continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and their creditors.

97.     Request for Authority to Continue Using Bank Accounts. Upon the filing of a chapter 11 petition, debtors generally are required to open new bank accounts, close old accounts, and obtain new checks and other business forms. This requirement is designed (a) to provide a clear line of demarcation between prepetition and postpetition transactions and operations, and (b) to block the inadvertent payment of prepetition claims through the payment of checks drawn prior to the filing of a petition.

98.     Because the Debtors conduct operations in multiple locations in several states and territories, the Debtors maintains a number of different bank accounts in addition to the main accounts described above. A list of bank accounts maintained by the Debtors as of the Petition Date is attached to the Cash Management Motion.

99.     Closing all of the existing Accounts would result in unnecessary delays, additional expenses, and administrative confusion which could disrupt the Debtors' operations.

100.     Because of the complexity of the Debtors' banking arrangements, it is imperative that the Debtors be permitted to continue using the accounts in order to avoid wholesale disruption of the normal operation of their business. The Debtors believe that the transition to chapter 11 will be smoothest and most orderly, and interference with continuing operations will be minimized, if the accounts are continued with the same account numbers.

101.     The Debtors represent that, if the relief requested in this Motion is granted, it will not pay, and each of the banks at which the accounts are maintained will be directed not to pay,

any debts incurred by the Debtors before the Petition Date other than as authorized by this Court. The Debtors will continue to work closely with each of the banks that maintains Accounts against which checks are drawn in order to ensure that appropriate procedures are in place so that checks issued before the Petition Date on account of obligations of the Debtors, but presented after the Petition Date, will not be honored absent approval from this Court.

102.    The Debtors will ensure that a substantial gap in check number sequence is created so that prepetition checks can be clearly distinguished from postpetition checks. All checks issued postpetition will be marked clearly "Debtor in Possession" so that parties will know that the Debtor is operating under chapter 11. By preserving business continuity and avoiding the operational and administrative paralysis that closing the Accounts and opening new ones necessarily would create, all parties in interest, including, but not limited to employees, vendors, and customers, will be well served and the benefit to the estate generally will be considerable.

103.    Request for Authority to Continue Use of Business Forms. The Debtors also use various business forms, the replacement of which would cause the Debtors to incur unnecessary costs, cause confusion for the Debtors' employees and customers, and possibly cause delays in normal business cycles. Among the types of forms the Debtors use are computer forms regarding the purchases and sales of goods. These forms are known to vendors and customers and changes to these forms would cause substantial disruption in the Debtors' businesses. Accordingly, the Debtors request that they be allowed to continue to use existing business forms and avoid the expense associated with replacing such forms.

104.    Request to Waive Investment and Deposit Guidelines. All deposits are in institutions that are insured or guaranteed by the United States or a department, agency or

instrumentality of the United States. As part of the Cash Management System, all cash is swept into Investment Accounts and held until it is needed for disbursements. The Overnight Sweep Investment Account earned 0.15% interest and the Money Market earned 1.0% interest in August, 2009 (the rate fluctuates with market rates).

105.    The Debtors' use of the accounts substantially conforms with the approved investment practices identified in Bankruptcy Code section 345 -- that all deposits into the accounts are safe, prudent, and designed to yield the maximum reasonable net return on the funds invested.

106.    Accordingly, the Debtors believe, and I concur, that sufficient cause exists to allow the Debtors to deviate from the approved investment practices established by the Bankruptcy Code, especially in light of the importance of maximizing the return on funds that the Debtors may be investing at any given time and the safety of the investment vehicle used by the Debtors to invest idle cash. Consequently, a waiver of the section 345 requirements is in the best interests of the estates, all creditors and other parties-in-interest.

107.    Request to Provide Administrative Expense Priority Status to Intercompany Claims. To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims (the "Intercompany Claims") arising after the Petition Date as a result of Intercompany Transactions through the Debtors' cash management systems or otherwise be accorded administrative expense priority status.

108.    If Intercompany Claims are accorded administrative expense priority status, any of the Debtors utilizing funds flowing through the Cash Management System will bear ultimate repayment responsibility for such amount, thereby maximizing protections.

6. **Reclamation and Related Administrative Priority Claims**

109.    The Debtors receive a high volume of goods each day in the ordinary course of their businesses. The Debtors believe, and I concur, that a number of vendors will assert their right to reclaim goods delivered to the Debtors shortly before or soon after the Petition Date, or seek payment of an administrative claim under section 503(b)(9) of the Bankruptcy Code.

110.    Without an orderly process to determine reclamation and/or section 503(b)(9) administrative claims, the Debtors believe, and I agree, that management's attention will unnecessarily be diverted from important operational and other issues in order to deal with these matters. Accordingly, the Debtors propose that the relief requested in the Reclamation Motion will facilitate the continued operation of the Debtors' businesses and should obviate any vendor's perceived need to initiate legal action to preserve or enforce its rights against the Debtors, thereby minimizing potential costs to the Debtors' estates in responding to such litigation.

7. **Postpetition Financing and Use of Cash Collateral**

111.    The Debtors are seeking entry of interim and final orders authorizing them, among other things, to (i) obtain postpetition financing on a senior secured superpriority basis pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364; (ii) utilize cash collateral pursuant to 11 U.S.C. § 363; and (ii) grant adequate protection to prepetition secured lenders pursuant to 11 U.S.C. §§ 361, 363 and 364.

112.    The Debtors have an immediate need to obtain postpetition financing and use the cash collateral in order to permit, among other things, the orderly continuation of the operation of its business, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs. The Debtors' use and access to the cash collateral specifically, is necessary in order to

insure that the Debtors have sufficient working capital and liquidity and can preserve and maintain the going concern value of the Debtors.

113.    Prepetition, the Debtors retained Candlewood to serve as their financial advisor in connection with the Debtors' exploration of strategic restructuring alternatives, including, but not limited to, obtaining debtor-in-possession financing and exploring a sale of substantially all of the Debtors' assets.

114.    The current condition of the steel industry and the declining and tightened credit markets limited the Debtors' postpetition financing alternatives.  Despite the current market conditions, the Debtors, acting through Candlewood, solicited a large number of potential postpetiton lenders (the "Prospective Lenders"), approximately fourteen of which responded with materials or inquiries.  After conducting preliminary due diligence, only two of the Prospective Lenders, including Black Diamond, submitted proposals to the Debtors.  The two Prospective Lenders, including Black Diamond, that submitted proposals were only willing to provide postpetition financing if (i) they received priming liens and (ii) they received first-priority liens on any unencumbered assets of the Debtors.

115.    In consultation with their financial advisors and after negotiations with their Prepetition Lenders, the Debtors have concluded that, given the state of the steel industry, tightened credit market, and the Debtors' need for cash to finance business operations, the proposed postpetition financing offers the most advantageous terms to the Debtors' estates.

116.    The Debtors' efforts have resulted in the proposed $15 million revolving credit facility (the "DIP Facility").  If the Court enters the proposed form of interim order (the "Interim Order") pending a final hearing on, and entry of, a final order, the Debtors will be authorized to borrow up to $5 million under the DIP Facility.

117. The DIP Facility will be secured by, among other things, (i) perfected first priority, senior priming liens on the Debtors' assets, senior in priority to the liens held by the prepetition secured parties which will be afforded superpriority status, but subject to a carve-out; (ii) perfected junior liens upon all property of each Debtor that is subject to valid, perfected and non-avoidable liens in existence on the Petition Date, with limited exceptions; and (iii) an allowed administrative expense claim having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

118. The Debtors prepetition secured parties are entitled, pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the prepetition collateral, in an amount equal to the aggregate diminution in value of the prepetition secured parties' respective prepetition collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the prepetition collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code. As adequate protection, the prepetition secured parties are hereby granted the following:

(a) <u>Adequate Protection Liens.</u> The prepetition secured parties are hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, financing statements or other agreements) a replacement security interest in and junior lien upon all the collateral of the same type and category in which they had prepetition liens;

(b) Section 507(b) Claim. The prepetition secured parties are hereby granted, subject to the payment of the carve out, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the

Bankruptcy Code held by the lenders under the DIP Facility (the "DIP Lenders");

*provided, however,* that the prepetition secured parties shall not receive or retain any

payments, property or other amounts in respect of the superpriority claims under section

507(b) of the Bankruptcy Code granted hereunder or under the prepetition secured credit

documents unless and until the obligations under the DIP Facility have indefeasibly been

paid in cash in full;

(c)     Interest.  The prepetition secured parties shall receive from the Debtors (i)

immediate cash payment of all accrued and unpaid interest at the respective rates

provided for in the prepetition secured credit documents, and all other accrued and unpaid

fees and disbursements (including, but not limited to, agent's fees) owing to the

prepetition secured parties under the prepetition secured credit documents and incurred

prepetition and (ii) on the first business day of each month, all accrued but unpaid interest

at the non-default contract rate applicable on the petition date, *provided* that, without

prejudice to the rights of any other party to contest such assertion, the prepetition secured

parties reserve their rights to assert claims for the payment of additional interest

calculated at any other applicable rate of interest (including, without limitation, default

rates);

(d)     Fees and Expenses.  The prepetition secured parties shall receive from the

Debtors current cash payments of all fees and expenses, including, but not limited to, the

reasonable fees and disbursements of counsel, financial and other consultants for the

prepetition secured parties.

119.     The Debtors negotiated the DIP Facility with the DIP Lenders extensively and at

arms-length.  Moreover, the Debtors' have exercised sound business judgment, within the

confines of the provisions and underlying policies of the Bankruptcy Code, in negotiating and obtaining the necessary DIP Facility.

120.    The proposed DIP Facility is essential to the continuance of the Debtors' operations during these chapter 11 cases. The proposed financing meets requirements of section 364(d) of the Bankruptcy Code, because, as discussed more fully below, (i) the Debtors were unable to obtain the necessary credit on more favorable terms elsewhere; (ii) the Debtors exercised sound business judgment in entering into the DIP Facility; and (iii) the interests of primed lienholders are adequately protected.

121.    The Debtors require immediate use of the cash collateral to fund their day-to-day operations to preserve and maintain the going concern value of the Debtors. Absent such relief, the Debtors' business will be brought to an immediate halt, with irreparable damaging consequences for the Debtors, their estates and their creditors. The interests of the prepetition secured parties in the Debtors' cash collateral will be protected by the adequate protection set forth above. Accordingly, the Debtors' request to use cash collateral in the operation of their business and administration of the chapter 11 cases should be approved.

122.    For the foregoing reasons and the reasons set forth in each of the First Day Motions, the Debtors respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as is appropriate.

### III.    RETENTION OF PROFESSIONALS

#### Reed Smith LLP

123.    Reed Smith LLP ("Reed Smith") has performed extensive legal work for the Debtor in connection with certain corporate, financing, litigation, securities, and other significant matters. Furthermore, Reed Smith represented PTC in the 2006 Case.

124.     Prior to commencement of these chapter 11 cases, the Debtors sought the services of Reed Smith with respect to, among other things, advice regarding restructuring matters in general, and preparation for the potential commencement and prosecution of chapter 11 cases. In this regard, Reed Smith has performed extensive legal work for the Debtors in connection with its ongoing restructuring efforts including, but not limited to, financing and creditor issues. As a result of representing the Debtors on such matters, Reed Smith has acquired extensive knowledge of the Debtors and their businesses, and is uniquely familiar with the Debtors' capital structure, corporate structure, financing documents, and other material agreements.

125.     I believe that the Debtors' continued representation by Reed Smith is critical to the Debtors' efforts to restructure its businesses because Reed Smith is extremely familiar with the Debtors' businesses and legal and financial affairs, and, accordingly, is well suited to guide the Debtors through the chapter 11 process. Finally, because Reed Smith has offices in both the Western District of Pennsylvania and the District of Delaware, the Debtors will be able to minimize duplication of effort in these cases.

126.     Indeed, the Debtors selected Reed Smith because of the firm's experience with and knowledge of their businesses, as well as its experience and knowledge in the field of debtors' and creditors' rights, and business reorganizations under chapter 11 of the Bankruptcy Code. In sum, I believe continued representation by Reed Smith is critical to the success of the Debtors' reorganization because Reed Smith is uniquely familiar with the Debtors' business and legal affairs.

127.     The Debtors desire to employ Reed Smith under a general retainer because of the extensive legal services that will be required in connection with the businesses of the Debtors

and their Subsidiaries. As noted above, the Debtors believe that Reed Smith is well qualified and uniquely able to act on the Debtors' behalf.

## DLA Piper LLP (US)

128. The Debtors seek authorization to retain DLA Piper LLP (US) ("DLA") as bankruptcy conflicts counsel for the Debtors. I understand that DLA has considerable experience in matters of this nature, and has acted in a professional capacity in numerous chapter 11 cases, representing the interests of debtors, creditors' committees, trustees, and secured and unsecured creditors.

129. The Debtors have selected DLA because of its experience and knowledge in the field of financial restructuring and bankruptcy law, including specifically its expertise, experience and knowledge of issues arising in complex chapter 11 bankruptcy cases, and its compatibility with the Debtors' lead bankruptcy counsel and its ability and willingness to respond quickly to the issues that may arise in these cases.

130. Accordingly, the Debtors believe, and I concur, that DLA is both well-qualified and uniquely able to represent the Debtors in these chapter 11 cases in an efficient and timely manner, and such representation will be in the best interests of these estates, their creditors, and other parties in interest.

## Candlewood Partners, LLC

131. The Debtors seek authorization to employ Candlewood Partners, LLC ("Candlewood") as their financial advisor and investment banker. Candlewood is a financial advisory and investment banking firm with considerable experience advising and assisting financially and operationally troubled companies. Its services include turnaround and

restructuring consulting, bankruptcy planning, chapter 11 reorganization management, investment banking, asset sales, and corporate wind-downs.

132.    I understand that Candlewood has extensive experience in developing and implementing appropriate strategies designed to maximize value for creditors and equity holders, including providing investment banking services consisting of, among other things, development of sales and marketing materials, development and implementation of a marketing plan and corresponding timetables, managing and coordinating all aspects of the sale process.

133.    I understand that the compensation structure set forth in the Candlewood Retention Application, and the engagement letter attached thereto, is comparable to compensation generally charged by financial advisory firms and investment banking firms of similar stature to Candlewood for comparable engagements, both in and out of court.  The Debtors believe, and I concur, that the proposed compensation arrangements set for the Candlewood Retention Application are highly beneficial to the Debtors' estates as they provide certainty and proper inducement for Candlewood to act expeditiously and prudently with respect to the matters for which it will be employed.

134.    Based on the foregoing, the Debtors believe, and I agree, that the retention of Candlewood as their financial advisor and investment banker, in accordance with the terms and conditions set forth in the Candlewood Retention Application, and the engagement letter attached thereto, is appropriate and necessary and in the best interests of the Debtors and their estates.

## Sitrick and Company, Inc.

135.    Public relations and corporate communications is a critical aspect of the chapter 11 reorganization process.  Accordingly, the Debtors seek to retain and employ Sitrick and

Company, Inc. ("Sitrick") during the pendency of these cases to serve as their corporate communications consultants. On or about August 31, 2009, the Debtors and Sitrick entered into an engagement agreement, a copy of which is attached to the motion seeking authority to retain Sitrick, and the Debtors seek authority to employ Sitrick postpetition on these terms and conditions.

136. The Debtors require knowledgeable corporate communications consultants to render these essential professional services. Sitrick has substantial expertise in all of these areas. Moreover, as also indicated above, Sitrick has obtained valuable institutional knowledge of the Debtors' communications needs as a result of its activities in providing services to the Debtors prior to the Petition Date. Accordingly, Sitrick is well qualified to perform these services and assist the Debtors in these chapter 11 cases.

137. Based on the foregoing, the Debtors believe, and I agree, that the retention of Sitrick as their corporate communications consultant, in accordance with the terms and conditions set forth in the Sitrick Retention Application, and the engagement letter attached thereto, is appropriate and necessary and in the best interests of the Debtors and their estates.

## Ordinary Course Professionals

138. Prior to the filing of their chapter 11 petitions, the Debtors employed, from time to time, certain professionals in the ordinary course of their businesses (the "Ordinary Course Professionals") to render services relating to, among other things, (a) tax preparation and other tax advice, (b) audit services, (c) legal advice pertaining regulatory, corporate, employment and labor matters, (d) legal representation in litigation, and (e) other matters requiring the expertise and assistance of professionals.

139.     The Debtors desire to continue to employ and retain Ordinary Course Professionals to render services to their estates that are similar to those rendered before the commencement of these chapter 11 cases.  Although the automatic stay and other issues in this case may decrease the Debtors' need for certain Ordinary Course Professionals' services, the Debtors cannot now quantify or qualify that need.  As such, the Debtors filed a motion asking the Court for authorization to employ and retain the Ordinary Course Professionals on terms substantially similar to those in effect prior to the Petition Date.

140.     The Debtors' believe that many of the Ordinary Course Professionals with whom the Debtors have previously dealt with to represent them on an ongoing basis might be unwilling to provide continued representation if payment is available only through a formal application process through the Bankruptcy Court.  Consequently, the Debtors believe, and I concur, that retention of the Ordinary Course Professionals and the payment of interim compensation according to the terms described in the Ordinary Court Motion is in the best interests of the estate.

[SIGNATURE PAGE TO FOLLOW]

_T. W. Crowley_

Thomas W. Crowley,
Chief Financial Officer
PTC Alliance Corp.

Sworn to and subscribed
Before me this 1 day
of _October_, 2009

_Martha M. Rogers_
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Martha M Rogers, Notary Public
Pine Twp., Allegheny County
My Commission Expires Aug. 2, 2013
Member, Pennsylvania Association of Notaries