## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------x
                                           :
In re:                                     :       Chapter 11
                                           :
PTC ALLIANCE CORP., et al.                 :       Case No. 09- 13395 (CSS)
                                           :
                                           :       Joint Administration Pending
                                           :
                              Debtors.     :
                                           :
-------------------------------------------x
```

## MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING (A) THE DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364; (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364; (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c); AND (IV) GRANTING RELATED RELIEF

By this Motion (the "Motion") the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move this Court for entry of Interim and Final Orders (I) Authorizing (A) the Debtors to Obtain Postpetition Financing on a Senior Secured Superpriority Basis Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364; (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Prepetition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 363 and 364; (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c); and (IV) Granting Related Relief. In support of this Motion, the Debtors rely on the Affidavit of Thomas W. Crowley in Support of Chapter 11 Petitions and First Day Orders and the Affidavit of Glenn Pollack in Support of the Debtors' Motion for Interim and Final Orders Regarding Cash Collateral, DIP Financing, Granting Liens and Related Matters. In further support of this Motion, the Debtors respectfully represent as follows:

# Introduction

## *Debtors' Current Business Operations*

1.    PTC Alliance Corp. ("<u>PTC</u>") and its subsidiaries (collectively, the "<u>Company</u>") are leading manufacturers and marketers of welded and cold drawn mechanical steel tubing and tubular shapes, chrome-plated bar products, fabricated parts, and precision components.  PTC was formed in 2000 by the merger of Pittsburgh Tube Company and J.H. Roberts Industries, Inc.  Today, the PTC family of companies is comprised of Alliance Tubular Products Company ("<u>Alliance</u>"), PTC Tubular Products, LLC, Enduro Industries, Inc., and PT/VW Corporation ("<u>PTVW</u>"), a wholly-owned subsidiary of PTC (the "<u>Direct Subsidiaries</u>"); PACD Acquisition LLC, and Mid-West Manufacturing Company, each a wholly-owned subsidiary of Alliance and an indirect subsidiary of PTC (the "<u>Indirect Subsidiaries</u>" and together with the Direct Subsidiaries, the "<u>Domestic Subsidiaries</u>"); and Wiederholt GmbH, PTC Alliance Precision Products (Asia) Private Limited, and PTC Alliance (UK) Limited (the "<u>Foreign Subsidiaries</u>" and, together with the Domestic Subsidiaries, the "<u>Subsidiaries</u>").  PTC and its Domestic Subsidiaries are collectively referred to herein as the "<u>Debtors</u>."  The Debtors have operations in the following seven states:  Pennsylvania, Ohio, Missouri, Illinois, Indiana, Kentucky, and West Virginia.

2.    The Company is one of the largest independent manufacturers of engineered DOM tubular steel products and chrome plated bar.  It is the only producer offering both products globally.  The Company further offers value added services ranging from cutting and machining, to fabricated parts and components.  Typical end uses for the Company's tubular products include hydraulic cylinders, tubes and rods for earth moving equipment, dump trucks, forklift trucks, mining equipment, agricultural machinery, and automobiles, among other things.

3. In North America, the Company primarily sells to three types of customers: (1) steel service centers (55% of sales); (2) original equipment manufacturers (30% of sales), and (3) tier 1, 2, and 3 automotive suppliers (15% of sales). The Company maintains a diverse customer base including a wide variety of "blue chip" companies. Major customers include Caterpillar, John Deere, Daimler, Chrysler, Volkswagen, NACCO, Hendrickson, BMW, Volvo, Delphi, JCB, Marmon/Keystone, Earle M. Jorgensen, and Ryerson. Many of these customer relationships span multiple decades.

4. The Debtors' net sales for year ending December 31, 2008 were $378.6 million and EBITDA of $57.4 million. As of December 31, 2008, the Debtors' books and records reflected assets totaling approximately $274.0 million, and liabilities totaling approximately $293.5 million. For the eight months ended August 31, 2009, the Debtors' net sales were $90.3 million with an EBITDA loss of ($24.8) million.

5. As of December 31, 2008, the Debtors had 849 active employees in North America. As of the Petition Date, the Debtors had 579 active employees in North America. Specifically, the Debtors employed 579 individuals in seven states, of which 577 were full-time employees and 2 were part-time employees. As of the Petition Date, the Debtors had 275 employees who were represented by unions.[1]

*Prepetition Capital Structure*

6. As of the Petition Date, the Debtors' total consolidated funded debt obligations were approximately $180,868,883.29 and consisted of, among other things, revolving credit, term loans, and secured notes payable to Black Diamond Commercial Finance, L.L.C.

---

[1] The Debtors' union employees are represented by the United Steelworkers, Teamsters, and the Metal Fabricators.

("BDCF"), The CIT Group Business Credit, Inc., The Bank of New York ("BONY"), BDC Finance, L.L.C., BDCM Opportunity Fund, L.P., and Black Diamond International Funding Ltd., (collectively, the "Prepetition Secured Parties"). The major components of the Debtors' consolidated funded debt obligations are described in greater detail below.

    a.    **Black Diamond Credit Facility.** On July 25, 2006, PTC and each of the Domestic Subsidiaries party thereto, the institutions from time to time party thereto as lenders, and BDCF, as administrative agent (the "Administrative Agent") for the lenders (the "Prepetition ABL Lenders"), entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition ABL Credit Agreement,"), providing for a credit facility in the aggregate principal amount not to exceed $70,000,000, which credit facility consists of (i) a revolving credit facility in an aggregate principal amount not to exceed $40,000,000, including a letter of credit subfacility of $5,000,000, and (ii) a term loan facility in an aggregate principal amount not to exceed $30,000,000. The Prepetition ABL Credit Agreement is secured by a lien on substantially all of the assets of the Debtors (as defined in the Prepetition ABL Credit Agreement). As of the Petition Date, outstanding principal obligations (including outstanding letters of credit) under the Prepetition ABL Credit Agreement were approximately $41, 279,000.

    b.    **Term Loan (A) Agreement.** On July 25, 2006, PTC, each of the Domestic Subsidiaries party thereto, the institutions from time to time party thereto as lenders, and BONY, as administrative agent for the lenders (the "Prepetition Term Loan (A) Lenders") entered into that certain Term Loan (A) Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan (A) Agreement"), providing for new term loan promissory notes in the original principal amount of $76,524,688.82 governed by the

terms and conditions set forth in the Prepetition Term Loan (A) Agreement. The Prepetition Term Loan (A) Agreement is secured by a lien on substantially all of the assets of the Debtors (as defined in the Prepetition ABL Credit Agreement). As of the Petition Date, outstanding principal obligations under the Prepetition Term Loan (A) Agreement were approximately $76,524,688.82.

        c.     <u>Term Loan (B) Agreement</u>. On July 25, 2006, PTC, each of the domestic subsidiaries of PTC party thereto, the institutions from time to time party thereto as lenders, and BONY, as administrative agent for the lenders (the "<u>Prepetition Term Loan (B) Lenders</u>") entered into that certain Term Loan (B) Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Term Loan (B) Agreement</u>"), providing for new term loan promissory notes in the original principal amount of $46,112,163.30 governed by the terms and conditions set forth in the Prepetition Term Loan (B) Agreement. The Prepetition Term Loan (B) Agreement is secured by a lien on substantially all of the assets of the Debtors (as defined in the Prepetition ABL Credit Agreement). As of the Petition Date, outstanding principal obligations under the Prepetition Term Loan (B) Agreement were approximately $63,065,194.47.

        7.     Three shareholders own 100% of the stock of PTC. The equity in PTC is owned as follows: BD PAC Holdings LLC, which is wholly owned by BDCM Opportunity Fund L.P. (66.096%); BD PAC Holdings 2 LLC, which is wholly owned by BDC Finance LLC (31.247%); and Peter Whiting (2.656%).

***The 2006 Bankruptcy Case***

        8.     On May 10, 2006, PTC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>2006 Case</u>"). The 2006 Case was necessary in order to restructure the

Company's balance sheet. At the time, PTC had four outstanding classes of preferred stock, and two classes of common stock. Prior to the filing of the 2006 Case, PTC reached a consensual agreement with its primary secured lender, BDCF, to restructure the balance sheet and simplify PTC's equity structure. Unsecured creditors were either paid in full or their claims were reinstated during the 2006 Case. PTC's employees and the collective bargaining agreements with the unions were not effected. The pre-negotiated chapter 11 plan in the 2006 Case was accepted by 100% of the classes entitled to vote on it, and was confirmed by the Bankruptcy Court on July 14, 2006.

*Events Leading to Chapter 11 Filing*

9. The goals of the 2006 Case were realized and the reorganized business emerged from bankruptcy. In the two years following the 2006 Case, the Debtors grew their business from an EBITDA of $41.7 million at the end of 2006, to $44.1 million in 2007 and up to $57.4 million in 2008. Unfortunately, the global recession's effects on the automotive, manufacturing, mechanical, and construction industries, the core of the Company's customer base, took its toll on the Debtors' business. As a direct consequence of the global recession, beginning in the fourth quarter of 2008 the Debtors' revenue fell dramatically. Net sales fell from an all time high of $378.6 million in 2008 to a projected $135.5 million in 2009. Further, the Debtors were saddled with surplus inventory.

10. In an effort to address the economic challenges it faced, the Company took significant actions to reduce expenses and increase profitability. For example, it closed or idled its plants in Hopkinsville, Kentucky, Jane Lew, West Virginia, and East Chicago, Illinois. The Debtors reduced their employee head count from 849 to 579 between December 31, 2008 and August 31, 2009. In addition to reduction in its labor force, the Debtors also reduced

management positions throughout the enterprise. As a result of workforce reductions, the Debtors realized significant savings.

11.     In addition to workforce reductions, the Debtors undertook a comprehensive program to reduce costs across their organizations. Through salary reductions (affecting the Debtors' laborers and its management workers), and reductions in gainsharing, bonuses, fringe benefits, and overtime pay, the Debtors reduced their costs by more than $14.5 million in 2009. By making difficult decisions, realizing and capitalizing on efficiencies, halting capital expenditures, and undertaking a thorough review of their costs, the Debtors were able to achieve a total savings of nearly $35 million in 2009.

12.     Notwithstanding the Debtors' cost savings efforts, they have been unable to overcome the impact of the severely decreased revenues. Moreover, many of the Debtors' obligations could not be reduced and remained unchanged or increased. Specifically, as of the Petition Date, the Debtors are burdened with approximately $61.0 million in pension liabilities, of which approximately $25.0 million is currently underfunded. The Debtors also have $40.0 million of OPEB (unfunded post-retirement medical benefits) liabilities. Approximately $4.2 million and $5.5 million of pension funding requirements are scheduled for fiscal years 2010 and 2011, respectively. This compares to no funding requirement in fiscal year 2008 and $1.5 million in 2009.

13.     The Debtors have also defaulted on certain covenants under the Prepetition ABL Credit Agreement, further compounding the Debtors' financial difficulties. Despite extensive discussions with the Debtors' lenders, the Debtors were unable to achieve any long-term relief under its loan obligations. Accordingly, the Debtors, with the assistance of Candlewood Partners, LLC ("Candlewood") began exploring all available options to save the enterprise,

including a sale of the company. To date, the Debtors have not found any buyer that would be willing to pay a sufficient amount for the enterprise to pay all of the Debtors' obligations.

14.     Relief under chapter 11 is necessary because the Debtors have defaulted on their secured debt covenants. Accordingly, the Debtors soon will lose the ability to use the Cash Collateral (defined below) to pay their creditors and employees. As of August 31, 2009, the Debtors' liabilities exceeded their assets by approximately $64.7 million. The Debtors have carefully considered all of their options. However, based upon the Debtors' lack of liquidity and the substantial debt that encumbers the Debtors, in order to maintain sufficient liquidity to continue their operations, the Debtors had no viable option other than seeking relief under chapter 11 of the Bankruptcy Code.

### DIP Financing Efforts

15.     Prepetition, the Debtors retained Candlewood to serve as their financial advisor in connection with the Debtors' exploration of strategic restructuring alternatives, including, but not limited to, obtaining debtor-in-possession financing and exploring a sale of substantially all of the Debtors' assets.

16.     The current condition of the steel industry and the declining and tightened credit markets limited the Debtors' postpetition financing alternatives. Despite the current market conditions, the Debtors, acting through Candlewood, solicited over 21 potential postpetiton lenders (the "Prospective Lenders"), approximately eight of which responded with materials or inquiries. After conducting preliminary due diligence, only one of the Prospective Lenders, besides BDCF, submitted a proposal to the Debtors. BDCF required priming liens. The other Prospective Lender that submitted a proposal required "consensual priming liens." The Debtors

could not assure consensual priming liens, accordingly, the other Prospective Lender declined to pursue the opportunity."

17.    In consultation with Candlewood and after negotiations with their Prepetition Secured Parties, the Debtors have concluded that, given the state of the steel industry, tightened credit market, the Company's performance, and the Debtors' need for cash to finance business operations, the proposed postpetition financing offers the most advantageous terms to the Debtors' estates.

18.    The Debtors' efforts have resulted in the proposed $15 million revolving credit facility. The proposed financing is essential to the continuance of the Debtors' operations during these chapter 11 cases. The proposed financing meets requirements of section 364(d) of the Bankruptcy Code, because, as discussed more fully below, (i) the Debtors were unable to obtain the necessary credit on more favorable terms elsewhere; (ii) the Debtors exercised sound business judgment in entering into the proposed financing; and (iii) the interests of primed lienholders are adequately protected.

19.    A failure to immediately use cash collateral and access funds under the $15 million revolving credit facility will likely result in disruption of the Debtors' operations, employee dislocation, and a loss in essential customers and suppliers. Further, access to the proceeds of the proposed postpetition credit facility and cash collateral is necessary in order to insure the Debtors have sufficient working capital and liquidity and can preserve and maintain the going concern value of the Debtors. Accordingly, the Debtors request interim approval to use of cash collateral and draw up to $5 million of the proposed financing to avoid immediate and irreparable harm.

## Jurisdiction

20. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409

21. The statutory predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

22. On October 1, 2009 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

23. The Debtors continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

24. Contemporaneous with the filing hereof, the Debtors have requested joint administration of the Debtors' bankruptcy cases. No trustee or examiner has been appointed in any of these chapter 11 cases.

## Relief Requested

25. By this Motion, the Debtors seek, among other things:

(a) Authorization for the Debtors to obtain postpetition financing pursuant to that certain Super-Priority Debtor-In-Possession Credit Agreement (the "DIP Facility, or "DIP Financing") together with any related documents or agreements, the "DIP Documents")

substantially in the form of the agreement attached hereto as "Exhibit A," up to the aggregate principal amount of $15 million (the actual available principal amount at any time being subject to the conditions and restrictions set forth in the DIP Documents) from BDCF and/or affiliates or designees thereof (collectively, the "DIP Lenders"), acting through BDCF, as administrative agent (in such capacity, the "the "DIP Agent"),[2] and all borrowing and reimbursement and other obligations of the Debtors under the DIP Facility and the guarantees thereof, shall at all times entitle the DIP Lenders to the following:

(i)     pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed administrative expense claim having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code;

(ii)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien upon all unencumbered property of each Debtor that is not subject to valid, perfected and non-avoidable liens as of the Petition Date (other than on collateral of PT/VW that is located in Germany and any Capital Stock of Wiederholt GmbH or any Foreign Subsidiary);

(iii)     pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior lien upon all property of each Debtor that is subject to valid, perfected and non-avoidable liens in existence on the Petition Date (other than liens that secure the Prepetition Secured Obligations, as defined in ¶ 34 below) or to valid liens in existence on the Petition Date and perfected thereafter as permitted by section 546(b) of the Bankruptcy Code (other than with respect to the liens described in clause (iv) below);

---

[2] Capitalized terms not defined herein shall have the meanings ascribed thereto in the DIP Credit Agreement.

(iv)    pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien (a "Priming Lien"), upon (x) all present and after-acquired property of the Debtors that is subject to a lien on or after the Petition Date on the Debtors' Current Assets[3], other than liens on Second Priority Agreement Primary Collateral (as defined in that certain Intercreditor Agreement, dated as of July 25, 2006, among the Administrative Agent under the Prepetition ABL Credit Agreement and BONY, as administrative agent under the Prepetition Term Loan (A) Agreement and Prepetition Term Loan (B) Agreement and the Debtors, as in effect on the Petition Date) and (y) present and after-acquired assets that are presently subject to liens that are junior to the liens that secure the Prepetition Secured Obligations (as defined in ¶ 34 below), which Priming Lien shall also prime any liens after the Petition Date to provide adequate protection in respect of any liens to which the Priming Lien is senior (the "Primed Liens"); subject only to (x) in the event of the occurrence and during the continuance of a Default (the occurrence of an Event of Default as defined below) or an Unmatured Default (an event which, but for the lapse of time or the giving of notice, or both, would constitute a Default), the payment of allowed and unpaid professional fees and disbursements incurred after the occurrence of such Default or Unmatured Default by the Debtors and any statutory committee in an aggregate amount not in excess of $250,000 (without application of any retainers held by such professionals) (y) payment of allowed and unpaid professional fees and disbursements of the Debtors' and any statutory committee's professionals (not to exceed the amounts provided therefore in the Approved Budget through the date of such

---

[3]  For purposes of this Order, all of the following shall constitute "Current Assets" of the Debtors: receivables, inventory, Documents (as defined in the Uniform Commercial Code) evidencing inventory, Deposit Accounts (as defined in the Uniform Commercial Code), cash, Supporting Obligations (as defined in the Uniform Commercial Code) in respect of any of the foregoing property, and all proceeds of any of the foregoing; all other assets and properties of any kind whatsoever of the Debtors shall constitute "Fixed Assets".

Default or Unmatured Default) incurred prior to such Default or Unmatured Default which have not yet been paid shall be permitted (without application of any retainers held by such professionals) as the same may be due and payable and (z) the payment of allowed and unpaid fees and disbursements of the Debtors pursuant to 28 U.S.C. § 1930 and to the Clerk of the Bankruptcy Court ((x), (y), and (z)collectively, the "Carve-Out"), provided that, other than as expressly provided in the Interim Order (defined below), no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any investigation, motion, action, claim or litigation against or any challenge to the amount, extent, or enforcement of the indebtedness of any Debtor owing to the DIP Agent, the Administrative Agent, any DIP Lender, any Prepetition Secured Party or BONY, as administrative agent under the Prepetition Term Loan (A) Agreement and Prepetition Term Loan (B) Agreement or to the priority, validity, or perfection of any collateral securing any such indebtedness. Moreover, so long as no Default or Unmatured Default shall have occurred, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, and payment of allowed and unpaid professional fees and disbursements incurred prior to such Default or Unmatured Default by the Debtors and any statutory creditors committee which has not yet been paid shall be permitted (without application of any retainers held by such professionals), as the same may be due and payable, and the same shall not reduce the Carve-Out;

(b)     authorization for the Debtor to use the cash, cash equivalents, and other amounts held in the Debtors' deposit and other accounts, to the extent subject to valid and perfected liens held by the Prepetition Secured Parties, subject to the security interests of such parties in accordance with section 552(b) of the Bankruptcy Code (collectively, the "Cash Collateral")

pursuant to sections 361, 362, and 363 of the Bankruptcy Code, and other collateral in which the Prepetition Secured Parties have an interest (together with the Cash Collateral, the "Prepetition Collateral") and provide adequate protection with respect to any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral resulting from the use of the Cash Collateral and the use, sale, or lease of the Prepetition Collateral (other than the Cash Collateral) or imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

(c)     pursuant to Bankruptcy Rule 4001 and Local Rule 9103-2, the emergency scheduling of an interim hearing (the "Interim Hearing") on this Motion for this Court to consider entry of an interim order in substantially the same form as that which is annexed to this Motion as "Exhibit B" (the "Interim Order"), among other things, (i) authorizing the Debtors, on an interim basis, to forthwith borrow up to the aggregate amount of $5 million or such amount that the DIP Lenders and the Debtors believe is necessary to adequately fund the operations until a final hearing, based on a cash forecast to be presented at the Interim Hearing, from the DIP Lenders under the DIP Facility, (ii) authorizing the use by the Debtors of Cash Collateral, and (iii) granting the adequate protection hereinafter described;

(d)     pursuant to Bankruptcy Rule 4001, the scheduling of a final hearing (the "Final Hearing") to occur as soon as possible after the entry of the Interim Order, for this Court to consider entry of a final order (the "Final Order") authorizing the balance of the DIP Facility on a final basis, as set forth in this Motion and the DIP Facility; and

(e)     certain related relief.

## The Proposed DIP Financing

*Implementation*

26.    Prepetition, the Debtors, the DIP Agent and the DIP Lenders engaged in extensive, arm's-length negotiations with respect to the terms and conditions of the proposed DIP Financing.  Upon entry of the Interim Order, the Debtors may draw immediately on a $5 million commitment from the DIP Lenders, pending the Court's entry of the Final Order.  This commitment and use of the Cash Collateral should allow the Debtors to meet all of their operational and administrative costs and expenses during the initial stage of these chapter 11 cases.

27.    The Debtors have provided a budget ("DIP Budget,") as amended and modified from time to time) to the DIP Agent, setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a monthly basis through and including December 25, 2009.  The DIP Budget will be annexed to the Interim Order and Final Orders and DIP Facility.  The Debtors will also deliver to the DIP Agent certain reports and forecasts, including a 13-week cash flow forecast detailing weekly receipts and disbursements, together with a variance report against the forecast.

28.    The DIP Agent and the DIP Lenders have requested that the Debtors pay certain fees to the DIP Agent pursuant to the letter agreement (the "Fee Letter") among the Administrative Agent and the Debtors and the contents thereof shall be treated as confidential information pursuant to Bankruptcy Rule 9018.  The Debtors shall provide a copy of the Fee Letter to the Court, any statutory committee appointed in these chapter 11 cases and the U.S. Trustee, but shall not file the Fee Letter with the Court.  The Debtors request that the parties

receiving a copy of the Fee Letter not disclose any of its contents to third parties, including, without limitation, in pleadings filed with the Court.

***Highlighted Provisions of DIP Financing***[4]

29.     Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, below are the essential terms of the DIP Facility and/or Interim Order.[5]  The Debtors submit that these terms are customary and reasonable for financing of this type.

| | |
|---|---|
| **Borrowers:** | PTC Alliance Corp., a Delaware corporation (together with its successors and permitted assigns,, PTC Tubular Products LLC, a Delaware limited liability company Mid-West Mfg. Co., a Delaware corporation, Alliance Tubular Products Co., a Delaware corporation, Enduro Industries, Inc., a Delaware corporation and PT/VW Corporation, a Pennsylvania corporation, and PACD Acquisition LLC, a Delaware limited liability company. |
| **Guarantors:** | None |
| **Administrative Agent:** | Black Diamond Commercial Finance, L.L.C. |
| **DIP Lenders:** | A syndicate of lenders listed on the signature pages of the DIP Facility and their respective successors and assigns. |
| **Commitment:** | Under the proposed DIP Facility, the DIP Lenders will provide a revolving debtor-in-possession credit facility to the Debtors, jointly and severally, in an aggregate principal amount not to exceed $15,000,000.  Upon approval of the Interim Order, $5 million of the facility will be available to the Debtors.  (Interim Order at ¶ 6(a); DIP Facility at 23) |
| **Termination Date:** | The earliest to occur of (i) thirty (30) days after the entry of the Interim Order by the Bankruptcy Court if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such thirty (30) day period, (ii) the Maturity |

---

[4]  Capitalized terms used in the following summary but not otherwise defined shall have the meanings ascribed to them in the DIP Facility.

[5]  To the extent the following summaries and descriptions in this Motion conflict with the express provisions of the DIP Facility and Interim Order, as applicable, the express provisions of the DIP Facility and Interim Order shall control.

Date (100 days after the Petition Date) (iii) the Sale Date or (iv) the acceleration of the loans under the DIP Facility and the termination of the revolving loan commitment in accordance with the terms of the DIP Facility. (DIP Facility at 35)

**Use of DIP Financing:** The borrowings under the DIP Facility will be used (i) to fund the sale of substantially all the assets of the Debtors under section 363 of the Bankruptcy Code (the "Sale"), (ii) to pay related fees and expenses associated with negotiation, execution, and delivery of the DIP Facility and the other DIP Documents, (iii) to pay the fees and expenses of the Debtors' professionals and any statutory creditors' committee, if any, including but not limited to the Carve-Out, and (iv) for working capital and other general corporate purposes, including authorized payments pursuant to orders of the Bankruptcy Court. (Interim Order at ¶¶ 5(b), 6(a); DIP Facility at 2)

**Entities with Interest in Cash Collateral:** Administrative Agent on behalf of the Prepetition ABL Lenders and BONY, as administrative agent on behalf of the Prepetition Term Loan (A) Lenders and Prepetition Term Loan (B) Lenders.

**Cash Collateral:** The Debtors shall not be permitted to request an advance under the DIP Facility unless (i) the Bankruptcy Court shall have entered the Interim Order and (ii) the Debtors shall at that time have the use of all Cash Collateral subject to the Interim and Final Orders.

**Interim Financing:** $5 million. (Interim Order at ¶ 6(a))

**Amoritization:** None.

**Interest Rates:** All loans under the DIP Facility, or portion thereof, which bear interest at the Alternate Base Rate plus the Applicable Margin (the "ABR Loans") and all DIP Obligations (defined below) shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin. Interest on DIP Obligations with respect to expenses and the like will be assessed only after the Borrower Representative shall have had a reasonable amount of time to review invoices in connection therewith and only with respect to such amounts which are not being reasonably disputed. Changes in the rate of interest on any ABR Advance will take effect

simultaneously with each change in the Alternate Base Rate.

Each LIBOR Advance shall bear interest at a rate per annum equal to the Adjusted LIBOR Rate applicable to such LIBOR Advance plus the Applicable Margin.

In the event, and on each occasion, that on the day two (2) Business Days prior to the commencement of any Interest Period for a LIBOR Loan, the DIP Agent shall have determined (which determination shall be conclusive and binding upon the Borrowers absent manifest error) that reasonable means do not exist for ascertaining the applicable Adjusted LIBOR Rate, the DIP Agent shall, as soon as practicable thereafter, give written, facsimile or telegraphic notice of such determination to the Borrower Representative and the DIP Lenders, and any request by the Borrower Representative for an Advance of LIBOR Loans (including pursuant to a refinancing with LIBOR Loans) pursuant to Section 2.5 or 2.8 of the DIP Facility shall be deemed a request for an Advance of ABR Loans. After such notice shall have been given and until the circumstances giving rise to such notice no longer exist, each request for an Advance of LIBOR Loans shall be deemed to be a request for an Advance of ABR Loans. (DIP Facility at §§ 2.7, 2.9.)

**Default Rate:** After the occurrence and during the continuance of a Default, the applicable interest rate(s) shall be increased by two percent (2.0%) per annum above the rates otherwise applicable thereto. (DIP Facility at § 2.10)

**Fees:** (i) The Debtors agree to pay to the DIP Agent, for the account of the DIP Lenders in accordance with their Pro Rata Shares, from and after the Closing Date until the date on which the Aggregate Revolving Loan Commitment shall be terminated in whole, a commitment fee accruing at the rate of the then Applicable Commitment Fee Percentage, on the amount by which the Aggregate Revolving Loan Commitment in effect from time to time exceeds the Revolving Credit Obligations in effect from time to time. All such commitment fees payable (i) shall be payable monthly in arrears on the last Business Day of each calendar month, and, in addition, on the date on which the Aggregate Revolving Loan Commitment shall be terminated in whole. (DIP Facility at 2.13(c)(i))

(ii)    The Debtors agree to pay to the DIP Agent for the sole account of the DIP Agent the fees set forth in the Fee Letter. (DIP Facility at 2.13(c)(ii))

(iii)    The Debtors agree to pay to the DIP Agent, for the account of the DIP Lenders in accordance with their Pro Rata Shares, upon the permanent reduction, in whole or in part, of the Aggregate Revolving Loan Commitment pursuant to Section 2.3(A)(ii) of the DIP Facility, an amount equal to 5.0% of the amount of any such permanent reduction (the "Reduction Fee"). (DIP Facility at 2.13(c)(iii))

All fees payable hereunder shall be fully earned on the date such payment is due and shall be non-refundable.

**Budget:**

To set forth monthly disbursements and receipts through annexed to the Interim Order and DIP Facility.

**Milestones:**

The Debtors shall use commercially reasonable efforts to:

(i)   on or before fourteen (14) days after the Petition Date, btain entry of the Bid Procedures Order by the Bankruptcy Court, which order shall authorize (1) credit bids and (2) the solicitation of bids for the Sale of the Debtors collectively;

(ii)   on or before seven (7) days after the Bid Deadline, conduct the Auction; and

(iii)   on or before sixty (60) days after the entry of the Bid Procedures Order by the Bankruptcy Court, obtain entry of the Sale Order by the Bankruptcy Court;

(iv)   on or before thirteen (13) days after entry of the Sale Order by the Bankruptcy Court, close the sale (the "Sale Date"), unless the Debtors are seeking approval from the Bankruptcy Court pursuant to Section 8.2(g) of the Stalking Horse Purchase Agreement to reject the "Collective Bargaining Agreements" listed on Schedule 5.9(a)(i) to the Stalking Horse Purchase Agreement, in which case the Sale shall be consummated as promptly as praticable after the Sale Date; and

(v)   the Sale shall have occurred within one hundred (100)

days after the Petition Date.

(DIP Facility at §5.2(G) and (H); 7.2(T) )

**Other Covenants:**

Financial reporting requirements, compliance with the Budget, covenants regarding sales of assets and other obligations specified in Article VII of the DIP Facility.

**Liens and Priorities:**

Obligations under the DIP Facility shall be senior to any Prepetition Secured Obligations. The borrowings under the DIP Facility shall be afforded certain liens and claims, including superpriority claims and priming liens, on property of the estate, as described in more detail below and in section 2.19 of the DIP Facility. (Interim Order at ¶ 8; DIP Facility at § 2.19)

**Carve-Out:**

The payment of allowed and unpaid professional fees and disbursements incurred after the occurrence of a Default or Unmatured Default by the Debtors and any statutory committee in an aggregate amount not in excess of $250,000 (without application of any retainers held by such professionals) and the payment of unpaid fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Bankruptcy Court (x) and (y). (Interim Order at ¶ 7(b); DIP Facility at § 2.19(A))

**Waiver of Rights:**

Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any obligations under the DIP Facility shall be outstanding, each Debtor irrevocably waives any right, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any lien of equal or greater priority than the liens securing all obligations arising under the DIP Facility and DIP Documents (the "<u>DIP Obligations</u>"), or to approve a claim of equal or greater priority than the DIP Obligations, except as expressly permitted under the Orders. (DIP Facility at § 2.22)

The Debtors waive any claims under section 506(c) of the Bankruptcy Code. (Interim Order at ¶¶ 7(a), 28)

**Adequate Protection to Prepetition Lenders:**

As adequate protection for the use of the Prepetition Secured Parties' Cash Collateral and for the security interests that are being primed as set forth in Section 2.19(A) of the DIP Facility and the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Prepetition Secured Parties shall, pursuant to the Interim and Final Orders, receive to the extent of any diminution (if any) in the value of the Prepetition Collateral, the junior superpriority

administrative expense claims and replacement liens provided for in the Interim and Final Orders. (Interim Order at ¶ 14, DIP Facility at § 2.19(C))

**Events of Default:**      The DIP Facility specifies events of default as described more fully below in ¶ 30. (DIP Facility at § 8.1)

**Waiver or Modification of Automatic Stay:**      The automatic stay is modified solely to permit each Debtor to perform its obligations under the DIP Facility and other DIP Documents and the DIP Lenders and the DIP Agent to exercise their rights and remedies in accordance with Article IX of the DIP Facility.

**Indemnification:**      As described below, the Debtors agree to certain indemnities and reimbursement of fees and expenses to the DIP Agent and the DIP Lenders.

**Conditions of Borrowing:**      As described fully in Article V of the DIP Facility, the parties have agreed to customary borrowing conditions including, but not limited to, (i) execution of necessary DIP documents, (ii) compliance with the Interim Order and other orders of the Court; and (iii) evidence of required consents and approvals. (Interim Order at ¶ 6; DIP Facility at Art. V)

*Events of Default under DIP Facility*

30. The DIP Facility contains customary events of default (each an "Event of Default"), which are typical to agreements of this type. The Events of Default include, but are not limited to, the following:[6]

     a. Failure of the Debtors to make payments, including interest payments, when due;

     b. Any of the Debtors fail duly and punctually to perform or observe any agreement, covenant or obligation binding on the Debtors under the applicable provisions of the DIP Facility;

     c. Any material false or misleading representation or warranty made or deemed made by any of the Debtors;

     d. Any of the Debtors shall default in the performance of or compliance with any term contained in the DIP Facility (other than as covered by paragraphs (a),

---

[6] Capitalized terms used in the following summary of Events of Default but not otherwise defined shall have the meanings ascribed to them in the DIP Facility.

(b) or (c) of Section 8.1 of the DIP Facility), or any of the Debtors shall default in the performance of or compliance with any term contained in any of the other DIP Documents or any of the Orders, and such default shall continue for fifteen (15) days after the earlier of (i) notice from the DIP Agent or any DIP Lender or (ii) the date on which any member of the Management Group first had actual knowledge thereof or should have had knowledge thereof.

e.      Any Debtor shall fail to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) with respect to any indebtedness (other than the DIP Obligations or the Prepetition Secured Obligations) the aggregate outstanding principal amount of which indebtedness is in excess of $1,000,000; or any breach, default or event of default shall occur, or any other condition shall exist under any instrument, agreement or indenture pertaining to any such indebtedness, if the effect thereof is to cause an acceleration, mandatory redemption, a requirement that a Debtor offer to purchase such indebtedness or other required repurchase of such indebtedness, or permit the holder(s) of such indebtedness to accelerate the maturity of any such indebtedness or require a redemption or other repurchase of such indebtedness; or any such indebtedness shall be otherwise declared to be due and payable (by acceleration or otherwise) or required to be prepaid, redeemed or otherwise repurchased by any Debtor (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof.

f.      Dismissal or conversion of the chapter 11 cases, entry of an order appointing a trustee or responsible officer or an examiner with enlarged powers (which is not reversed or vacated within 30 days after entry thereof); any of the Debtor's board of directors, managers, or sole member, as the case may be, shall authorize a liquidation of its business.

g.      An application shall be filed by any Debtor for the approval of any other super-priority claim (other than the Carve-Out) in the chapter 11 cases which is pari passu with or senior to the claims of the DIP Agent and the DIP Lenders against such Debtor hereunder, or there shall arise or be granted any such pari passu or senior super-priority claim.

h.      Entry of an order by the Court granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor which have a value in excess of $500,000 in the aggregate.

i.      An order of the Bankruptcy Court shall be entered reversing, staying, vacating or (without the written consent of the DIP Agent) otherwise amending, supplementing or modifying any of the Orders or terminating the use of Cash Collateral by the Debtors.

j.      An order of the Bankruptcy Court shall be entered allowing any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against the DIP Agent, any DIP Lender or any of the Collateral.

k.      Any Debtor shall file a motion (which is not withdrawn within 3 Business Days) seeking, or the Bankruptcy Court shall enter, an order approving payment of any prepetition claim other than as provided for in a First Day Order or an Order as otherwise consented to by the DIP Agent.

l.       Any plan of reorganization in the cases that the DIP Agent or the Required Lenders (defined in the DIP Facility) rejects, is confirmed by the Bankruptcy Court; or a plan of reorganization is filed by any party-in-interest or a motion for the sale of substantially all the assets of any Debtor which does not contemplate indefeasible payment in full in cash of the DIP Obligations on the effective date of any such plan of reorganization or upon the closing of such sale.

m.       Any Debtor or any of their subsidiaries shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtors or any of their subsidiaries) any other person's opposition of any motion made in the Bankruptcy Court by the DIP Agent or the DIP Lenders seeking confirmation of the amount of the DIP Agent's or DIP Lenders' claim or the validity and enforceability of the DIP Liens in favor of the DIP Agent for the benefit of the Secured Parties (defined in the Security Agreement to the DIP Facility); or the Debtors or any of their subsidiaries shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtors or any of their subsidiaries) any other person's motion to, disallow in whole or in part the DIP Agent's or DIP Lenders' claim in respect of the DIP Obligations or to challenge the validity and enforceability of the liens in favor of the DIP Agent for the benefit of the Secured Parties.

n.       Without the consent of the Prepetition Secured Parties, the Cash Collateral shall be used in a manner inconsistent with the Interim and Final Orders; or an order of a court of competent jurisdiction authorizes the use of Cash Collateral without the written consent of DIP Agent; or an order of a court of competent jurisdiction shall be entered terminating any Debtor's use of the Cash Collateral.

o.       Any money judgment(s) (other than a money judgment covered by insurance as to which the insurance company has not disclaimed or reserved the right to disclaim coverage), writ or warrant of attachment, or similar process (in the case of the Debtors, as to any post-petition liability or any prepetition liability than is not subject to the stay in the chapter 11 cases) against any Debtor or any of its Material Foreign Subsidiaries or any of their respective assets involving in any single case or in the aggregate an amount in excess of $1,000,000 is or are entered and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days or in any event later than fifteen (15) days prior to the date of any proposed sale thereunder.

p.       Any order, judgment or decree shall be entered against any Debtor decreeing its involuntary dissolution or split up and such order shall remain undischarged and unstayed for a period in excess of sixty (60) days; or any Debtor shall otherwise dissolve or cease to exist except as specifically permitted by the DIP Facility.

q.       At any time, for any reason, (i) any provisions of any DIP Document that materially affects the ability of the DIP Agent, or any of the DIP Lenders to enforce the DIP Obligations or enforce their rights against the Collateral ceases to be in full force and effect or any Debtor seeks to repudiate its obligations thereunder and the liens intended to be created thereby are, or any Debtor seeks to render such liens, invalid or unperfected, or (ii) any DIP Lien on Collateral in favor of the DIP Agent contemplated by the DIP Documents or the Orders shall, at any time, for any reason, be invalidated or otherwise cease to be in full force

and effect, or such DIP Lien shall not have the priority contemplated by the DIP Facility or the DIP Documents or the Orders.

r.    Any Termination Event (as defined in the DIP Facility) occurs which could reasonably be expected to subject any Debtor or any Controlled Group member (as defined in the DIP Facility) to liability individually or in the aggregate in excess of $1,000,000.

s.    The plan administrator of any Plan applies under Section 412(c) of the Code for a waiver of the minimum funding standards of Section 412(a) of the Code and the substantial business hardship upon which the application for the waiver is based could reasonably be expected to subject either a Debtor or any Controlled Group member to liability individually or in the aggregate in excess of $500,000.

t.    A Change of Control shall occur.

u.    Any Debtor or any of its Subsidiaries, as defined in the DIP Facility (other than Wiederholt GmbH or the foreign subsidiaries), shall be the subject of any proceeding or investigation pertaining to (i) the Release by such Debtor or any such Subsidiary of any Contaminant (as defined in the DIP Facility) into the environment, (ii) the liability of the Debtor or any such Subsidiaries arising from the Release by any other Person of any Contaminant into the environment, or (iii) any violation of any Environmental, Health or Safety Requirements of Law by such Debtor or any such Subsidiaries, which, in any case, has subjected or is reasonably likely to subject such Debtor to liability individually or in the aggregate in excess of $1,000,000.

v.    The Final Order Entry Date shall not have occurred by the date that is thirty (30) days following the date of entry of the Interim Order (or such later date as the DIP Agent may agree in its sole discretion).

w.    Any Debtor shall fail to comply with any provision of the Interim Order or the Final Order.

x.    The Debtors shall fail to provide a Proposed Budget (as defined in the DIP Facility) that is acceptable to the DIP Agent, in its reasonable discretion, as contemplated by Section 7.1(A)(viii)(1) of the DIP Facility, within seven (7) days of the initial delivery to the DIP Agent of such Proposed Budget.

y.    The Bankruptcy Court shall approve a Sale that does not provide for sufficient funds to pay the DIP Obligations in full in cash on the date of the consummation of such Sale.

z.    Any of the Sale milestones contained in the DIP Facility shall fail to occur on or before the dates provided therein.

A Default shall be deemed "continuing" until cured or until waived in writing in accordance with Section 9.3 of the DIP Facility.

***Remedies under DIP Facility***

31.     At any time after the occurrence and during the continuance of a Default, and without further order of or application to the Bankruptcy Court, the DIP Agent may (i) terminate forthwith the revolving loan commitment; (ii) declare the outstanding balance under the DIP Facility then outstanding to be forthwith due and payable, whereupon the principal under the DIP Facility together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Debtors accrued and under any other DIP Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Debtors; (iii) set off amounts in any other accounts maintained with the DIP Agent and apply such amounts to the obligations of the Debtors under the DIP Facility and in the other DIP Documents; and (iv) exercise any and all remedies under the DIP Documents and under applicable law available to the DIP Agent and the DIP Lenders. Notwithstanding the foregoing, the Carve-Out must be paid in full prior to application of proceeds by any of the DIP Lenders in connection with exercising their rights of collection with respect to the Collateral.

***Indemnification under DIP Facility***

32.     The Debtors agree to defend, protect, indemnify, and hold harmless the DIP Agent and each and all of the DIP Lenders and each of their respective affiliates, and each of such DIP Agent's, DIP Lender's, or affiliate's respective officers, directors, employees, attorneys and agents (including, without limitation, those retained in connection with the satisfaction or attempted satisfaction of any of the conditions set forth in Article V of the DIP Facility) (collectively, the "Indemnitees") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses of any kind or nature

whatsoever (including, without limitation, the fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding, whether or not such Indemnitees shall be designated a party thereto), imposed on, incurred by, or asserted against such Indemnitees in any manner relating to or arising out of the DIP Facility or DIP Documents.

## Use of Cash Collateral and Proposed Adequate Protection

33.     To the extent that the Prepetition Secured Parties' interests in the Cash Collateral constitute valid and perfected security interests and liens as of the Petition Date, the Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Cash Collateral under the Prepetition ABL Credit Agreement, Prepetition Term Loan (A) Agreement, and Prepetition Term Loan (B) Agreement (collectively, the "Prepetition Credit Agreements") to the extent that there is a diminution in the value of such collateral from and after the Petition Date.  As adequate protection for any such diminution in value, Prepetition Secured Parties, shall be granted (i) a junior lien on all assets of the Debtors subject to liens granted in favor of the DIP Agent under the DIP Facility, (ii) a superpriority claim pursuant to section 507(b) of the Bankruptcy Code *provided, however* that the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Prepetition Credit Agreements unless and until the DIP Obligations have indefeasibly been paid in cash in full, (iii) payment of all accrued and unpaid interest; and (iv) in accordance with the terms of the Prepetition Credit Agreements, the current payment of reasonable fees and expenses accrued and incurred by the Prepetition Secured Parties (including reasonable fees and disbursements of the Administrative Agent's professionals).

## Basis for Expedited Relief

34.     As of the Petition Date, the Debtors were indebted and liable to the Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of approximately $181,623,816 million in respect of loans made by the Prepetition Secured Parties pursuant to, and in accordance with the terms of the Prepetition Credit Agreements, plus, in each case, interest thereon and other obligations incurred in connection therewith as provided in the Prepetition Credit Agreements (the "Prepetition Secured Obligations").  The Prepetition Secured Obligations constitute the legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).  The Debtors maintain that no portion of the Prepetition Secured Obligations is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.  The Debtors assert that they do not have any claims, counterclaims, causes of action, defenses, or setoff rights, whether arising under the Bankruptcy Code or otherwise, against the Prepetition Secured Parties and their affiliates, agents, officers, directors, employees, and attorneys with respect to the Prepetition Secured Obligations.

35.     The Debtors assert that the liens and security interests granted to the Prepetition Secured Parties pursuant to and in connection with the Prepetition Secured Obligations (including, without limitation, all security agreements, pledge agreements, deeds of trust, and other security documents executed by the Debtors in favor of the Prepetition Secured Parties) are (i) valid, binding, perfected, enforceable, liens and security interests in the property and of the priority described in the Prepetition Credit Agreements (collectively, the "Prepetition Secured Credit Documents"), (ii) not subject to avoidance, recharacterization, or subordination pursuant

to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) subject and subordinate only to (x) the liens granted to the DIP Lenders pursuant to the terms of the DIP Facility and DIP Documents (the "DIP Liens") and the liens granted to the Prepetition Secured Parties (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, financing statements or other agreements) as replacement security interests in and junior lien upon all the collateral (the "Adequate Protection Liens"), (y) the Carve Out and (z) valid, perfected and unavoidable liens permitted under the Prepetition Secured Credit Documents to the extent such permitted liens are senior to or pari passu with the liens of the Prepetition Secured Parties on the Prepetition Collateral (together with the liens granted to the Prepetition Secured Parties under the Prepetition Secured Credit Documents, the "Prepetition Liens").

36.     The Debtors have an immediate need to obtain the DIP Financing and use the Prepetition Collateral, including the Cash Collateral, in order to permit, among other things, the orderly continuation of the operation of its business, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs. The Debtors' use of the Prepetition Collateral in general, and access to the Cash Collateral specifically, is necessary in order to insure that the Debtors have sufficient working capital and liquidity and can preserve and maintain the going concern value of the Debtors.

37.     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Facility and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or unsecured credit with the enhanced priority afforded by section 364(c)(1) of the Bankruptcy

Code. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Lenders, subject to the Carve Out as provided for under the DIP Facility, the DIP Liens and the superpriority claims under the terms and conditions set forth in this Motion and in the DIP Facility.

38.     The Debtors believe that the terms of the DIP Facility and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

39.     The Debtors believe that the DIP Facility and use of Cash Collateral has been negotiated in good faith between and among the Debtors, the DIP Lenders, and the Prepetition Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facility, including without limitation, all loans made to the Debtors pursuant to the DIP Facility have been extended by the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

40.     The Debtors request entry of an Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent granting the relief sought by the Interim Order, the Debtors' estates will be immediately and irreparably harmed. The DIP Facility and use of Cash Collateral will provide the liquidity necessary to fund the operations of the Company, and avoid any negative operational impact of the chapter 11 filing. Therefore, consummation of the DIP

Facility and the use of Cash Collateral in accordance with this Motion and the DIP Facility is in the best interest of the Debtors' estates.

41.     The Debtors have determined that the DIP Facility and the use of the Cash Collateral are necessary for the Debtors to maintain sufficient liquidity so that the Debtors may continue to operate their business in chapter 11 and for the Debtors' successful reorganization. Without immediate access to additional financing, the Debtors will not be able to pay the ongoing costs of administering the estate, irreparably damaging the value of the Debtors and their prospects for a successful reorganization.    Further, access to additional financing will provide the Debtors' customers and vendors with the requisite security that the Company will be able to continue conducting its business in the ordinary course without interruption.

42.     Because the Prepetition Secured Parties have liens on substantially all of the Debtors' assets, the Debtors have concluded that the only viable source of postpetition financing is from the Prepetition Secured Parties.    The Debtors accordingly commenced vigorous, arms-length, and good faith negotiations with such lenders for postpetition financing. The Debtors, in their sound business judgment, determined that BDCF's proposal for the postpetition financing addressed the Debtors' working capital needs.    Accordingly, the Debtors ultimately decided to accept BDCF's proposal and agreed to enter into the DIP Facility.

## Applicable Authority for Obtaining DIP Financing

43.     Section 364(c) and (d) of the Bankruptcy Code provides:

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -

(1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2)     In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

44.     Debtors who exercise sound business judgment, within the confines of the policies underlying the Bankruptcy Code, in obtaining postpetition financing are afforded deference by Courts. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

45.     Bankruptcy 4001(c) governs the procedures for obtaining authorization to obtain DIP Financing and provides, in relevant part: The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. The Debtors seek entry of the Interim Order in order to avoid immediate and irreparable harm to the estate. Accordingly, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the Court is authorized to grant the relief requested herein.

## Applicable Authority to Use Cash Collateral
## and Prime Prepetition Lenders' Liens

46.     Pursuant to section 363(c)(2) of the Bankruptcy Code, the Debtors may not use the Cash Collateral without the consent of the Prepetition Secured Parties or authority granted by the Court. Section 363(e) of the Bankruptcy Code provides that, on request of an entity that has an interest in property to be used by a debtor, the Court shall prohibit or condition such use as necessary to provide adequate protection of such interest. Additionally, section 364(d) of the Bankruptcy Code requires that adequate protection be provided where, as here, the liens of secured creditors are being primed to secure the obligations under the DIP Financing.

47.     Under section 361 of the Bankruptcy Code, the Debtor may provide adequate protection by making a cash payment or periodic cash payments "to such entity, to the extent that. . . any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1). *See In re Carbone Cos., Inc.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from dimunition or decrease as a result of the proposed use of cash collateral.") (citing *In re Gasel Transp. Lines, Inc.*, 326 B.R. 683 (6th Cir. BAP 2005)). Adequate protection may also be provided by providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property. 11 U.S.C. § 361(2).

48.     As adequate protection for any diminution in the value of the Prepetition Collateral resulting from (i) the priming liens proposed to be granted pursuant to section 364(d) of the Bankruptcy Code; (ii) the use of the Cash Collateral pursuant to section 363(c) of the Bankruptcy Code; and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Debtors propose that the Prepetition Secured Parties should be granted,

subject to the Carve-Out, (A) a lien junior to the liens of the DIP Financing on all of the collateral securing the DIP Financing, (B) payment of current cash interest at the contractual non-default rate in respect of the Prepetition Secured Obligations, (C) payment of all fees and expenses of the agents and the lenders under the Prepetition ABL Credit Agreement, Prepetition Term Loan (A) Credit Agreement, and Prepetition Term Loan (B) Credit Agreement, and (D) the usual and customary claims, priorities and other protections provided to prepetition secured creditors in situations of this kind.

## The Requirements of Section 364 (c) of the Bankruptcy Code are Satisfied

49.     Pursuant to section 364(c) of the Bankruptcy Code, if a debtor is unable to obtain postpetition credit on an unsecured basis, a court may authorize the debtor to obtain postpetition credit or incur postpetition debt which entitles the postpetition lender to priming liens, a first-priority lien on unencumbered property of the debtor, and superpriority administrative expense status. 11 U.S.C. § 364(c)(1), (2), and (3). A debtor seeking postpetition financing must make reasonable efforts to seek credit on an unsecured basis, but the debtor is granted deference by the court if the court finds the debtor acted within its business judgment when seeking out alternative sources of financing. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085 (4th Cir. 1986). Moreover, a debtor is not required to exhaustively seek out every potential source of postpetition financing. *See id.; see also In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005); *In re Baxco Corp.*, 148 B.R. 855, 860 (Bankr. N.D. Ill. 1992).

50.     As discussed above, the current condition of the credit market impacted the Debtors' ability to obtain postpetition financing on more favorable terms. Moreover, after solicitation of prospective postpetition lenders, including solicitation of the Prepetition Secured

Parties, the Debtors determined that it was highly unlikely that the Debtors would obtain alternative financing on an unsecured basis that did not involve priming the existing Prepetition Secured Parties' security interests. Accordingly, the Debtors' efforts to obtain necessary postpetition financing satisfy the requirements of section 364(c) of the Bankruptcy Code.

### The Requirements of Section 364(d)(1) of the Bankruptcy Code are Satisfied

51.     Section 364(d) of the Bankruptcy Code allows postpetition financing that provides a postpetition lender a senior or equal lien on a debtor's encumbered property (a "priming" lien) if (i) the debtor could not obtain alternative financing and (ii) the interests of the secured parties whose security interests are being primed are adequately protected. *See* 11 U.S.C. § 364(d)(1).

52.     As discussed above, the Debtors unsuccessfully sought postpetition financing that did not require a priming lien. The DIP Lenders are unwilling to provide the DIP Financing without the Priming Liens. Accordingly, the first requirement of section 364(d)(1) is satisfied.

53.     Secondly, the Prepetition Secured Parties' security interests are adequately protected. Although the Bankruptcy Code does not define what constitutes adequate protection, section 361 of the Bankruptcy Code, lists three nonexclusive examples: to the extent of any decrease in value if an entity's interest in property resulting from the grant of a priming lien (i) a cash payment or periodic cash payments; (ii) an additional or replacement lien; or (iii) "granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." Whether the protection offered by a Debtor is adequate protection is determined on a case-by-case basis.

*See MNBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *Martin v. United States (In re Martin)*, 761 F.2d 472 (8th Cir. 1995). Further, the adequate protection requirement is designed to protect a lienholder from the diminution of the value of its interest due to use of priming. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

54.     The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Secured Parties' respective Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code. As adequate protection, the Prepetition Secured Parties will receive the following:

(a)     <u>Adequate Protection Liens</u>. The Prepetition Secured Parties will receive (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, financing statements or other agreements) a replacement security interest in and junior lien upon all the collateral (the "<u>Adequate Protection Liens</u>"), of the same type and category in which they had Prepetition Liens (such collateral, the "<u>Replacement Collateral</u>");

(b)     <u>Section 507(b) Claim</u>. Subject to the payment of the Carve Out, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Lenders; *provided*,

*however*, that the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code unless and until the DIP Obligations have indefeasibly been paid in cash in full;

(c)     Interest.  The Prepetition Secured Parties shall receive from the Debtors (i) immediate cash payment of all accrued and unpaid interest on the Prepetition Secured Obligations at the respective rates provided for in the Prepetition Secured Credit Documents, and all other accrued and unpaid fees and disbursements (including, but not limited to, agent's fees) owing to the Prepetition Secured Parties under the Prepetition Secured Credit Documents and incurred prior to the Petition Date and (ii) on the first business day of each month, all accrued but unpaid interest on the Prepetition Secured Obligations, at the non-default contract rate applicable on the Petition Date under the Prepetition Secured Credit Documents, *provided* that, without prejudice to the rights of any other party to contest such assertion, the Prepetition Secured Parties reserve their rights to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Prepetition Secured Credit Documents, and for the payment of any other amounts provided for in the Prepetition Secured Credit Documents;

(d)     Fees and Expenses.  The Prepetition Secured Parties shall receive from the Debtors current cash payments of all fees and expenses payable to the Prepetition Secured Parties under the Prepetition Secured Credit Documents and to any Prepetition Secured Party entitled to be paid under the Prepetition Secured Credit Documents, including, but not limited to, the reasonable fees and disbursements of counsel, financial and other consultants for the Prepetition Secured Parties.

55.     These protections are fair and reasonable and will protect the Prepetition Secured Parties from in diminution in value of the Prepetition Secured Parties' interests in the collateral.  Accordingly, the requirements for priming existing liens are duly satisfied.

**The DIP Financing is Necessary to Preserve the Value of the Debtors' Estates**

56.     Given the nature of the Debtors' business, customers', employees', vendors' and suppliers' confidence in the viability of the enterprise is key to the Debtors' ability to continue operations without interruption.  Therefore, having DIP Financing in place, will assure the Debtors' customers, employees, and trade creditors that the Debtors remain vital and have the working capital necessary to continue operations, including make payroll and make capital expenditures during these chapter 11 cases with the ultimate goal of preserving and maximizing the going concern value of the Debtors' business which will inure to the benefit of all creditor constituencies.

**The DIP Financing Should Be Authorized as Fair and
Reasonable and a Sound Exercise of the Debtors' Business Judgment**

57.     The terms and Conditions of the DIP Financing are fair and reasonable and were negotiated by the Debtors and DIP Lenders at arms-length and  in good faith.  Additionally, the Carve-Out for professional fees is reasonable and necessary to ensure any statutory committee and the Debtors' estates may retain the assistance of outside counsel.  *Ames Dep't Stores*, 115 B.R. at 38.

58.     Moreover, approval of the DIP Facility and the use of Cash Collateral will provide the Debtors with immediate and ongoing access to funds to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs.  Unless these expenditures are made, the Debtors will be forced to cease operations, which would (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii)

jeopardize the Debtors' ability to reorganize and maximize value. Because the Debtors' available and projected Cash Collateral is insufficient to fund such expenditures, the credit provided under the DIP Facility is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders. Additionally, the availability of credit under the DIP Facility will provide confidence to the Debtors' customers and suppliers and will be viewed favorably by the Debtors' employees, thereby promoting a successful reorganization. Accordingly, the timely approval of the relief requested herein is imperative.

59. The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow up to $5 million and to use such proceeds to fund their operations and administrative costs and expenses of these chapter 11 cases. Because the Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(l), as an administrative expense under section 364(a) or (b), in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) or without granting priming liens pursuant to section 364(d), the Debtors propose to obtain the financing set forth in the DIP Facility by providing, inter alia, superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2), (3) and (d) of the Bankruptcy Code.

60. Having determined that financing is available only under sections 364(c)and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility with the DIP Lenders extensively and at arms-length. Moreover, the Debtors' have exercised sound business judgment, within the confines of the provisions and underlying policies of the Bankruptcy Code, in negotiating and obtaining the necessary DIP Financing. Such judgment is accorded deference by bankruptcy courts. *See, e.g., In re Snowshoe Co.*, 789 F.2d at 1088; *Ames Dep't Stores.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be

utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *see also In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981);

*In re Simasko Prod. Co.,* 47 B.R. 444, 449 (Bankr. D. Colo. 1985).

61.     Substantially all the Debtors' assets are encumbered and, despite the efforts of the Debtors and Candlewood Partners, the Debtors have been unable to secure the required financing absent the proposed superpriority claims and priming liens. The Debtors have negotiated the best terms available to obtain the necessary financing needed to maintain sufficient liquidity to preserve their assets. The Debtors submit that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of their sound business judgment.

### Section 364(e) Protections Should Apply to the DIP Financing

62.     The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms-length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Use of Cash Collateral Should Be Approved

63.     In addition to the need for debtor-in-possession financing, the Debtors' other pressing concern is the need for immediate use of the Cash Collateral. The Debtors require use of the Cash Collateral to pay present operating expenses, including payroll, and to pay vendors to ensure a continued supply of services and materials essential to the Debtors' continued viability.

64. Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

65. The Debtors require immediate use of the Cash Collateral to fund their day-to-day operations. Absent such relief, the Debtors' business will be brought to an immediate halt, with irreparable damaging consequences for the Debtors, their estates and their creditors. The interests of the Prepetition Secured Parties in the Debtors' Cash Collateral will be protected by the adequate protection set forth above. Accordingly, the Debtors' request to use Cash Collateral in the operation of their business and administration of the chapter 11 cases should be approved.

## The Automatic Stay Should Be Modified on a Limited Basis

66. The relief requested herein contemplates a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default and, with respect to set off and other remedies in respect of the Collateral (defined in the DIP Facility), after five (5) business days' notice thereof, all rights and remedies under the DIP Facility. This kind of modification is an ordinary and standard feature of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval and Scheduling of Final Hearing

67. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or obtain credit pursuant to section 364 of the Bankruptcy Code, respectively, may not be commenced earlier than fifteen

(15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

68.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to use Cash Collateral and borrow up to $5 million under the DIP Facility on an interim basis, pending entry of a Final Order, in order to (i) maintain and finance the ongoing operations of the Debtors and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule the Final Hearing.

69.     The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their business on an ongoing basis during these chapter 11 cases. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

### Waiver of Bankruptcy Rules 6004(a) and (h)

70.     The Debtors believe an efficient and expeditious approval and implementation of the DIP Facility is in the best interests of the Debtors' creditors and other parties in interests. Accordingly, the Debtors seek waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

71.     Notice of this Motion has been provided to (i) the United States Trustee for the District of Delaware; (ii)  the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Agent; (iv) counsel to the Administrative Agent; (iv) BONY, as administrative agent under the Prepetition Term Loan (A) Agreement and Prepetition Term Loan (B) Agreement; and (v) any known lienholders whose liens are being primed under the DIP Facility.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

## No Prior Request

72.     No prior request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other relief as is just and proper.

Dated: October 1, 2009
       Wilmington, Delaware

      **MESSANA ROSNER & STERN LLP**

      /s/ Frederick B. Rosner
      Frederick B. Rosner (DE #3995)
      1000 N. West Street • Suite 1200
      Wilmington, Delaware 19801
      Tel:     (302) 777-1111


      - and –

      **DLA PIPER LLP (US)**
      1251 Avenue of the Americas
      New York, New York 10020-1104
      Tel:     (212) 835-6000
      Fax:     (212) 835-6001
      H. Jeffrey Schwartz, Esq.
      Anthony P. Coles, Esq.

      Proposed Special DIP Counsel for the Debtors and
      Debtors in Possession