**SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of October __, 2009**

among

**PTC ALLIANCE CORP.,
PTC TUBULAR PRODUCTS LLC,
MID-WEST MFG. CO.,
ALLIANCE TUBULAR PRODUCTS CO.,
ENDURO INDUSTRIES, INC.,
PT/VW CORPORATION, and
PACD ACQUISITION LLC,**
debtors and debtors-in-possession, as Borrowers

**THE INSTITUTIONS FROM TIME TO TIME
PARTY HERETO AS LENDERS**

and

**BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.,**
as Administrative Agent

TABLE OF CONTENTS

Page

ARTICLE I : DEFINITIONS ......................................................................................3
    1.1    Certain Defined Terms ..............................................................................3
    1.2    References ...............................................................................................36
    1.3    Supplemental Disclosure ........................................................................36

ARTICLE II : THE CREDIT FACILITIES .............................................................37
    2.1    Revolving Loans .....................................................................................37
    2.2    [RESERVED] ..........................................................................................37
    2.3    Optional Payments; Mandatory Prepayments .......................................37
    2.4    Method of Making Advances ..................................................................39
    2.5    Method of Requesting Advances .............................................................41
    2.6    Minimum Amount of Each Advance .......................................................41
    2.7    Alternate Rate of Interest .......................................................................41
    2.8    Refinancing of Loans ..............................................................................42
    2.9    Interest on Obligations ...........................................................................43
    2.10   Default Rate ............................................................................................43
    2.11   Method of Payment ................................................................................43
    2.12   Notes, Telephonic Notices .....................................................................44
    2.13   Repayment of Loans; Interest and Fees and Taxes. ..............................44
    2.14   Notification of Advances, Interest Rates, Prepayments and Aggregate
             Revolving Loan Commitment Reductions ..............................................49
    2.15   Lending Installations .............................................................................49
    2.16   Non-Receipt of Funds by the Administrative Agent ..............................49
    2.17   Termination Date ...................................................................................49
    2.18   Replacement of Certain Lenders ...........................................................49
    2.19   Priority and Liens. .................................................................................50
    2.20   No Discharge; Survival of Claims .........................................................52
    2.21   Use of Cash Collateral ...........................................................................52
    2.22   Waiver of any Priming Rights ...............................................................52
    2.23   Nature and Extent of Each Borrower's Liability. ..................................53

ARTICLE III : [RESERVED] ...................................................................................54

ARTICLE IV : CHANGE IN CIRCUMSTANCES ..................................................54
    4.1    Yield Protection ......................................................................................54
    4.2    Changes in Capital Adequacy Regulations ...........................................55
    4.3    Funding Losses .......................................................................................55
    4.4    Lender Statements; Survival of Indemnity .............................................55

ARTICLE V : CONDITIONS PRECEDENT ...........................................................56
    5.1    Effectiveness ...........................................................................................56
    5.2    Revolving Loans .....................................................................................59

ARTICLE VI :  REPRESENTATIONS AND WARRANTIES ................................................ 61
    6.1    Organization; Corporate Powers ........................................................ 61
    6.2    Authority.......................................................................................... 61
    6.3    No Conflict; Governmental Consents................................................ 62
    6.4    Financial Statements ........................................................................ 62
    6.5    No Material Adverse Change ........................................................... 62
    6.6    Taxes............................................................................................... 63
    6.7    Litigation; Loss Contingencies and Violations ................................ 63
    6.8    Subsidiaries..................................................................................... 64
    6.9    ERISA............................................................................................. 64
    6.10   Accuracy of Information ................................................................. 65
    6.11   Securities Activities ........................................................................ 65
    6.12   Material Agreements ....................................................................... 65
    6.13   Compliance with Laws .................................................................... 65
    6.14   Assets and Properties ...................................................................... 65
    6.15   Statutory Indebtedness Restrictions ................................................ 66
    6.16   Insurance......................................................................................... 66
    6.17   Labor Matters ................................................................................. 66
    6.18   Environmental Matters .................................................................... 66
    6.19   Secured, Super-Priority Obligation for the Borrowers' Assets ........... 67
    6.20   Patriot Act and AML Laws ............................................................. 68

ARTICLE VII :  COVENANTS ...................................................................................... 70
    7.1    Reporting ........................................................................................ 70
    7.2    Affirmative Covenants. .................................................................... 78
    7.3    Negative Covenants. ........................................................................ 83
    7.4    Financial Covenants ........................................................................ 90

ARTICLE VIII :  DEFAULTS ........................................................................................ 92
    8.1    Defaults........................................................................................... 92

ARTICLE IX : REMEDIES, DEFAULTING LENDERS; WAIVERS AND
AMENDMENTS .......................................................................................................... 97
    9.1    Remedies Upon Default................................................................... 97
    9.2    Defaulting Lender ........................................................................... 97
    9.3    Amendments.................................................................................... 98
    9.4    Preservation of Rights ................................................................... 100

ARTICLE X :  GENERAL PROVISIONS .................................................................... 100
    10.1   Survival of Representations ........................................................... 100
    10.2   Governmental Regulation.............................................................. 100
    10.3   Performance of Obligations .......................................................... 101
    10.4   Headings ....................................................................................... 101
    10.5   Entire Agreement.......................................................................... 101
    10.6   Several Obligations; Benefits of this Agreement ........................... 102
    10.7   Expenses; Indemnification. ........................................................... 102
    10.8   Numbers of Documents ................................................................. 104

| | | |
|---|---|---|
| 10.9 | Accounting | 104 |
| 10.10 | Severability of Provisions | 104 |
| 10.11 | Nonliability of Lenders | 104 |
| 10.12 | **GOVERNING LAW** | 104 |
| 10.13 | CONSENT TO JURISDICTION; SERVICE OF PROCESS; JURY TRIAL. | 104 |
| 10.14 | No Strict Construction | 106 |
| 10.15 | Other Transactions | 106 |
| 10.16 | Patriot Act | 106 |

ARTICLE XI : THE ADMINISTRATIVE AGENT .... 106

| | | |
|---|---|---|
| 11.1 | Appointment; Nature of Relationship | 106 |
| 11.2 | Powers | 107 |
| 11.3 | General Immunity | 107 |
| 11.4 | No Responsibility for Loans, Creditworthiness, Collateral, Recitals, Etc. | 107 |
| 11.5 | Action on Instructions of Lenders | 108 |
| 11.6 | Employment of Administrative Agents and Counsel | 108 |
| 11.7 | Reliance on Documents; Counsel | 108 |
| 11.8 | The Administrative Agent's Reimbursement and Indemnification | 108 |
| 11.9 | Rights as a Lender | 109 |
| 11.10 | Lender Credit Decision | 109 |
| 11.11 | Successor Administrative Agent | 109 |
| 11.12 | Collateral Documents | 109 |

ARTICLE XII : SETOFF; RATABLE PAYMENTS .... 110

| | | |
|---|---|---|
| 12.1 | Setoff | 110 |
| 12.2 | Ratable Payments | 111 |
| 12.3 | Application of Payments | 111 |
| 12.4 | Relations Among Lenders | 112 |

ARTICLE XIII : BENEFIT OF AGREEMENT; ASSIGNMENTS; PARTICIPATIONS .... 112

| | | |
|---|---|---|
| 13.1 | Successors and Assigns | 112 |
| 13.2 | Participations | 112 |
| 13.3 | Assignments | 113 |
| 13.4 | Confidentiality | 114 |
| 13.5 | Dissemination of Information | 115 |

ARTICLE XIV : NOTICES .... 115

| | | |
|---|---|---|
| 14.1 | Giving Notice | 115 |
| 14.2 | Change of Address | 115 |

ARTICLE XV : COUNTERPARTS .... 115

| | | |
|---|---|---|
| 15.1 | Counterparts | 115 |

## EXHIBITS AND SCHEDULES

### Exhibits

EXHIBIT A   --   Form of Borrowing Base Certificate

EXHIBIT B   --   Form of Collateral Access Agreement

EXHIBIT C   --   Form of Compliance Certificate

EXHIBIT D   --   Form of Interim Order

EXHIBIT E   --   Form of Officer's Certificate

EXHIBIT F   --   Form of Revolving Note

EXHIBIT G   --   Form of Borrowing Notice

EXHIBIT H   --   Form of Assignment and Acceptance

EXHIBIT I   --   Original Budget

**Schedules**

| | | |
|---|---|---|
| Schedule 1 | -- | Commitments |
| Schedule 1.1.2 | -- | Permitted Existing Contingent Obligations |
| Schedule 1.1.3 | -- | Permitted Existing Indebtedness |
| Schedule 1.1.4 | -- | Permitted Existing Investments |
| Schedule 1.1.5 | -- | Permitted Existing Liens |
| Schedule 1.1.6 | -- | Management Group |
| Schedule 1.1.8 | -- | Deferred Compensation Agreements |
| Schedule 1.1.10 | -- | First Day Motions |
| Schedule 6.7 | -- | Litigation, Loss Contingencies and Violations |
| Schedule 6.8 | -- | Subsidiaries |
| Schedule 6.9 | -- | ERISA Matters |
| Schedule 6.16 | -- | Insurance |
| Schedule 6.17 | -- | Labor Matters |
| Schedule 6.18 | -- | Environmental Matters |
| Schedule 7.2(Q) | -- | Certain Collateral Locations |
| Schedule 7.3(H) | -- | Permitted Affiliate Transactions |

## SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This Super-Priority Debtor-in-Possession Credit Agreement, dated as of October __, 2009 (as amended, supplemented, or otherwise modified from time to time, this "Agreement"), is entered into among PTC ALLIANCE CORP., a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (together with its successors and permitted assigns, "PTC"), PTC TUBULAR PRODUCTS LLC, a Delaware limited liability company and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code ("PTC Tubular"), MID-WEST MFG. CO., a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code ("Mid-West Mfg."), ALLIANCE TUBULAR PRODUCTS CO., a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code ("Alliance Tubular"), ENDURO INDUSTRIES, INC., a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code ("Enduro"), PT/VW CORPORATION, a Pennsylvania corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code ("PTVW"), and PACD ACQUISITION LLC, a Delaware limited liability company and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code ("PACD," collectively with PTC Tubular, Mid-West Mfg., Alliance Tubular, Enduro and PTVW, the "Subsidiary Loan Parties," and the Subsidiary Loan Parties, collectively with PTC, the "Borrowers"), the institutions from time to time parties hereto as Lenders, whether by execution of this Agreement or an assignment and acceptance pursuant to Section 13.3, and BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., a Delaware limited liability company, as administrative agent (in such capacity, the "Administrative Agent") for the Lenders.

## PRELIMINARY STATEMENTS

On October __, 2009 (the "Filing Date"), each Borrower filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court and has continued in the possession of its assets and in the management of its business pursuant to sections 1107 and 1108 of the Bankruptcy Code.

PTC, the Subsidiary Loan Parties, the Pre-Petition Credit Agreement Lenders, and the Pre-Petition Credit Agreement Agent are parties to the Pre-Petition Credit Agreement, pursuant to which the Borrowers were truly and justly indebted to the Pre-Petition Credit Agreement Lenders on the Filing Date in the principal amount of $41,279,000 (including the aggregate outstanding face amount of issued but undrawn letters of credit outstanding thereunder) in respect of the extensions of credit provided for thereunder.

PTC, the Subsidiary Loan Parties (other than PTVW), the institutions from time to time party thereto as lenders, and the Pre-Petition Term Loan (A) Agent, are parties to the Pre-Petition Term Loan (A) Agreement, pursuant to which the Borrowers were truly and justly indebted to

the Pre-Petition Term Loan (A) Lenders on the Filing Date in the principal amount of $76,524,688.82 in respect of the extensions of credit provided for thereunder.

PTC, the Subsidiary Loan Parties (other than PTVW), the institutions from time to time party thereto as lenders, and Pre-Petition Term Loan (B) Agent, are parties to the Pre-Petition Term Loan (B) Agreement, pursuant to which the Borrowers were truly and justly indebted to the Pre-Petition Term Loan (B) Lenders on the Filing Date in the principal amount of $63,065,194.47 in respect of the extensions of credit provided for thereunder.

Each Borrower has requested that the Lenders provide a revolving credit debtor-in-possession facility to Borrowers, jointly and severally, in an aggregate principal amount not to exceed $15,000,000.

The proceeds of the Loans will be used (i) to fund the Sale process, (ii) to pay related fees and expenses associated with negotiation, execution, and delivery of this Agreement and the other Loan Documents, (iii) to pay the fees and expenses of PTC's professionals and the Committee, if any, including but not limited to the Carve-Out and (iv) for working capital and other general corporate purposes, including the payment of the Permitted Payments under the First Day Orders.

To provide security for the repayment of the Loans and the payment of the other obligations of the Borrowers hereunder and under the other Loan Documents, each of the Borrowers will provide to the Administrative Agent (for the benefit of the Secured Parties) the following (all as more fully described herein):

(a)     an allowed administrative expense claim in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code;

(b)     a perfected first priority Lien, pursuant to section 364(c)(2) of the Bankruptcy Code, upon all unencumbered property of each Borrower that is not subject to valid, perfected and non-avoidable liens as of the Filing Date;

(c)     a perfected junior Lien, pursuant to section 364(c)(3) of the Bankruptcy Code, upon all property of each Borrower that is subject to valid, perfected and non-avoidable Liens in existence on the Filing Date (other than Liens that secure the Pre-Petition Obligations) or to valid Liens in existence on the Filing Date and perfected thereafter as permitted by section 546(b) of the Bankruptcy Code (other than with respect to the Liens described in clause (d) below); and

(d)    a perfected first priority, senior priming Lien (a "<u>Priming Lien</u>"), pursuant to section 364(d)(1) of the Bankruptcy Code, upon (x) all present and after-acquired property of the Borrowers that is subject to a Lien on or after the Filing Date to secure the Pre-Petition Obligations (other than Liens on Second Priority Agreement Primary Collateral (as defined in the Pre-Petition Intercreditor Agreement)) and (y) present and after-acquired assets that are presently subject to Liens that are junior to the Liens that secure the Prepetition Obligations, which Priming Lien shall also prime any Liens after the Filing Date to provide adequate protection in respect of any Liens to which the Priming Lien is senior (the "<u>Primed Liens</u>");

subject only to the Carve-Out (as defined herein).

In consideration of the foregoing and of the mutual agreements herein contained, the parties hereto agree as follows:

## 1): DEFINITIONS

1.2    <u>Certain Defined Terms</u>.  In addition to the terms defined above, the following terms used in this Agreement shall have the following meanings, applicable both to the singular and the plural forms of the terms defined.

As used in this Agreement:

"**ABR Advance**" means an Advance comprised of ABR Loans.

"**ABR Loan**" means a Loan, or portion thereof, which bears interest at the Alternate Base Rate plus the Applicable Margin.

"**Account Debtor**" means the account debtor or obligor with respect to any of the Receivables and/or the prospective purchaser with respect to any contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with a Borrower.

"**Acquisition**" means any transaction, or any series of related transactions, consummated on or after the date of this Agreement by which a Borrower (i) acquires any going business or all or substantially all of the assets of any firm, corporation or division thereof, whether through purchase of assets, merger or otherwise or (ii) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the securities of a corporation which have ordinary voting power for the election of directors (other than securities having such power only by reason of the happening of a contingency), a majority (by percentage of voting power) of the membership, ownership or other equity interests in a limited liability company or a majority (by percentage of voting power) of the outstanding partnership interests of a partnership.

"**Adjusted LIBOR Rate**" shall mean, with respect to any LIBOR Loan for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the quotient of (a) the LIBOR Rate in effect for such Interest Period divided by (b) a percentage (expressed as a decimal) equal to 100% minus Statutory Reserves. For purposes hereof, the term "LIBOR Rate" shall mean the greater of (x) 3.0% per annum and (y) the rate at which dollar deposits approximately equal in principal amount to such LIBOR Loan and for a maturity comparable to such Interest Period are offered to the principal London office of the Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"**Administrative Agent**" is defined in the preamble hereto.

"**Advance**" means a borrowing hereunder consisting of the aggregate amount of the several Loans made by the Lenders to the Borrowers at the same time.

"**Affected Lender**" is defined in Section 2.18 hereof.

"**Affiliate**" of any Person means any other Person directly or indirectly controlling, controlled by or under common control with such Person. A Person shall be deemed to control another Person if the controlling Person is the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of ten percent (10%) or more of any class of voting securities (or other voting interests) of the controlled Person or possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of Capital Stock, any other Equity Interest, by contract or otherwise. In no event shall the Administrative Agent or any Lender be considered an Affiliate of any Borrower.

"**Aggregate Revolving Loan Commitment**" means the aggregate of the Revolving Loan Commitments of all the Lenders, as reduced from time to time pursuant to the terms hereof. The Aggregate Revolving Loan Commitment as of the Closing Date is $15,000,000.

"**Agreement**" is defined in the preamble hereto.

"**Agreement Accounting Principles**" means generally accepted accounting principles in effect from time to time, applied in a manner consistent with that used in preparing the financial statements referred to in Section 6.4 hereof; provided, however, that with respect to the calculation of financial ratios and other financial tests utilized under or required by this Agreement, "Agreement Accounting Principles" means generally accepted accounting principles as in effect as of the date of this Agreement, applied in a manner consistent with that used in preparing the financial statements referred to in Section 6.4 hereof.

"**Alternate Base Rate**" means, for any day, a fluctuating rate of interest per annum equal to the highest of (i) the Prime Rate for such day, (ii) the sum of (a) the LIBOR Rate for a LIBOR Loan with an Interest Period of one (1) month commenced on such date <u>plus</u> (b) 1% per annum and (iii) the sum of (a) the Federal Funds Effective Rate for such day <u>plus</u> (b) one-half of one percent (0.5%) per annum.

"**AML Laws**" is defined in <u>Section 6.20(A)</u> hereof.

"**Applicable Commitment Fee Percentage**" means, as at any date of determination, a rate per annum equal to 1.5%.

"**Applicable Margin**" means (a) with respect to ABR Loans, 7.0%, and (b) with respect to LIBOR Loans, 6.0%.

"**Applicable Percentage**" means (a) at all times prior to the Administrative Agent's completion of the first appraisal of the Borrowers' Inventory on the basis of "Net Forced Liquidation Value" (as defined hereafter) following the Closing Date, the NOLV Percentage and (b) at all other times, the NFLV Percentage.

"**Approved Budget**" is defined in <u>Section 7.1(A)(viii)(1)</u> hereof.

"**Asset Sale**" means, with respect to any Person, the sale, lease, conveyance, disposition or other transfer by such Person of any of its assets (including by way of a sale-leaseback transaction and including the sale or other transfer of any of the Equity Interests of any Subsidiary of such Person).

"**Auction**" is defined in <u>Section 5.2(H)</u> hereof.

"**Authorized Officer**" means, with respect to any Borrower, any of the President, Chief Executive Officer, the Chief Financial Officer of such Borrower, acting singly.

"**Availability Period**" means the period commencing on the Closing Date and ending on the Termination Date.

"**Bankruptcy Code**" means title 11 of the United States Code.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"**Benefit Plan**" means a defined benefit plan as defined in Section 3(35) of ERISA (other than a Multiemployer Plan or a Foreign Employee Benefit Plan) in respect of which the Borrowers or any other member of the Controlled Group is, or within the immediately preceding six (6) years was, an "employer" as defined in Section 3(5) of ERISA.

"**Bid Deadline**" means the date on which the Qualified Bids are due pursuant to the Bid Procedures Order (as such deadline may be subsequently amended).

"**Bid Procedures Order**" is defined in Section 5.2(G) hereof.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Borrowers**" is defined in the preamble hereto.

"**Borrower Representative**" means PTC, acting on its own behalf as a Borrower and on behalf of all other Borrowers.

"**Borrowing Base**" means, as of any date of calculation, an amount, as set forth on the most current Borrowing Base Certificate delivered to the Administrative Agent, equal to (a) up to eighty-five percent (85%) of the Gross Amount of Eligible Receivables; plus (b) the lesser of (i) up to sixty-five percent (65%) of the aggregate value of all Eligible Inventory of the Borrowers consisting of raw materials and work-in-process, valued at the lower of cost and market on a first-in-first-out basis, and (ii) up to eighty-five percent (85%) of the Applicable Percentage of the aggregate value of all Eligible Inventory of the Borrowers consisting of raw materials and work-in-process, valued at the lower of cost and market on a first-in-first-out basis; plus (c) the lesser of (i) up to seventy percent (70%) of the aggregate value of all Eligible Inventory of the Borrowers consisting of finished goods, valued at the lower of cost and market on a first-in-first-out basis, and (ii) up to eighty-five percent (85%) of the Applicable Percentage of the aggregate value of all Eligible Inventory of the Borrowers consisting of finished goods, valued at the lower of cost and market on a first-in-first-out basis; minus (d) such reserves as the Administrative Agent deems appropriate, including but not limited to, reserves for (I) the "Carve-Out" (as defined hereafter) and (II) the costs and fees of liquidation (including professional fees).

"**Borrowing Base Certificate**" means a certificate, in substantially the form of Exhibit A attached hereto and made a part hereof, setting forth the Borrowing Base and the component calculations thereof.

"**Borrowing Date**" means a date on which an Advance is made hereunder.

"**Borrowing Notice**" is defined in Section 2.5 hereof.

"**Budget Variance Report**" means a report calculated with reference to the Approved Budget for the immediately preceding week, which report shall be separated into line items, certified by an Authorized Officer of the Borrowers, in form satisfactory to the Administrative Agent in its reasonable discretion, to be delivered on a weekly basis, beginning on the third (3rd) Business Day of the week following the week in which the Interim Order is entered and showing comparisons of the actual cash receipts and disbursements for the Borrowers for the immediately preceding week against the corresponding anticipated cash receipts and disbursements for the Borrower as set forth in the Approved Budget for the immediately preceding week.

"**Business Activity Report**" means (A) a Notice of Business Activities Report filed with the State of Minnesota, Department of Revenue, (B) a Notice of Business Activities Report filed with the State of New Jersey, Division of Taxation, or (C) any similar report required by any other state relating to the ability of a Borrower to enforce its accounts receivable claims against account debtors located in any such state.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which Lenders in the State of New York are required or permitted to close; provided, however, that when used in connection with a LIBOR Loan, the term "Business Day" shall also exclude any day on which Lenders are not open for dealings in dollar deposits on the London interbank market.

"**Capital Expenditures**" is defined in Section 7.4(A) hereof.

"**Capital Stock**" means (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (iii) in the case of a partnership, partnership interests (whether general or limited), (iv) in the case of a limited liability company, membership, ownership or other equity interests and (v) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"**Capitalized Lease**" of a Person means any lease of property by such Person as lessee which would be capitalized on a balance sheet of such Person prepared in accordance with Agreement Accounting Principles.

"**Capitalized Lease Obligations**" of a Person means the amount of the obligations of such Person under Capitalized Leases which would be capitalized on a balance sheet of such Person prepared in accordance with Agreement Accounting Principles.

"**Carve-Out**" is defined in Section 2.19(A) hereof.

"**Cases**" means the cases of the Borrowers currently pending under Chapter 11 of the Bankruptcy Code.

"**Cash Collateral Account**" means a deposit account in the name, and under the sole dominion and control, of the Administrative Agent.

"**Cash Equivalents**" means (i) marketable direct obligations issued or unconditionally guaranteed by the United States government and backed by the full faith and credit of the United States government; (ii) domestic and Eurodollar certificates of deposit and time deposits, bankers' acceptances and floating rate certificates of deposit issued by any commercial bank organized under the laws of the United States, any state thereof, the District of Columbia, Canada, any province thereof, or its branches or agencies and having capital and surplus in an aggregate amount not less than $500,000,000 (fully protected against currency fluctuations for any such deposits with a term of more than ten (10) days); (iii) shares of money market, mutual or similar funds having net assets in excess of $500,000,000 and the investments of which are limited to investment grade securities (i.e., securities rated at least Baa by Moody's Investors Service, Inc. or at least BBB by Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc.) and (iv) commercial paper of United States banks and bank holding companies and their subsidiaries and United States finance, commercial industrial or utility companies which, at the time of acquisition, are rated A-1 (or better) by Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc. or P-1 (or better) by Moody's Investors Services, Inc.; provided that the maturities of such Cash Equivalents shall not exceed 365 days.

"**Cash Management Obligations**" means all obligations of each Borrower or any of its Subsidiaries (other than Wiederholt) in respect of overdrafts and related liabilities owed to any Lender or any Affiliate of any Lender arising from depositary or cash management services or in connection with any automated clearinghouse transfer of funds.

"**Change of Control**" means an event or series of events by which:

       (a)    any "person" (as such term is used in Section 13(d) of the Securities Exchange Act of 1934), individually or as a group, becomes a "beneficial owner" (as such term is defined in Rules 13d-3 and 13d-5 promulgated under the Securities Exchange Act of 1934), directly or indirectly, of more than fifty percent (50%) of the total voting power of PTC's outstanding Capital Stock;

       (b)    PTC consolidates with, or merges with or into, any Person or any Person's consolidation with, or merger with or into, PTC pursuant to a transaction in which any of the outstanding voting Capital Stock of PTC is converted into or exchanged for cash, securities or other property;

(c)     PTC (directly or through its Wholly-Owned Subsidiaries) ceases to be the "beneficial owner"(as defined in Rules 13d-3 and 13d-5 promulgated under the Securities Exchange Act of 1934, provided that a person shall be deemed to have "beneficial ownership" of all securities that such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time) directly or indirectly, of one hundred percent (100%) of the voting power of each of its Subsidiaries;

(d)     any Borrower sells or otherwise disposes of more than fifty percent (50%) of the assets of such Borrower and its Subsidiaries on a consolidated basis (computed on the basis of the greater of (i) book value in accordance with Agreement Accounting Principles consistently applied or (ii) fair market value determined by such Borrower's board of directors, managers, or sole member, as the case may be, in its reasonable good faith judgment) in any transaction or series of related transactions (other than sales of inventory in the ordinary course of business and sales of inventory by PTVW); or

(e)     except as otherwise permitted under the terms of this Agreement, any Borrower shall cease to own and control all of the economic and voting rights associated with all of the outstanding Capital Stock of its Subsidiaries.

"**Closing Date**" means [October __, 2009].

"**Code**" means the Internal Revenue Code of 1986, as amended, reformed or otherwise modified from time to time, or any successor statute.

"**Collateral**" means all property and interests in property now owned or hereafter acquired by a Borrower in or upon which a security interest, lien or mortgage is granted to the Administrative Agent, for the benefit of the Secured Parties, whether under the Security Agreement, under any of the other Collateral Documents, under any of the other Loan Documents or under any Order or any other order of the Bankruptcy Court.

"**Collateral Access Agreement**" means any landlord waiver, mortgagee waiver, bailee letter or any similar acknowledgement or agreement of any landlord or mortgagee in respect of any real property leased by any Borrower where any Collateral is located or any warehouseman or processor in possession of any Inventory of any Loan Party, substantially in the form of Exhibit B annexed hereto with such changes thereto as may be agreed to by Administrative Agent in the reasonable exercise of its discretion.

"**Collateral Documents**" means all agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect, or evidence Liens to secure the Obligations, including, without limitation, the Security Agreement, the Pledge Agreement, and all other security agreements, pledge agreements, mortgages, deeds of trust, loan agreements,

notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether heretofore, now, or hereafter executed by or on behalf of any of the Borrowers and delivered to the Administrative Agent, together with all agreements and documents referred to therein or contemplated thereby.

"**Collection Account**" means each lock-box and blocked depository account maintained by a Borrower that is subject to a Collection Account Agreement, for the collection of Receivables and other proceeds of Collateral.

"**Collection Account Agreement**" means a written agreement among the applicable Borrower, the Administrative Agent, and the applicable bank at which the subject deposit account or accounts are maintained providing (unless otherwise determined by the Administrative Agent), among other things, that, upon written notice from the Administrative Agent (a) such bank shall not permit any funds or other assets to be transferred or withdrawn by any Borrower from any such deposit account or accounts, (b) such bank shall only comply with the instructions of the Administrative Agent and shall not comply with the instructions of any Borrower in respect of any such deposit account or accounts, and (c) such bank shall transfer all payments or other remittances received in any such deposit account or accounts to the Cash Collateral Account (or as the Administrative Agent may otherwise direct).

"**Commission**" means the Securities and Exchange Commission and any Person succeeding to the functions thereof.

"**Committee**" means the official statutory committee of unsecured creditors appointed in the Cases pursuant to section 1102 of the Bankruptcy Code or any other statutory committee appointed in the Cases.

"**Compliance Certificate**" means a certificate in form and substance substantially similar to Exhibit C hereto.

"**Contaminant**" means any waste, pollutant, hazardous substance, toxic substance, hazardous waste, special waste, petroleum or petroleum-derived substance or waste, asbestos, polychlorinated biphenyls ("PCBs"), or any constituent of any such substance or waste, and includes but is not limited to these terms as defined in Environmental, Health or Safety Requirements of Law.

"**Contingent Obligation**", as applied to any Person, means (i) any Contractual Obligation, contingent or otherwise, of that Person with respect to any Indebtedness of another or other obligation or liability of another, including, without limitation, any such Indebtedness, obligation or liability of another directly or indirectly guaranteed, endorsed (otherwise than for

collection or deposit in the ordinary course of business), co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable, including Contractual Obligations (contingent or otherwise) arising through any agreement to purchase, repurchase, or otherwise acquire such Indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, or other financial condition, or to make payment other than for value received and (ii) any other contingent obligation or liability of such Person, whether or not reflected in financial statements of such Person as a liability.

"**Contractual Obligation**", as applied to any Person, means any provision of any equity or debt securities issued by that Person or any indenture, mortgage, deed of trust, security agreement, pledge agreement, guaranty, contract, undertaking, agreement or instrument, in any case in writing, to which that Person is a party or by which it or any of its properties is bound, or to which it or any of its properties is subject.

"**Controlled Group**" means the group consisting of (i) any corporation which is a member of the same controlled group of corporations (within the meaning of Section 414(b) of the Code) as a Borrower; (ii) a partnership or other trade or business (whether or not incorporated) which is under common control (within the meaning of Section 414(c) of the Code) with a Borrower; and (iii) a member of the same affiliated service group (within the meaning of Section 414(m) of the Code) as a Borrower, any corporation described in clause (i) above or any partnership or trade or business described in clause (ii) above.

"**Customary Permitted Liens**" means:

(1)     Liens (other than Environmental Liens and Liens in favor of the PBGC or IRS) with respect to the payment of taxes, assessments or governmental charges in all cases which are not yet due or (if foreclosure, distraint, sale or other similar proceedings shall not have been commenced) which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted and, in each case, with respect to which adequate reserves or other appropriate provisions are being maintained in accordance with Agreement Accounting Principles;

(ii)     statutory Liens of landlords and Liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other similar Liens imposed by law created in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted and with respect to which adequate reserves or other appropriate provisions are being maintained in accordance with Agreement Accounting Principles;

(iii)    Liens (other than Environmental Liens and Liens in favor of the PBGC or IRS) incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other types of social security benefits or to secure the performance of bids, tenders, sales, contracts (other than for the repayment of borrowed money), surety, appeal and performance bonds; provided that (A) all such Liens do not in the aggregate materially detract from the value of the Borrowers' assets or property taken as a whole or materially impair the use thereof in the operation of the businesses taken as a whole, and (B) all Liens securing bonds to stay judgments or in connection with appeals do not secure at any time an aggregate amount exceeding $500,000;

(iv)    Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of the Borrowers;

(v)    Liens of attachment or judgment with respect to judgments, writs or warrants of attachment, or similar process against any which do not constitute a Default under Section 8.1(n) hereof;

(vi)    normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(vii)    Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or equivalent in foreign jurisdictions) on items in the course of collection; and

(viii)    any interest or title of the lessor in the property subject to any operating lease entered into by a Borrower in the ordinary course of business.

"**Debt Issuance**" means the incurrence by any Borrower or any of their respective Subsidiaries (other than Wiederholt) of any Indebtedness after the Closing Date (other than as permitted by Section 7.3(A)).

"**Default**" means an event described in Article VIII hereof.

"**Defaulting Lender**" means any Lender, as determined by the Administrative Agent, that has (a) failed to fund any portion of its Revolving Loans within one Business Day of the date required to be funded by it hereunder, (b) notified any Borrower, the Administrative Agent or any Lender in writing that it does not intend to comply with any of its funding obligations under

this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) failed, within one Business Day after request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Revolving Loans, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, or (e) (i) become or is insolvent or has a parent company that has become or is insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"**Deferred Compensation Agreement**" means those deferred compensation agreements described on Schedule 1.1.8 hereto.

"**Disclosed Litigation**" is defined in Section 6.7 hereof.

"**DOL**" means the United States Department of Labor and any Person succeeding to the functions thereof.

"**Dollar(s)**", "**dollar(s)**" or "**$**" shall mean the lawful money of the United States of America.

"**Dollar Amount**" of any currency other than Dollars at any date shall mean the equivalent amount of Dollars, calculated on the basis of the then applicable Exchange Rate.

"**Domestic Subsidiaries**" means any Subsidiary of any Person organized under the laws of any state of the United States and substantially all of the operations of which are conducted within the United States.

"**EBITDA**" is defined in Section 7.4(A) hereof.

"**Eligible Inventory**" means Inventory of the Borrowers which is held for sale or lease or to be furnished under any contract of service by the Borrowers in the ordinary course of business which is at all times and shall continue to meet standards of eligibility from time to time established in accordance with this Agreement. Initially, standards of eligibility will be established by the Administrative Agent in its reasonable credit judgment (which credit judgment shall be exercised in a manner that is not arbitrary or capricious) and may be revised from time to

time by the Administrative Agent in its reasonable credit judgment (which credit judgment shall be exercised in a manner that is not arbitrary or capricious). In general, without limiting the foregoing, the following Inventory is not Eligible Inventory:

(a) Inventory that is located outside the United States (which shall not be deemed to include any territories of the United States) or Canada;

(b) Inventory which is obsolete, not in good condition, not either currently usable or currently saleable in the ordinary course of the applicable Borrower's business or does not meet all material standards imposed by any Governmental Authority having regulatory authority over such item of Inventory, its use or its sale;

(c) Inventory consisting of packaging material and supplies;

(d) Inventory which (i) is consigned to a third party for sale or (ii) is on consignment from a third party to the applicable Borrower for sale;

(e) Inventory that is subject to, or any accounts or other proceeds resulting from the sale or other disposition thereof could be subject to, any Lien (except those in favor of the Administrative Agent under the Collateral Documents and those with respect to the Pre-Petition Obligations), including any sale on approval or sale or return transaction;

(f) Inventory that is not in the possession of the applicable Borrower, unless such Inventory is in the possession of a warehouseman, bailee, consignee or processor that has not issued a document of title in respect thereof and has entered into a Collateral Access Agreement with respect to such premises as of the Closing Date; provided, that a Collateral Access Agreement entered into after the Closing Date may be accepted for purposes of this clause (f) by the Administrative Agent in its sole discretion;

(g) Inventory that is held for lease or is the subject of any lease;

(h) Inventory that is subject to any trademark, trade name or licensing arrangement, or any law, rule or regulation, that could limit or impair the ability of the Administrative Agent to promptly exercise all rights of the Administrative Agent under the Collateral Documents;

(i) Inventory with respect to which any insurance proceeds are not payable to the Administrative Agent as a loss payee;

(j)     Inventory in respect of which the Administrative Agent shall not have a first-priority, perfected, enforceable Lien securing the Obligations;

(k)     Inventory which is evidenced by an Eligible Receivable;

(l)     Inventory which is in transit;

(m)     Inventory which has been returned or rejected;

(n)     Inventory consisting of overruns or Inventory produced in excess of specific customer orders; and

(o)     Inventory which is not in full conformity with the representations and warranties made by the Borrowers to the Administrative Agent with respect thereto whether contained in this Agreement or the Security Agreement.

"**Eligible Receivables**" means Receivables created by any Borrower in the ordinary course of its business arising out of the sale of goods or rendition of services by such Borrower, which Receivables are and at all times shall continue to meet standards of eligibility from time to time established in accordance with this Agreement. Initially, standards of eligibility will be established by the Administrative Agent in its reasonable credit judgment (which credit judgment shall be exercised in a manner that is not arbitrary or capricious) and may be revised from time to time by the Administrative Agent in its reasonable credit judgment (which credit judgment shall be exercised in a manner that is not arbitrary or capricious). In general, without limiting the foregoing, the following Receivables are not Eligible Receivables:

(i)     Receivables which remain unpaid ninety (90) days after the date of the original applicable invoice (net of any credits or credit balances included in such total);

(p)     all Receivables owing by a single Account Debtor (including a Receivable which remains unpaid fewer than ninety (90) days after the date of the original applicable invoice) if fifty percent (50%) of the balance owing by such Account Debtor, calculated without taking into account any credit balances of such Account Debtor, remains unpaid ninety (90) days after the date of the original applicable invoice or has otherwise become, or has been determined by the Administrative Agent to be ineligible in accordance with clause (a) or any of clauses (c) through (x) of this definition;

(q)     Receivables with respect to which the Account Debtor is a director, officer, employee, Subsidiary or Affiliate of any Borrower;

(r)     Receivables with respect to which the Account Debtor is any federal Governmental Authority, the United States of America, any foreign government or foreign governmental agency, or, in each case, any department, agency or instrumentality thereof, unless with respect to any such non-foreign government Receivable, the applicable Borrower has complied to the Administrative Agent's satisfaction with the provisions of the Federal Assignment of Claims Act or other applicable statutes, including executing and delivering to the Administrative Agent all statements of assignment and/or notification which are in form and substance acceptable to the Administrative Agent and which are deemed necessary by the Administrative Agent to effectuate the assignment of such Receivables to the Administrative Agent for the benefit of the Secured Parties;

(s)     Receivables with respect to which the Account Debtor is any provincial, state or municipal Governmental Authority or any agency or instrumentality thereof;

(t)     Receivables not denominated in U.S. Dollars or any other currency readily available, freely traded, in which deposits are customarily offered to banks in the London interbank market, convertible into Dollars in the international interbank market available to the Lenders in such market and as to which a Dollar Amount may be readily calculated unless currency control or other exchange regulations are imposed in the country in which such currency is issued with the result that different types of such currency are introduced, such country's currency is, in the determination of the Administrative Agent, no longer readily available or freely traded or as to which, in the determination of the Administrative Agent, a Dollar Amount is not readily calculable;

(u)     Receivables with respect to which the Account Debtor is not a resident of the United States (which shall not be deemed to include any territories of the United States), Canada, or Puerto Rico, unless (x) the Account Debtor has supplied the applicable Borrower with an irrevocable letter of credit, issued by a financial institution satisfactory to the Administrative Agent, sufficient to cover such Receivable in form and substance satisfactory to the Administrative Agent or (y) such Receivable is subject to then-effective credit insurance payable to the Administrative Agent that is issued by an issuer on terms and in an amount satisfactory to the Administrative Agent;

(v)     Receivables that are subject to any dispute, contra-account, defense, offset or counterclaim, volume rebate or advertising or other allowance provided that if any portion of any such Receivables are not subject to any dispute, contra-account, defense, offset, counterclaim, volume rebate or advertising or other allowance and the payment of such portion is not being withheld or delayed or otherwise affected in any manner due to the portion that is subject to such dispute, contra-account, defense, offset, counterclaim, volume rebate or advertising or other allowance, then such portion which is not subject to any dispute, contra-account, defense, offset, counterclaim, volume rebate or advertising or other allowance shall not be excluded from Eligible Receivables because of this clause (h);

(w)     Receivables with respect to which the Administrative Agent does not have a first priority and valid fully perfected and enforceable security interest;

(x)     Receivables with respect to which the Account Debtor is the subject of a bankruptcy or similar insolvency or liquidation proceeding or has suspended business or failed to pay its debts generally as they come due or made an assignment for the benefit of creditors or whose assets have been conveyed to a receiver, trustee or assignee for the benefit of creditors;

(y)     Receivables with respect to which the Account Debtor's obligation to pay the Receivable is conditional upon the Account Debtor's approval or is otherwise subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval (except with respect to Receivables in connection with which Account Debtors are entitled to return Inventory on the basis of the quality of such Inventory) or consignment basis;

(z)     Receivables with respect to which the Account Debtor is located in Minnesota or New Jersey (or any other jurisdiction which adopts a statute or other requirement with respect to which any Person that obtains business from within such jurisdiction or is otherwise subject to such jurisdiction's tax law requiring such Person to file a Business Activity Report or make any other required filings in a timely manner in order to enforce its claims in such jurisdiction's courts or arising under such jurisdiction's laws); provided, however, such Receivables shall nonetheless be eligible if the applicable Borrower has filed a Business Activity Report (or other applicable report) with the applicable state office, or is qualified to do business in such jurisdiction and, at the time the Receivable was created, was qualified to do business in such jurisdiction, or had on file with the applicable state office a current Business Activity Report (or other applicable report), or is exempt from such filing requirement;

(aa)     Receivables with respect to which the Account Debtor's obligation does not constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms;

(bb)     Receivables with respect to which the applicable Borrower has not yet shipped the applicable goods or performed the applicable service;

(cc)     any Receivable which is not in conformity with the representations and warranties made by the Borrowers to the Administrative Agent with respect thereto, whether contained in this Agreement or any other Loan Document;

(dd)     Receivables in connection with which the applicable Borrower has not complied with all material requirements contained in the charter and by-laws or other organizational or governing documents of the applicable Borrower, and any law, rule or

regulation, or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon the applicable Borrower or any of its property or to which the Applicable Borrower or any of its property is subject, including all laws, rules, regulations and orders of any Governmental Authority or judicial authority relating to truth in lending, billing practices, fair credit reporting, equal credit opportunity, debt collection practices and consumer debtor protection, applicable to such Receivable (or any related contracts) or affecting the collectability of such Receivables;

(ee)     Receivables in connection with which the applicable Borrower (or any other party to such Receivable) is in default in the performance or observance of any of the terms thereof (other than payment of such Receivable) in any material respect;

(ff)     Receivables that are not bona fide existing obligations created by the sale and actual delivery of Inventory, goods or other property or the furnishing of services of other good and sufficient consideration to customers of the applicable Borrower in the ordinary course of business;

(gg)     Receivables subject to any Lien (except those in favor of the Administrative Agent under the Collateral Documents), or the Inventory, goods, property, services or other consideration of which such Receivable constitutes proceeds is subject to any such Lien, except in either case Liens with respect to the Pre-Petition Obligations;

(hh)     Receivables due from any Subsidiary or Affiliate of any Borrower;

(ii)     Receivables that have been classified by the applicable Borrower as doubtful or that have otherwise failed to meet established or customary credit standards of the applicable Borrower, to the extent of such write-down;

(jj)     Receivables evidenced by a promissory note or other similar instrument;

(kk)     Receivables that are subordinate or junior in right or priority of payment to any other obligation or claim;

(ll)     the total Eligible Receivables of such Account Debtor to the Borrowers represent more than twenty percent (20%) (or, so long as (A) such Account Debtor maintains a credit rating of "BB" or better by S&P and "Ba2" or better by Moody's or (B) the Required Lenders so consent and such consent is not subsequently withdrawn by the Required Lenders, 25%) of the Eligible Receivables of the Borrowers at such time, but only to the extent of such excess;

(mm)   Receivables for tooling; and

(nn)   Receivables that are consigned or otherwise assigned to any Person for collection or otherwise.

"**Environmental, Health or Safety Requirements of Law**" means all Requirements of Law derived from or relating to federal, state and local laws or regulations relating to or addressing pollution or protection of the environment, or protection of worker health or safety, including, but not limited to the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Clean Water Act, 33 U.S.C. §1251 et seq., the Clean Air Act, 42 U.S.C. §7401 et seq., the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., and the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., in each case including any amendments thereto, any successor statutes, and any regulations or guidance promulgated thereunder, and any state or local equivalent thereof.

"**Environmental Lien**" means a lien in favor of any Governmental Authority for (a) any liability under Environmental, Health or Safety Requirements of Law, or (b) damages arising from, or costs incurred by such Governmental Authority in response to, a Release or threatened Release of a Contaminant into the environment.

"**Environmental Property Transfer Act**" means any applicable requirement of law that conditions, restricts, prohibits or requires any notification or disclosure triggered by the closure of any property or the transfer, sale or lease of any property or deed or title for any property for environmental reasons, including, but not limited to, any so-called "Industrial Site Recovery Act" or "Responsible Property Transfer Act."

"**Equipment**" means all of the Borrowers' present and future (i) equipment, including, without limitation, machinery, manufacturing, distribution, selling, data processing and office equipment, assembly systems, tools, molds, dies, fixtures, appliances, furniture, furnishings, vehicles, vessels, aircraft, aircraft engines, and trade fixtures, (ii) other tangible personal property (other than consumer goods, farm products and Inventory), and (iii) any and all accessions, parts and appurtenances attached to any of the foregoing or used in connection therewith, and any substitutions therefor and replacements, products and proceeds thereof.

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"**Equity Issuance**" means any issuance or sale by any Borrower or any of their Domestic Subsidiaries after the Closing Date of any Equity Interests (including any Equity Interests issued

upon exercise of any warrant or option) or any warrants or options to purchase Equity Interests other than any issuance or sale of any such Equity Interests to any Borrower or any of their Domestic Subsidiaries.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time including (unless the context otherwise requires) any rules or regulations promulgated thereunder.

"**Eurocurrency Liabilities**" shall have the meaning assigned thereto in Regulation D issued by the Board, as in effect from time to time.

"**Exchange Rate**" means, the rate at which any currency other than Dollars may be exchanged into Dollars, calculated on the basis of the rates of exchange published in *The Wall Street Journal* for such currency on the 25th of each month (or if such day is not a Business Day, the Business Day immediately following such date) for the purchase of Dollars with such other currency; provided, however, that if at the time of any such determination, for any reason, no such rate of exchange is being published, the Administrative Agent may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"**Executive Order**" is defined in Section 6.20(A) hereof.

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by Administrative Agent.

"**Fee Letter**" is defined in Section 2.13(C)(ii) hereof.

"**Filing Date**" is defined in the preliminary statements of this Agreement.

"**Final Order**" means a final order of the Bankruptcy Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) granting final approval of this Agreement and the other Loan Documents and granting the Liens, super-priority claims and other benefits and protections with respect to the Borrowers described herein and in the Loan Documents (including the Interim Order) in favor of the Administrative Agent and the Lenders, substantially

on the terms provided in the Interim Order, with such changes thereto as may be satisfactory to the Administrative Agent.

"**Final Order Entry Date**" means the date the Final Order is entered in the Cases.

"**First Day Motions**" means the motions listed on <u>Schedule 1.1.10</u>.

"**First Day Orders**" is defined in <u>Section 5.1(K)</u> hereof.

"**Foreign Employee Benefit Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA which (i) is maintained or contributed to for the benefit of employees of PTC or any member of the Controlled Group, (ii) is not covered by ERISA pursuant to Section 4(b)(4) of ERISA, and (iii) could reasonably be expected to subject any Borrower to liability.

"**Foreign Pension Plan**" means any Foreign Employee Benefit Plan which under applicable local law is required to be funded through a trust or other funding vehicle.

"**Foreign Subsidiaries**" means PTC Asia and PTC Alliance (UK) Limited, a company organized under the laws of England and Wales.

"**Governmental Authority**" means any nation or government, any federal, state, local or other political subdivision or agency thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Gross Amount of Eligible Receivables**" means the outstanding face amount of Eligible Receivables, determined in accordance with Agreement Accounting Principles, consistently applied, less (i) all finance charges, late fees and other fees that are unearned, (ii) the value of any accrual which has been recorded by the Borrowers with respect to downward price adjustments, and (iii) such other reserves as the Administrative Agent elects to establish in accordance with its reasonable credit judgment (which credit judgment shall be exercised in a manner that is not arbitrary or capricious).

"**Gross Negligence**" means recklessness, the absence of the slightest care or the complete disregard of consequences. Gross Negligence does not mean the absence of ordinary care or diligence, or an inadvertent act or inadvertent failure to act. If the term "gross negligence" is used with respect to the Administrative Agent or any Lender or any indemnitee in any of the other Loan Documents, it shall have the meaning set forth herein.

"**Hedging Obligations**" of a Person means any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all agreements, devices or arrangements designed to protect at least one of the parties thereto from the fluctuations of interest rates, exchange rates or forward rates applicable to such party's assets, liabilities or exchange transactions, including, but not limited to, dollar-denominated or cross-currency interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency agreements, interest rate options, puts and warrants or other similar derivative agreements, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any of the foregoing.

"**Indebtedness**" of any Person means such Person's (a) obligations for borrowed money, (b) obligations representing the deferred purchase price of property or services (other than the obligations owing under the Deferred Compensation Agreements and other than accounts payable arising in the ordinary course of such Person's business payable on terms customary in the trade), (c) obligations, whether or not assumed, secured by Liens or payable out of the proceeds or production from property or assets now or hereafter owned or acquired by such Person, (d) obligations which are evidenced by notes, acceptances or other instruments, (e) Capitalized Lease Obligations, (f) Contingent Obligations described in subsection (i) of such definition, (g) obligations with respect to letters of credit, and (h) Off-Balance Sheet Liabilities. The amount of Indebtedness of any Person at any date shall be without duplication (i) the outstanding balance at such date of all unconditional obligations as described above and the maximum liability of any such Contingent Obligations at such date and (ii) in the case of Indebtedness of others secured by a Lien to which the property or assets owned or held by such Person is subject, the lesser of the fair market value at such date of any asset subject to a Lien securing the Indebtedness of others and the amount of the Indebtedness secured.

"**Indemnified Matters**" is defined in Section 10.7(B) hereof.

"**Indemnitees**" is defined in Section 10.7(B) hereof.

"**Interest Expense**" is defined in Section 7.4(A) hereof.

"**Interest Payment Date**" means (a) with respect to ABR Loans, the last Business Day of each calendar month, and (b) with respect to each LIBOR Loan, the last day of the Interest Period for such LIBOR Loan.

"**Interest Period**" shall mean, as to any LIBOR Advance, the period commencing on the date of such LIBOR Advance (including as a result of a refinancing of ABR Loans) or on the last day of the preceding Interest Period applicable to such LIBOR Advance and ending on the numerically corresponding day (or if there is no corresponding day, the last day) in the calendar month that is one (1) month thereafter; provided, however, that (i) if any Interest Period would

end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) no Interest Period shall end later than the Termination Date.

"**Interim Availability Amount**" means $5,000,000.

"**Interim Availability Period**" means the period commencing on the date of entry of the Interim Order and ending on the Final Order Entry Date.

"**Interim Order**" means an order (in substantially the form of <u>Exhibit D</u> and otherwise in form and substance satisfactory to the Administrative Agent) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code granting interim approval of this Agreement and the other Loan Documents, including the granting of the super-priority claims and first priority lien status, the waiver of rights under Section 506(c) of the Bankruptcy Code and the payment of all fees constituting Obligations hereunder and modifying the automatic stay solely to permit each Borrower to perform its obligations hereunder and under the other Loan Documents and the Lenders and the Administrative Agent to exercise their rights and remedies in accordance with <u>Article IX</u> of this Agreement, authorizing the incurrence by each Borrower of secured and super-priority Indebtedness in accordance with this Agreement, as to which no stay has been entered and which has not been reversed, vacated or overturned, and which has not been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Administrative Agent waives such requirement.

"**Inventory**" shall mean any and all goods now owned or hereafter acquired by the Borrowers, including, without limitation, goods in transit, wheresoever located, which are held for sale or lease, furnished under any contract of service or held as raw materials, work in process or supplies, and all materials used or consumed in the Borrowers' business, and shall include all right, title and interest of the Borrowers in any property the sale or other disposition of which has given rise to Receivables and which has been returned to or repossessed or stopped in transit by the Borrowers.

"**Investment**" means, with respect to any Person, any investment by such Person in any other Person, including (i) any purchase or other acquisition by that Person of any Indebtedness, Equity Interests or other securities, or of a beneficial interest in any Indebtedness, Equity Interests or other securities, issued by any other Person, (ii) any purchase by that Person of all or substantially all of the assets of a business conducted by another Person, and (iii) any loan, advance (other than deposits with financial institutions available for withdrawal on demand, prepaid expenses, accounts receivable, advances to employees and similar items made or incurred in the ordinary course of business) or capital contribution by that Person to any other

Person, including all Indebtedness to such Person arising from a sale of property by such Person other than in the ordinary course of its business.

"**IRS**" means the Internal Revenue Service and any Person succeeding to the functions thereof.

"**Lenders**" means the lending institutions listed on the signature pages of this Agreement and their respective successors and assigns.

"**Lending Installation**" means, with respect to a Lender or the Administrative Agent, any office, branch, subsidiary or affiliate of such Lender or the Administrative Agent.

"**LIBOR Advance**" means an Advance comprised of LIBOR Loans.

"**LIBOR Loan**" means a Loan, or portion thereof, which bears interest at LIBOR plus the Applicable Margin.

"**Lien**" means any lien (statutory or other), mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance or preference, priority or security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, Capitalized Lease or other title retention agreement).

"**Loan(s)**" means, collectively, all loans and advances of any kind made by the Administrative Agent or any Lender pursuant to this Agreement.

"**Loan Account**" is defined in Section 2.13(F) hereof.

"**Loan Documents**" means this Agreement, the Notes, the Collateral Documents, each Order and all other documents, instruments and agreements executed in connection therewith or contemplated thereby, as the same may be amended, restated or otherwise modified and in effect from time to time.

"**Management Group**" means the persons listed on Schedule 1.1.6 for so long as they hold the management positions reflected on Schedule 1.1.6.

"**Margin Stock**" shall have the meaning ascribed to such term in Regulation U.

"**Material Adverse Effect**" means a material adverse effect upon (a) the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrowers taken as a whole, (b) the ability of any of the Borrowers to perform their respective obligations under the Loan Documents in any material respect, or (c) the ability of the Lenders or the Administrative Agent to enforce in any material respect the Obligations or their rights with respect to the Collateral; provided, however, that no state of facts, change, event, effect or occurrence arising or related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) the taking of any action contemplated by the Stalking Horse Purchase Agreement, or (ii) changes as a result of the announcement or pendency of the Stalking Horse Purchase Agreement.

"**Maturity Date**" means the date that is one hundred (100) days after the Filing Date.

"**Maximum Availability Period**" means the period commencing on the Final Order Entry Date and ending on the Termination Date.

"**Multiemployer Plan**" means a "Multiemployer Plan" as defined in Section 4001(a)(3) of ERISA which is, or within the immediately preceding six (6) years was, contributed to by any Borrower or any member of the Controlled Group.

"**Net Cash Proceeds**" means (a) cash received by any Person or any Domestic Subsidiary of such Person from any Asset Sale by any Person (including cash received as consideration for the assumption or incurrence of liabilities incurred in connection with or in anticipation of such Asset Sale), Debt Issuance or Equity Issuance, after (i) in connection with any Asset Sale, provision for all income or other taxes actually paid with respect to such Asset Sale in the taxable year thereof or in the following taxable year, (ii) payment of all reasonable brokerage and underwriting commissions and other fees and expenses related to such Asset Sale, Debt Issuance or Equity Issuance, (iii) in connection with any Asset Sale, all amounts used to repay Indebtedness secured by a prior Lien on any asset disposed of in such Asset Sale or which is or may be required (by the express terms of a post-petition instrument governing such Indebtedness or an order of the Bankruptcy Court) to be repaid in connection with such Asset Sale (including payments made to obtain or avoid the need for the consent of any holder of such Indebtedness), and (iv) in connection with any Asset Sale, deduction of appropriate amounts to be provided by such Person or a Domestic Subsidiary of such Person as a reserve, in accordance with Agreement Accounting Principles, against any liabilities associated with the assets sold or disposed of in such Asset Sale and retained by such Person or a Domestic Subsidiary of such Person after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with the assets sold or disposed of in such Asset Sale; and (b) in connection with any Asset Sale, cash payments in respect of any Indebtedness, Equity Interest or other consideration received by such Person or any Domestic Subsidiary of such Person from such Asset Sale upon receipt of such cash payments by such Person or such Domestic Subsidiary.

"**Net Income**" is defined in Section 7.4(A) hereof.

"**Net Forced Liquidation Value**" means the forced liquidation value (net of costs and expenses incurred in connection with liquidation) of all Inventory of the Borrowers as set forth in the most recent appraisal of such Inventory conducted by or at the request of the Administrative Agent pursuant to this Agreement.

"**Net Orderly Liquidation Value**" means the orderly liquidation value (net of costs and expenses incurred in connection with liquidation) of all Inventory of the Borrowers as set forth in the most recent appraisal of such Inventory conducted by or at the request of the Administrative Agent pursuant to this Agreement.

"**NFLV Percentage**" means a quotient expressed as a percentage (a) the numerator of which is the aggregate Net Forced Liquidation Value of all Inventory of the Borrowers and (b) the denominator is the aggregate value of all Eligible Inventory of the Borrowers as of the date of the most recent appraisal of such Inventory conducted for purposes of determining such Net Forced Liquidation Value, valued at the lower of cost and market on a first-in-first-out basis.

"**NOLV Percentage**" means a quotient expressed as a percentage (a) the numerator of which is the aggregate Net Orderly Liquidation Value of all Inventory of the Borrowers and (b) the denominator is the aggregate value of all Eligible Inventory of the Borrowers as of the date of the most recent appraisal of such Inventory conducted for purposes of determining such Net Orderly Liquidation Value, valued at the lower of cost and market on a first-in-first-out basis.

"**Notes**" means the Revolving Notes.

"**Notice of Assignment**" is defined in Section 13.3(B) hereof.

"**Obligations**" means all Loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrowers to the Administrative Agent, any Lender, any affiliate of the Administrative Agent, any Lender, or any Indemnitee, of any kind or nature, present or future, arising under this Agreement, the Notes, the Collateral Documents or any other Loan Document or with respect to Cash Management Obligations, whether or not evidenced by any note, guaranty or other instrument, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification, or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired. The term includes, without limitation, all interest, charges, expenses, fees, attorneys' fees and disbursements, paralegals' fees (in each case whether or not allowed), and any other sum chargeable to the Borrowers under this Agreement or any other Loan Document.

"**OFAC**" is defined in Section 6.20(B)(i) hereof.

"**Off-Balance Sheet Liabilities**" of a Person means (a) any repurchase obligation or liability of such Person or any of its Subsidiaries with respect to Receivables sold by such Person or any of its Subsidiaries, (b) any liability of such Person or any of its Subsidiaries under any sale and leaseback transactions which do not create a liability on the consolidated balance sheet of such Person, (c) any liability of such Person or any of its Subsidiaries under any financing lease or so-called "synthetic" lease transaction, or (d) any obligations of such Person or any of its Subsidiaries arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the consolidated balance sheets of such Person and its Subsidiaries.

"**Officer's Certificate**" means a certificate in form and substance substantially similar to Exhibit E hereto.

"**Orders**" means the Interim Order and the Final Order.

"**Original Budget**" means the cash flow forecast attached as Exhibit I.

"**Other Taxes**" is defined in Section 2.13(E)(ii) hereof.

"**Participants**" is defined in Section 13.2(A) hereof.

"**Patriot Act**" is defined in Section 10.17 hereof.

"**PBGC**" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"**PCBs**" is defined in the definition of Contaminant above.

"**Permitted Existing Contingent Obligations**" means the Contingent Obligations of the Borrowers existing on the date hereof and identified as such on Schedule 1.1.2 to this Agreement.

"**Permitted Existing Indebtedness**" means the Indebtedness of the Borrowers existing on the date hereof and identified as such on Schedule 1.1.3 to this Agreement.

"**Permitted Existing Investments**" means the Investments of the Borrowers existing on the date hereof and identified as such on Schedule 1.1.4 to this Agreement.