"**Permitted Existing Liens**" means the Liens on assets of the Borrowers existing on the date hereof and identified as such on Schedule 1.1.5 to this Agreement.

"**Permitted Payments**" means the payments permitted to be made by the Borrowers under the First Day Orders.

"**Permitted Purchase Money Indebtedness**" is defined in Section 7.3(A)(v) hereof.

"**Person**" means any individual, corporation, firm, enterprise, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company or other entity of any kind, or any government or political subdivision or any agency, department or instrumentality thereof.

"**Plan**" means an employee benefit plan defined in Section 3(3) of ERISA in respect of which the Borrower or any member of the Controlled Group is, or within the immediately preceding six (6) years was, an "employer" as defined in Section 3(5) of ERISA.

"**Pledge Agreement**" means that certain Debtor-in-Possession Pledge Agreement dated as of the date hereof, executed by the Borrowers party thereto in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Post-Petition**" means, when used with respect to any agreement or instrument, any claim or proceeding or any other matter, an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred, after the Filing Date.

"**Prepayment Date**" means thirty (30) days after the entry of the Interim Order by the Bankruptcy Court if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such thirty (30) day period.

"**Pre-Petition Agreements**" means, collectively, the Pre-Petition Credit Documents, the Pre-Petition Term Loan (A) Documents and the Pre-Petition Term Loan (B) Documents.

"**Pre-Petition Collateral**" means, collectively, "Collateral" (as defined in the Pre-Petition Credit Agreement), "Collateral" (as defined in the Pre-Petition Term Loan (A) Agreement) and "Collateral" (as defined in the Pre-Petition Term Loan (B) Agreement), and all proceeds thereof.

"**Pre-Petition Credit Agreement**" means, that certain Credit Agreement, dated as of July 25, 2006, among PTC and each of its subsidiaries from time to time party thereto, as borrowers, the Pre-Petition Credit Agreement Agent, and the Pre-Petition Credit Agreement Lenders, as the same has been amended, supplemented or otherwise modified from time to time.

"**Pre-Petition Credit Documents**" means, collectively, the Pre-Petition Credit Agreement and each of the "Loan Documents" (as defined therein).

"**Pre-Petition Credit Agreement Agent**" means Black Diamond Commercial Finance, L.L.C., as administrative agent under the Pre-Petition Credit Agreement.

"**Pre-Petition Credit Agreement Lenders**" means the banks and financial institutions party to the Pre-Petition Credit Agreement as lenders.

"**Pre-Petition Creditor**" means the Pre-Petition Credit Agreement Agent, any Pre-Petition Credit Agreement Lender, the Pre-Petition Term Loan (A) Agent, any Pre-Petition Term Loan (A) Lender, the Pre-Petition Term Loan (B) Agent and any Pre-Petition Term Loan (B) Lender.

"**Pre-Petition Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of July 25, 2006, among the Pre-Petition Credit Agreement Agent, the Pre-Petition Term Loan (A) Agent, the Pre-Petition Term Loan (B) Agent and the Borrowers, as in effect on the Filing Date.

"**Pre-Petition Obligations**" means the obligations of Borrowers under the Pre-Petition Credit Documents, the Pre-Petition Term Loan (A) Documents and the Pre-Petition Term Loan (B) Documents.

"**Pre-Petition Term Loan (A) Agent**" means The Bank of New York Mellon Corporation (formerly known as The Bank of New York), as administrative agent under the Pre-Petition Term Loan (A) Agreement.

"**Pre-Petition Term Loan (A) Agreement**" means that certain Term Loan (A) Agreement, dated as of July 25, 2006, among PTC and each of its domestic subsidiaries from time to time party thereto, as borrowers, the Pre-Petition Term Loan (A) Lenders and the Pre-Petition Term Loan (A) Agent, as the same may be amended, supplemented or otherwise modified from time to time.

"**Pre-Petition Term Loan (A) Documents**" means, collectively, the Pre-Petition Term Loan (A) Agreement and the other "Loan Documents" (as defined therein).

"**Pre-Petition Term Loan (A) Lenders**" means the banks and financial institutions party to the Pre-Petition Term Loan (A) Agreement as lenders.

"**Pre-Petition Term Loan (B) Agent**" means The Bank of New York Mellon Corporation (formerly known as The Bank of New York), as administrative agent under the Pre-Petition Term Loan (B) Agreement.

"**Pre-Petition Term Loan (B) Agreement**" means that certain Term Loan (B) Agreement, dated as of July 25, 2006, among PTC and each of its domestic subsidiaries from time to time party thereto, as borrowers, the Pre-Petition Term Loan (B) Lenders and the Pre-Petition Term Loan (B) Agent, as the same may be amended, supplemented or otherwise modified from time to time.

"**Pre-Petition Term Loan (B) Documents**" means, collectively, the Pre-Petition Term Loan (B) Agreement and the other "Loan Documents" (as defined therein).

"**Pre-Petition Term Loan (B) Lenders**" means the banks and financial institutions party to the Pre-Petition Term Loan (B) Agreement as lenders.

"**Primed Liens**" is defined in the preliminary statements of this Agreement.

"**Priming Lien**" is defined in the preliminary statements of this Agreement.

"**Prime Rate**" means the prime rate of interest published in *The Wall Street Journal*, changing when and as said prime rate changes.

"**Professionals**" means a Person retained or to be compensated for services rendered or costs incurred on or after the Filing Date by any Borrower or Committee pursuant to sections 327, 328, 329, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code in the Borrowers' Cases.

"**Proposed Budget**" is defined in Section 7.1(A)(viii)(1) hereof.

"**Pro Rata Share**" means, with respect to any Lender, the percentage obtained by dividing (a) such Lender's Revolving Loan Commitment at such time (as adjusted from time to time in accordance with the terms of this Agreement) by (b) the Aggregate Revolving Loan Commitment at such time; provided, however, if all of the Revolving Loan Commitments are terminated pursuant to the term of this Agreement, then "Pro Rata Share" means the percentage obtained by dividing (1) the principal amount of such Lender's Revolving Loans then outstanding by (2) the aggregate principal amount of all of the Revolving Loans; provided that

when a Defaulting Lender shall exist, any such Defaulting Lender's Revolving Commitment shall be disregarded in the calculation.

"**PTC**" is defined in the preamble hereto.

"**PTC Asia**" means PTC Alliance Precision Products (Asia) Private Limited, a company organized under the laws of India.

"**Purchasers**" is defined in Section 13.3(A) hereof.

"**Qualified Bid**" is defined in the Stalking Horse Purchase Agreement.

"**Receivable(s)**" means and includes all of the Borrowers' presently existing and hereafter arising or acquired accounts, accounts receivable, and all present and future rights of the Borrowers to payment for goods sold or leased or for services rendered (except those evidenced by instruments or chattel paper), whether or not they have been earned by performance, and all rights in any merchandise or goods which any of the same may represent, and all rights, title, security and guaranties with respect to each of the foregoing, including, without limitation, any right of stoppage in transit.

"**Reduction Fee**" is defined in Section 2.13(C)(iii) hereof.

"**Register**" is defined in Section 13.3(C) hereof.

"**Regulation T**" means Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor or other regulation or official interpretation of said Board of Governors relating to the extension of credit by and to brokers and dealers of securities for the purpose of purchasing or carrying margin stock (as defined therein).

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor or other regulation or official interpretation of said Board of Governors relating to the extension of credit by banks for the purpose of purchasing or carrying Margin Stock applicable to member banks of the Federal Reserve System.

"**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor or other regulation or official interpretation of said Board of Governors relating to the obtaining of credit by borrowers for the purpose of purchasing or carrying margin stock (as defined therein).

"**Release**" means any intentional or unintentional release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment, including the movement of Contaminants through or in the air, soil, surface water or groundwater.

"**Reorganization Plan**" means a plan of reorganization in the Cases.

"**Replacement Lender**" is defined in Section 2.18 hereof.

"**Reportable Event**" means a reportable event as defined in Section 4043 of ERISA and the regulations issued under such section, with respect to a Plan, excluding, however, such events as to which the PBGC by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days after such event occurs, provided, however, that a failure to meet the minimum funding standards of Sections 412 or 430 of the Code and of Sections 302 or 303 of ERISA shall be a Reportable Event regardless of the issuance of any such waiver of the notice requirement in accordance with either Section 4043(a) of ERISA or Section 412(c) of the Code.

"**Required Lenders**" means Lenders whose Pro Rata Shares constitute more than fifty percent (50%) of the aggregate Pro Rata Shares; provided, however, that, if any Lender with a Revolving Loan Commitment shall have wrongfully failed to fund its Pro Rata Share of any Revolving Loan requested by the Borrower Representative, which such Lender is obligated to fund under the terms of this Agreement and any such failure has not been cured, then "Required Lenders" shall be determined in accordance with Section 9.2.

"**Requirements of Law**" means, as to any Person, the charter and by-laws or other organizational or governing documents of such Person, and any law, rule or regulation, or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject including, without limitation, the Securities Act of 1933, the Securities Exchange Act of 1934, Regulations T, U and X, ERISA, the Fair Labor Standards Act, the Worker Adjustment and Retraining Notification Act, Americans with Disabilities Act of 1990, and any certificate of occupancy, zoning ordinance, building, environmental or land use requirement or permit or environmental, labor, employment, occupational safety or health law, rule or regulation, including Environmental, Health or Safety Requirements of Law.

"**Restricted Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Borrower or any of its Subsidiaries now or hereafter outstanding, except a dividend payable solely in such Borrower's or such Subsidiary's Capital Stock or in options, warrants or other rights to purchase such Capital Stock, (ii) any redemption, retirement, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Borrower or any of its Subsidiaries now or hereafter outstanding, other than in exchange for,

or out of the proceeds of, the substantially concurrent sale of other Equity Interests of such Borrower or such Subsidiary, (iii) any redemption, purchase, retirement, defeasance, prepayment or other acquisition for value, direct or indirect, of (A) any pre-petition Indebtedness or (B) any other Indebtedness prior to the stated maturity thereof, and (iv) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any Indebtedness (other than the Obligations) or any Equity Interests of any Borrower or any of its Subsidiaries, or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission.

"**Revolving Credit Availability**" means, at any particular time, the amount by which the Revolving Credit Maximum Amount at such time exceeds the Revolving Credit Obligations at such time.

"**Revolving Credit Maximum Amount**" means, at any particular time, the lesser of (a) the Aggregate Revolving Loan Commitment at such time and (b) the Borrowing Base at such time; provided that in no event shall the Revolving Credit Maximum Amount exceed the maximum principal amount of Revolving Loans approved by the Bankruptcy Court pursuant to the then-effective Order.

"**Revolving Credit Obligations**" means, at any particular time, the outstanding principal amount of the Revolving Loans at such time.

"**Revolving Loan(s)**" is defined in Section 2.1 hereof.

"**Revolving Loan Commitment**" means, for each Lender, the obligation of such Lender to make Revolving Loans not exceeding the amount set forth on Schedule 1 to this Agreement opposite its name thereon or on Schedule 1 of the assignment and acceptance by which it became a Lender, as such amount may be modified from time to time pursuant to the terms of this Agreement or to give effect to any applicable assignment and acceptance.

"**Revolving Note**" means a promissory note, in substantially the form of Exhibit F hereto, duly executed by the Borrowers and payable to a Lender in the amount of its Revolving Loan Commitment, including any amendment, restatement, modification, renewal or replacement of such Revolving Note.

"**Risk-Based Capital Guidelines**" is defined in Section 4.2 hereof.

"**Sale**" means the sale of substantially all of the assets of the Borrowers under section 363 of the Bankruptcy Code pursuant to the Auction.

"**Sale Date**" is defined in Section 7.2(T)(v) hereof.

"**Sale Order**" is defined in Section 5.2(H) hereof.

"**Secured Parties**" is defined in the Security Agreement.

"**Security Agreement**" means that certain Debtor-in-Possession Security Agreement, dated as of the date hereof, executed by the Borrowers in favor of the Administrative Agent for the benefit of the Secured Parties, as amended, restated or otherwise modified from time to time.

"**Single Employer Plan**" means a Plan (exclusive of any Multiemployer Plan) maintained by one or more members of the Controlled Group exclusively for employees of one or more members of the Controlled Group.

"**Stalking Horse Bidder**" means BD PTC Acquisition, Inc., a Delaware corporation.

"**Stalking Horse Purchase Agreement**" means that certain Asset Purchase Agreement dated as of October _____, 2009, among the Borrowers and the Stalking Horse Bidder, as the same may be amended, modified, supplemented or restated from time to time.

"**Statutory Reserves**" means on any date the percentage (expressed as a decimal) established by the Board and any other banking authority which is, for purposes of the definition of Adjusted LIBOR Rate, the then stated maximum rate for all reserves (including but not limited to any emergency, supplemental or other marginal reserve requirements) applicable to any member Lender of the Federal Reserve System in respect of Eurocurrency Liabilities (or any successor category of liabilities under Regulation D issued by the Board, as in effect from time to time). Such reserve percentages shall include, without limitation, those imposed pursuant to said Regulation. The Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in such percentage.

"**Subsidiary**" of a Person means (i) any corporation more than fifty percent (50%) of the outstanding securities having ordinary voting power of which shall at the time be owned or controlled, directly or indirectly, by such Person or by one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries, or (ii) any partnership, association, joint venture or similar business organization more than fifty percent (50%) of the ownership interests of which shall at the time be so owned or controlled. For purposes of this Agreement, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, association, joint venture or similar business organization if such Person or Persons shall be allocated a majority of the partnership, association, joint venture or similar business organization gains or losses or shall be or control the managing general partner of such partnership, association, joint venture or similar

business organization. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of PTC.

"**Subsidiary Loan Parties**" is defined in the preamble to this Agreement.

"**Tax Related Person**" means any Person (including, without limitation, a beneficial owner of an interest in a pass-through entity) whose income is realized through or determined by reference to the Administrative Agent, any Lender, and any Tax Related Person of any of the foregoing.

"**Taxes**" is defined in Section 2.13(E)(i) hereof.

"**Termination Conditions**" is defined in Section 2.17 hereof.

"**Termination Date**" shall mean the earliest to occur of (i) the Prepayment Date, (ii) the Maturity Date, (iii) the Sale Date and (iv) the acceleration of the Loans and the termination of the Revolving Loan Commitment in accordance with the terms hereof.

"**Termination Event**" means (i) a Reportable Event with respect to any Benefit Plan; (ii) the withdrawal of PTC or any member of the Controlled Group from a Benefit Plan during a plan year in which PTC or such Controlled Group member was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or the cessation of operations which within a twelve-month period results in the termination of employment of twenty percent (20%) of Benefit Plan participants who are employees of PTC or any member of the Controlled Group; (iii) the imposition of an obligation on PTC or any member of the Controlled Group under Section 4041 of ERISA to provide affected parties written notice of intent to terminate a Benefit Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the institution by the PBGC of proceedings to terminate a Benefit Plan; (v) any event or condition which could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Benefit Plan; (vi) the partial or complete withdrawal of PTC or any member of the Controlled Group from a Multiemployer Plan or (vii) the failure of any Plan intended to be qualified under Section 401(a) of the Code to be so qualified or the failure of any related trust intended to be exempt under Section 501(a) of the Code to be so exempt.

"**Transaction Costs**" means the fees, costs and expenses payable by the Borrowers in connection with the execution, delivery and performance of the Loan Documents.

"**Transaction Documents**" means the Loan Documents and the agreements, documents, and instruments delivered in connection therewith.

"**Transactions**" means the financing contemplated by this Agreement, and the other transactions consummated in connection therewith.

"**Transferee**" is defined in <u>Section 13.5</u> hereof.

"**Type**" when used in respect of any Loan shall refer whether such Loan is an ABR Loan, or a LIBOR Loan.

"**Unfunded Liabilities**" means (i) in the case of Single Employer Plans, the amount (if any) by which the present value of all vested nonforfeitable benefits under all Single Employer Plans exceeds the fair market value of all such Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plans, and (ii) in the case of Multiemployer Plans, the withdrawal liability that would be incurred by the Controlled Group if all members of the Controlled Group completely withdrew from all Multiemployer Plans.

"**Unmatured Default**" means an event which, but for the lapse of time or the giving of notice, or both, would constitute a Default.

"**Wiederholt**" means Wiederholt GmbH, a corporation organized under the laws of the Federal Republic of Germany.

"**Wholly-Owned Subsidiary**" of any Person means a Subsidiary of such Person (i) all of the Equity Interests or other ownership interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more other Wholly-Owned Subsidiaries of such Person and (ii) of which such Person possesses, directly or indirectly, the power to direct or cause the direction of the management or policies, whether through the ownership of voting securities, by agreement or otherwise.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms. Any accounting terms used in this Agreement which are not specifically defined herein shall have the meanings customarily given them in accordance with Agreement Accounting Principles.

1.3     <u>References</u>.   The existence throughout the Agreement of references to the Borrowers' Subsidiaries is for a matter of convenience only.  Any references to Subsidiaries of the Borrowers set forth herein shall not in any way be construed as consent by the Administrative Agent or any Lender to the establishment, maintenance or acquisition of any Subsidiary, except as may otherwise be permitted hereunder.

1.4     <u>Supplemental Disclosure</u>.   At any time at the reasonable request of the Administrative Agent and at such additional times as the Borrowers determine, the Borrowers shall supplement each schedule or representation herein or in the other Loan Documents with

respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such schedule or as an exception to such representation or which is necessary to correct any information in such schedule or representation which has been rendered inaccurate thereby. Unless any such supplement to such schedule or representation discloses the existence or occurrence of events, facts or circumstances which are not prohibited by the terms of this Agreement or any other Loan Documents, such supplement to such schedule or representation shall not be deemed an amendment thereof unless expressly consented to in writing by the Administrative Agent and the Required Lenders, and no such amendments, except as the same may be consented to in a writing which expressly includes a waiver, shall be or be deemed a waiver by the Administrative Agent or any Lender of any Default disclosed therein. Any items disclosed in any such supplemental disclosures shall be included in the calculation of any baskets, limits or similar restrictions contained in this Agreement or any other Loan Documents.

## ARTICLE II: THE CREDIT FACILITIES

2.1 <u>Revolving Loans</u>. Upon the satisfaction of the conditions precedent set forth in Sections 5.1 and <u>5.2</u>, from and including the date of this Agreement and prior to the Termination Date, each Lender severally and not jointly agrees, on the terms and conditions set forth in this Agreement, to make revolving loans to the Borrowers from time to time, in Dollars, in an amount not to exceed such Lender's Revolving Loan Commitment (each individually, a "<u>Revolving Loan</u>" and, collectively, the "<u>Revolving Loans</u>"); <u>provided</u>, that (a) at no time during the Interim Availability Period shall the Revolving Credit Obligations exceed the Interim Availability Amount, and (b) at no time shall the Revolving Credit Obligations exceed the Revolving Credit Maximum Amount. Subject to the terms of this Agreement, the Borrowers may borrow, repay and reborrow Revolving Loans at any time prior to the Termination Date. On the Termination Date, the Borrowers shall repay in full the outstanding principal balance of the Revolving Loans. Each Advance under this <u>Section 2.1</u> shall consist of Revolving Loans made by each Lender ratably in proportion to such Lender's respective Pro Rata Share.

2.2 [RESERVED].

2.3 <u>Optional Payments; Mandatory Prepayments</u>.

(A) <u>(i) Optional Payments</u>. The Borrowers may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent at least three (3) Business Days prior thereto in the case of LIBOR Loans and at least one (1) Business Day prior thereto in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of LIBOR Loans or ABR Loans. Upon receipt of any such notice the Administrative Agent shall promptly notify each Lender. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an amount that is an integral multiple of $100,000 and not less than $200,000. Each prepayment of Loans pursuant to this <u>Section 2.3(A)(i)</u> shall be paid to the Administrative Agent, for the account of the Lenders in accordance with their Pro Rata Shares.

(2)  **Reduction of Revolving Loan Commitments.** Unless a Default or Unmatured Default shall be continuing, the Borrowers may permanently reduce the Aggregate Revolving Loan Commitment in whole, or in part ratably among the Lenders, in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount (unless the Aggregate Revolving Loan Commitment is reduced in whole), upon at least thirty (30) Business Days' written notice to the Administrative Agent, which notice shall specify the amount of any such reduction; provided, however, that the amount of the Aggregate Revolving Loan Commitment may not be reduced below the aggregate principal amount of the outstanding Revolving Credit Obligations. Borrowers shall pay the Reduction Fee contemplated under Section 2.13(C)(iv) on the effective date of such reduction. All accrued commitment fees shall be payable on the effective date of any termination of the obligations of the Lenders to make Loans hereunder.

(B)  **Mandatory Prepayments.**

(ii)  **Mandatory Prepayments on the Happening of Certain Events.**

(1)  **Asset Sale Prepayments.** Upon the consummation of any Asset Sale by any Borrower, other than those Asset Sales permitted pursuant to Sections 7.3(B)(i), (ii) and (iii), within three (3) Business Days after any Borrower's or its designee's (i) receipt of any Net Cash Proceeds from such Asset Sale, or (ii) conversion to cash or Cash Equivalents of non-cash proceeds (whether principal or interest and including securities, release of escrow arrangements or lease payments) received from such Asset Sale, the Borrowers shall make a mandatory prepayment of the Revolving Loans in an amount equal to one hundred percent (100%) of such Net Cash Proceeds or such proceeds converted from non-cash to cash or Cash Equivalents. Nothing in this Section 2.3(B)(i)(1) shall be construed to constitute any Lender's consent to any transaction referred to in this Section 2.3(B)(i)(1) which is not expressly permitted by the terms of this Agreement.

(2)  **Debt Issuance or Equity Issuance.** Not later than one (1) Business Day following the receipt of any Net Cash Proceeds of any Debt Issuance or Equity Issuance by any Borrower or any of their respective Domestic Subsidiaries, Borrowers shall make a mandatory prepayment of the Revolving Loans in an amount equal to one hundred percent (100%) of such Net Cash Proceeds. Nothing in this Section 2.3(B)(i)(2) shall be construed to constitute any Lender's consent to any transaction referred to in this Section 2.3(B)(i)(2) which is not expressly permitted by the terms of this Agreement.

(3)  **Insurance, Condemnation, etc. Proceeds.** Not later than three (3) Business Days following the receipt of any insurance, condemnation, or eminent domain proceeds by the Borrowers or any of their Domestic Subsidiaries (other than

proceeds for insurance on freight claims or for unpaid accounts receivable), Borrowers shall make a mandatory prepayment of the Revolving Loans in an amount equal to one hundred percent (100%) of such proceeds so received. Nothing in this <u>Section 2.3(B)(i)(3)</u> shall be construed to constitute any Lender's consent to any transaction referred to in this <u>Section 2.3(B)(i)(3)</u> which is not expressly permitted by the terms of this Agreement.

(4) <u>Application of Prepayments</u>. Unless a Default shall have occurred and is continuing (in which case the provisions of <u>Section 12.3</u> shall control), each mandatory prepayment required by <u>clauses (1) through (3)</u> of this <u>Section 2.3(B)(i)</u> shall be applied <i>first</i> to repayment of Revolving Loans and <i>second</i>, to the other Obligations then due and payable.

(5) <u>Change of Control Prepayments</u>. Upon the occurrence of a Change of Control, the Borrower shall immediately make a mandatory prepayment of the Obligations in the entire outstanding amount thereof. Such prepayment shall be allocated and applied in accordance with <u>Section 12.3</u>.

(iii) <u>Other Mandatory Prepayments of Revolving Loans</u>. If at any time and for any reason the Revolving Credit Obligations are greater than the Revolving Credit Maximum Amount, the Borrowers shall immediately make a mandatory prepayment of the Revolving Loans to the extent necessary to eliminate such excess.

2.4 <u>Method of Making Advances</u>.

(A) The Administrative Agent shall promptly (but in any event not later than 10:00 a.m. (New York City time) on the applicable Borrowing Date) notify each Lender of its proportionate share of such Advance, the date of such Advance, and the Type of Advance. Not later than 12:00 noon (New York City time) on each Borrowing Date, each Lender shall make available its Revolving Loan in funds immediately available in Chicago to the Administrative Agent at its address specified pursuant to <u>Article XIV</u>. The Administrative Agent will promptly make the funds so received from the Lenders available to the Borrowers at the Administrative Agent's aforesaid address. Subject to the limitations set forth in <u>Section 2.7</u>, Loans shall be either ABR Loans or LIBOR Loans as the Borrower Representative may request subject to and in accordance with this <u>Article II</u>, <u>provided</u>, that all Loans made pursuant to the same Advance shall, unless otherwise specifically provided herein, be Loans of the same Type. Each Lender may fulfill its Commitment with respect to any LIBOR Loan or ABR Loan by causing any lending office of such Lender to make such Loan; <u>provided</u>, that any such use of a lending office shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement. Each Lender shall, subject to its overall policy considerations, use reasonable efforts (but shall not be obligated) to select a lending office which will not result in the payment of increased costs by the Borrowers pursuant to <u>Section 2.13</u> or <u>Article IV</u>. Subject to the other provisions of this Agreement, Advances of Loans of more than one Type may be incurred at the

same time, provided, that no more than three (3) Advances of LIBOR Loans may be outstanding at any time.

(B)    Administrative Agent Advances.  Notwithstanding any other provision of this Agreement, and in order to reduce the number of fund transfers among the Borrowers, the Administrative Agent, and the Lenders, the Borrowers, the Administrative Agent, and the Lenders agree that the Administrative Agent may (but shall not be obligated to), and the Borrowers and the Lenders hereby irrevocably authorize the Administrative Agent to, fund, on behalf of the Lenders, Revolving Loans pursuant to Section 2.4(A), subject to the procedures for settlement set forth in Section 2.4(C); provided, however, that (a) the Administrative Agent shall in no event fund any such Revolving Loans if the Administrative Agent shall have received written notice from the Required Lenders on the Business Day prior to the date of the proposed Revolving Loan that one or more of the conditions precedent contained in Section 5.2 will not be satisfied at the time of the proposed Revolving Loan, and (b) the Administrative Agent shall not otherwise be required to determine that, or take notice whether, the conditions precedent in Section 5.2 have been satisfied.  All Revolving Loans funded by the Administrative Agent pursuant to this Section 2.4(B) shall be ABR Loans.

(C)    Procedures for Settlement.

(i)    With respect to all periods for which the Administrative Agent has funded Revolving Loans pursuant to Section 2.4(B), on Friday of each week, or if the applicable Friday is not a Business Day, then on the following Business Day, or such shorter period as the Administrative Agent may from time to time select (any such week or shorter period being herein called a "Settlement Period"), the Administrative Agent shall notify each Lender of the unpaid principal amount of the Revolving Loans outstanding as of the last day of each such Settlement Period.  In the event that such amount is greater than the unpaid principal amount of the Revolving Loans outstanding on the last day of the Settlement Period immediately preceding such Settlement Period (or, if there has been no preceding Settlement Period, the amount of the Revolving Loans made on the date of such Lender's initial funding), each Lender shall promptly (and in any event not later than 2:00 p.m. (New York City time) if the Administrative Agent requests payment from such Lender not later than 12:00 noon (New York City time) on such day) make available to the Administrative Agent its Pro Rata Share of the difference in immediately available funds.  In the event that such amount is less than such unpaid principal amount, the Administrative Agent shall promptly pay over to each Lender its Pro Rata Share of the difference in immediately available funds.  In addition, if the Administrative Agent shall so request at any time when an Unmatured Default or Default shall have occurred and be continuing, or any other event shall have occurred as a result of which the Administrative Agent shall determine that it is desirable to present claims against the Borrowers for repayment, each Lender shall promptly remit to the Administrative Agent or, as the case may be, the Administrative Agent shall promptly remit to each Lender, sufficient funds to adjust the interests of the Lenders in the then outstanding Revolving Loans to such an extent that, after giving effect to such adjustment,

each such Lender's interest in the then outstanding Revolving Loans will be equal to its Pro Rata Share thereof. The obligations of the Administrative Agent and each Lender under this Section 2.4(C)(i) shall be absolute and unconditional. Each Lender shall only be entitled to receive interest on its Pro Rata Share of the Revolving Loans which have been funded by such Lender.

(ii)    In the event that any Lender fails to make any payment required to be made by it pursuant to Section 2.4(C)(i), the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Effective Rate for one (1) Business Day and thereafter at the Alternate Base Rate. During the period in which such Lender has not paid such corresponding amount to the Administrative Agent, notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the amount so advanced by the Administrative Agent to the Borrowers shall, for all purposes hereof, be a Revolving Loan made by the Administrative Agent for its own account. Upon any such failure by a Lender to pay the Administrative Agent, the Borrowers shall, upon demand by the Administrative Agent, repay such amount to the Administrative Agent for its own account. Nothing in this Section 2.4(C)(ii) shall be deemed to relieve any Lender from its obligation to fulfill its Revolving Loan Commitment hereunder or to prejudice any rights that the Administrative Agent or the Borrowers may have against any Lender as a result of any default by such Lender hereunder.

2.5    Method of Requesting Advances. The Borrower Representative shall give the Administrative Agent irrevocable notice in substantially the form of Exhibit G hereto (a "Borrowing Notice") (a) not later than 3:00 p.m. (New York City time) on the Business Day immediately preceding the Borrowing Date of each ABR Advance or (b) not later than 1 p.m. (New York City time) three (3) Business Days preceding the Borrowing Date of each LIBOR Advance, specifying: (i) the Type of Loans to be Advanced; (ii) the Borrowing Date (which shall be a Business Day) of such Advance; and (iii) the aggregate amount of such Advance. If no election is made as to the Type of Loan, such notice shall be deemed a request for Borrowing of ABR Loans.

2.6    Minimum Amount of Each Advance. Each Advance shall be in the minimum amount of $500,000 (and in multiples of $100,000 if in excess thereof), provided, however, that (i) during the Interim Availability Period, any ABR Advance may be in the amount of the unused Interim Availability Amount and (ii) during the Maximum Availability Period, any ABR Advance may be in the amount of the unused Revolving Credit Maximum Amount.

2.7    Alternate Rate of Interest. In the event, and on each occasion, that on the day two (2) Business Days prior to the commencement of any Interest Period for a LIBOR Loan, the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrowers absent manifest error) that reasonable means do not exist for ascertaining the applicable Adjusted LIBOR Rate, the Administrative Agent shall, as soon as practicable thereafter, give written, facsimile or telegraphic notice of such determination to the

Borrower Representative and the Lenders, and any request by the Borrower Representative for an Advance of LIBOR Loans (including pursuant to a refinancing with LIBOR Loans) pursuant to Section 2.5 or 2.8 shall be deemed a request for an Advance of ABR Loans. After such notice shall have been given and until the circumstances giving rise to such notice no longer exist, each request for an Advance of LIBOR Loans shall be deemed to be a request for an Advance of ABR Loans.

2.8    Refinancing of Loans. The Borrowers shall have the right, at any time, on three (3) Business Days' prior irrevocable notice to the Administrative Agent (which notice, to be effective, must be received by the Administrative Agent not later than 1:00 p.m., New York City time, on the third (3rd) Business Day preceding the date of any refinancing), (x) to refinance any outstanding Loans of one Type (or a portion thereof) with an Advance of Loans of another Type or (y) to continue an outstanding Advance of LIBOR Loans for an additional Interest Period, subject to the following:

(A)    as a condition to the refinancing of ABR Loans with LIBOR Loans and to the continuation of LIBOR Loans for an additional Interest Period, no Default shall have occurred and be continuing at the time of such refinancing;

(B)    if less than a full Advance of Loans shall be refinanced, such refinancing shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Loans comprising such Advance held by the Lenders immediately prior to such refinancing;

(C)    the aggregate principal amount of Loans being refinanced shall be at least $1,000,000, provided that no partial refinancing of an Advance of LIBOR Loans shall result in the LIBOR Loans remaining outstanding pursuant to such LIBOR Advance being less than $1,000,000 in aggregate principal amount;

(D)    each Lender shall effect each refinancing by applying the proceeds of its new LIBOR Loan or ABR Loan, as the case may be, to its Loan being refinanced;

(E)    the Interest Period with respect to an Advance of LIBOR Loans effected by a refinancing or in respect to the Advance of LIBOR Loans being continued as LIBOR Loans shall commence on the date of refinancing or the expiration of the current Interest Period applicable to such continuing Advance, as the case may be;

(F)    an Advance of LIBOR Loans may be refinanced only on the last day of an Interest Period applicable thereto; and

(G)     each request for a refinancing with an Advance of LIBOR Loans which fails to state an applicable Interest Period shall be deemed to be a request for an Interest Period of one (1) month.

In the event that the Borrower Representative shall not give notice to refinance or continue any Advance of LIBOR Loans, or the Borrowers shall not be entitled to refinance or continue such Advance as LIBOR Loans, in each case as provided above, such Advance shall automatically be refinanced with an Advance of ABR Loans at the expiration of the then-current Interest Period. The Administrative Agent shall, after it receives notice from the Borrower Representative, promptly give each Lender notice of any refinancing, in whole or part, of any Loan made by such Lender.

2.9     Interest on Obligations.

(A)     Subject to the provisions of Section 2.10, all ABR Loans and all Obligations other than Loans shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin. Interest on Obligations with respect to expenses and the like will be assessed only after the Borrower Representative shall have had a reasonable amount of time to review invoices in connection therewith and only with respect to such amounts which are not being reasonably disputed. Changes in the rate of interest on any ABR Advance will take effect simultaneously with each change in the Alternate Base Rate.

(B)     Subject to the provisions of Section 2.7 and Section 2.10, each LIBOR Advance shall bear interest at a rate per annum equal to the Adjusted LIBOR Rate applicable to such LIBOR Advance plus the Applicable Margin.

2.10     Default Rate. After the occurrence and during the continuance of a Default, the interest rate(s) applicable to the Obligations shall be increased by two percent (2.0%) per annum above the rates otherwise applicable thereto.

2.11     Method of Payment. All payments of principal, interest, and fees hereunder shall be made, without setoff, deduction or counterclaim, in immediately available funds to the Administrative Agent at the Administrative Agent's address specified pursuant to Article XIV, or at any other Lending Installation of the Administrative Agent specified in writing by the Administrative Agent to the Borrower Representative, by 3:00 p.m. (New York City time) on the date when due and shall be made ratably among the Lenders (unless such amount is not to be shared ratably in accordance with the terms hereof). Each payment delivered to the Administrative Agent for the account of any Lender shall be delivered promptly by the Administrative Agent to such Lender in the same type of funds which the Administrative Agent received at its address specified pursuant to Article XIV or at any Lending Installation specified in a notice received by the Administrative Agent from such Lender. The Borrowers authorize the Administrative Agent to charge the Revolving Loan account of the Borrowers for each payment of interest and fees as it becomes due hereunder.

2.12 <u>Notes, Telephonic Notices</u>. Each Lender is authorized to record the principal amount of each of its Loans and each repayment with respect to its Loans on the schedule attached to its respective Notes; <u>provided, however</u>, that the failure to so record shall not affect the Borrowers' obligations under any such Note. The Borrowers authorize the Lenders and the Administrative Agent to extend Advances and to transfer funds based on telephonic notices made by any Person or Persons the Administrative Agent or any Lender in good faith believes to be acting on behalf of the Borrowers. The Borrowers agree to deliver promptly to the Administrative Agent a written confirmation, signed by an Authorized Officer, if such confirmation is requested by the Administrative Agent or any Lender, of each telephonic notice. If the written confirmation differs in any material respect from the action taken by the Administrative Agent and the Lenders, (i) the telephonic notice shall govern absent manifest error and (ii) the Administrative Agent or the Lender, as applicable, shall promptly notify the Authorized Officer who provided such confirmation of such difference.

2.13 <u>Repayment of Loans; Interest and Fees and Taxes</u>.

(A) <u>Promise to Pay</u>. Each of the Borrowers unconditionally promises, jointly and severally, to pay when due the principal amount of each Loan, all unpaid interest accrued thereon and, all other Obligations, all in accordance with the terms of this Agreement and the Notes.

(B) <u>Interest Payment Dates</u>. Interest accrued on each Loan shall be payable on each Interest Payment Date, commencing with the first such date to occur after the date hereof, and at maturity (whether by acceleration or otherwise). Interest accrued on the outstanding balance of all Obligations other than Loans shall be payable in arrears (i) on the last day of each calendar month, commencing on the first such day following the incurrence of such Obligation, (ii) upon repayment thereof in full or in part, and (iii) if not theretofore paid in full, at the time such other Obligation becomes due and payable (whether by acceleration or otherwise).

(C) <u>Fees</u>.

(i) The Borrowers agree to pay to the Administrative Agent, for the account of the Lenders in accordance with their Pro Rata Shares, from and after the Closing Date until the date on which the Aggregate Revolving Loan Commitment shall be terminated in whole, a commitment fee accruing at the rate of the then Applicable Commitment Fee Percentage, on the amount by which the Aggregate Revolving Loan Commitment in effect from time to time exceeds the Revolving Credit Obligations in effect from time to time. All such commitment fees payable under this clause (i) shall be payable monthly in arrears on the last Business Day of each calendar month, and, in addition, on the date on which the Aggregate Revolving Loan Commitment shall be terminated in whole.

(ii) The Borrowers agree to pay to the Administrative Agent the fees set forth in the letter agreement (the "<u>Fee Letter</u>") among the Administrative Agent and the Borrowers dated October __, 2009, payable at the times and in the amounts set forth therein.

(iii)     The Borrowers agree to pay to the Administrative Agent, for the account of the Lenders in accordance with their Pro Rata Shares, upon the permanent reduction, in whole or in part, of the Aggregate Revolving Loan Commitment pursuant to Section 2.3(A)(ii), an amount equal to 5.0% of the amount of any such permanent reduction (the "Reduction Fee").

All fees payable hereunder shall be fully earned on the date such payment is due and shall be non-refundable.

(D)     Interest and Fee Basis.  Interest on LIBOR Loans and all fees shall be calculated daily and shall be computed on the actual number of days elapsed over a year of 360 days, and interest on ABR Loans and all other Obligations shall be calculated daily and computed on the actual number of days elapsed over a year of 365 days (or 366 days, as the case may be).  Interest shall be payable for the day an Obligation is incurred but not for the day of any payment on the amount paid if payment is received prior to 3:00 p.m. (New York City time) at the place of payment.  If any payment of principal of or interest on a Loan or any payment of any other Obligations shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and, in the case of a principal payment, such extension of time shall be included in computing interest in connection with such payment.

(E)     Taxes.

(i)     Any and all payments by or on behalf of the Borrowers under the Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings or any liabilities with respect thereto including those arising after the date hereof as a result of the adoption of or any change in any law, treaty, rule, regulation, guideline or determination of a Governmental Authority or any change in the interpretation or application thereof by a Governmental Authority but excluding, in the case of each Lender and the Administrative Agent, such taxes (including income taxes, franchise taxes and branch profit taxes) as are imposed on or measured by such Lender's or Administrative Agent's, as the case may be, net income by the United States of America or any Governmental Authority of the jurisdiction under the laws of which such Lender or Administrative Agent, as the case may be, is organized or maintains a Lending Installation (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings, and liabilities which the Administrative Agent or a Lender determines to be applicable to this Agreement, the other Loan Documents, the Revolving Loan Commitments and the Loans being hereinafter referred to as "Taxes").  If any Taxes are required to be withheld or deducted from or in respect of any sum payable hereunder or under the other Loan Documents to any Lender or the Administrative Agent, (i) the Borrowers shall increase the sum payable so that after withholdings and payments of all taxes and all required deductions (including deductions and withholdings applicable to additional sums payable under this Section 2.13(E)) such Lender, the Administrative Agent, and each of their Tax Related Persons (as the case may be) receives and retains after payment of all taxes (including income taxes) an amount equal to the sum it would

have received and retained had no such deductions and withholdings been made, (ii) the Borrowers or the Administrative Agent shall make such deductions and withholdings, and (iii) the Borrowers shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. If a withholding tax of the United States of America or any other Governmental Authority shall be or become applicable (y) after the date of this Agreement, to such payments by or on behalf of the Borrowers made to the Lending Installation or any other office that a Lender may claim as its Lending Installation, or (z) after such Lender's selection and designation of any other Lending Installation, to such payments made to such other Lending Installation, such Lender shall use reasonable efforts to make, fund and maintain its Loans through another Lending Installation of such Lender in another jurisdiction so as to reduce the Borrowers' liability hereunder, if the making, funding or maintenance of such Loans through such other Lending Installation of such Lender does not, in the judgment of such Lender, otherwise adversely affect such Lender, its Loans, or obligations under the Revolving Loan Commitments of such Lender.

(ii)     In addition, the Borrowers agree to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, or similar levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement, the other Loan Documents, the Revolving Loan Commitments and the Loans (hereinafter referred to as "Other Taxes").

(iii)     The Borrowers agree to indemnify each Lender and the Administrative Agent for the full amount of Taxes and Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any Governmental Authority on amounts payable under this Section 2.13(E)) paid by such Lender, the Administrative Agent and each of their Tax Related Persons (as the case may be) and any liability (including penalties, interest, and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within thirty (30) days after the date such Lender or the Administrative Agent (as the case may be) makes written demand therefor. A certificate as to any additional amount payable to any Lender or the Administrative Agent under this Section 2.13(E) submitted to the Borrower Representative and the Administrative Agent (if a Lender is so submitting) by such Lender or the Administrative Agent shall show in reasonable detail the amount payable and the calculations used to determine such amount and shall, absent manifest error, be final, conclusive and binding upon all parties hereto. With respect to such deduction or withholding for or on account of any Taxes and to confirm that all such Taxes have been paid to the appropriate Governmental Authorities, the Borrowers shall promptly (and in any event not later than thirty (30) days after receipt) furnish to each Lender and the Administrative Agent such certificates, receipts and other documents as may be required (in the judgment of such Lender or the Administrative Agent) to establish any tax credit to which such Lender or the Administrative Agent may be entitled.

(iv)     Within thirty (30) days after the date of any payment of Taxes or Other Taxes by the Borrowers, the Borrowers shall furnish to the Administrative Agent the original or a certified copy of a receipt evidencing payment thereof.

(v)     Without prejudice to the survival of any other agreement of the Borrowers hereunder, the agreements and obligations of the Borrowers contained in this Section 2.13(E) shall survive the payment in full of principal and interest hereunder and the termination of this Agreement.

(vi)     Without limiting the obligations of the Borrowers under this Section 2.13(E), each Lender (including any Replacement Lender or Purchaser) that is not created or organized under the laws of the United States of America or a political subdivision thereof (each a "Non-U.S. Lender") shall, to the extent legally entitled to do so, deliver to the Borrowers and the Administrative Agent on or before the Closing Date, or, if later, the date on which such Lender becomes a Lender pursuant to Section 13.3 hereof (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent, but only for so long as such Non-U.S. Lender is legally entitled to do so), either (1) two (2) duly completed copies of either (A) IRS Form W-8BEN, or (B) IRS Form W-8ECI, or in either case an applicable successor form; or (2) in the case of a Non-U.S. Lender that is not legally entitled to deliver the forms listed in clause (vi)(1), (x) a certificate of a duly authorized officer of such Non-U.S. Lender to the effect that such Non-U.S. Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of a Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code (such certificate, an "Exemption Certificate") and (y) two (2) duly completed copies of IRS Form W-8BEN or applicable successor form.  Each such Lender further agrees to deliver to the Borrower Representative and the Administrative Agent from time to time a true and accurate certificate executed in duplicate by a duly authorized officer of such Lender in a form reasonably satisfactory to the Borrower Representative and the Administrative Agent, before or promptly upon the occurrence of any event requiring a change in the most recent certificate previously delivered by it to the Borrower Representative and the Administrative Agent pursuant to this Section 2.13(E)(vi).  Further, each Lender which delivers a form or certificate pursuant to this clause (vi) covenants and agrees to deliver to the Borrower Representative and the Administrative Agent within fifteen (15) days prior to the expiration of such form, for so long as this Agreement is still in effect, another such certificate and/or two (2) accurate and complete original newly-signed copies of the applicable form (or any successor form or forms required under the Code or the applicable regulations promulgated thereunder).

Each Lender shall promptly furnish to the Borrower Representative and the Administrative Agent such additional documents as may be reasonably required by the Borrower Representative or the Administrative Agent to establish any exemption from or reduction of any Taxes or Other Taxes required to be deducted or withheld and which may be obtained without undue expense to

such Lender. Notwithstanding any other provision of this <u>Section 2.13(E)</u>, no Borrower shall be obligated to gross up any payments to any Lender pursuant to <u>Section 2.13(E)(i)</u>, or to indemnify any Lender pursuant to <u>Section 2.13(E)(iii)</u>, in respect of United States federal withholding taxes to the extent imposed as a result of (x) the failure of such Lender to deliver to the Borrower Representative the form or forms and/or an Exemption Certificate, as applicable to such Lender, pursuant to <u>Section 2.13(E)(vi)</u>, (y) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding tax on the date first delivered or the information or certifications made therein by the Lender being untrue or inaccurate on the date first delivered in any material respect, or (z) the Lender designating a successor Lending Installation at which it maintains its Loans which has the effect of causing such Lender to become obligated for tax payments in excess of those in effect immediately prior to such designation; <u>provided</u>, <u>however</u>, that the Borrower shall be obligated to gross up any payments to any such Lender pursuant to <u>Section 2.13(E)(i)</u>, and to indemnify any such Lender pursuant to <u>Section 2.13(E)(iii)</u>, in respect of United States federal withholding taxes if (x) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or exemption certificate to establish a complete exemption from U.S. federal withholding tax or inaccuracy or untruth contained therein resulted from a change in any applicable statute, treaty, regulation or other applicable law or any interpretation of any of the foregoing occurring after the date hereof, which change rendered such Lender no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding tax, or rendered the information or the certifications made in such form or forms or Exemption Certificate untrue or inaccurate in any material respect, (y) the redesignation of the Lender's Lending Installation was made at the request of the Borrower Representative or the obligation to gross up payments to any such Lender pursuant to <u>Section 2.13(E)(i)</u>, or to indemnify any such Lender pursuant to <u>Section 2.13(E)(iii)</u>, is with respect to a Purchaser that becomes a Purchaser as a result of an assignment made at the request of the Borrower Representative, or (z) the Lender's predecessor in interest (or the Lender with respect to its prior Lending Installation) was entitled to gross-ups or indemnification.

(F)  <u>Loan Account</u>. Each Lender shall maintain in accordance with its usual practice an account or accounts (a "<u>Loan Account</u>") evidencing the Obligations of the Borrowers owing to such Lender from time to time, including the amount of principal and interest payable and paid to such Lender from time to time hereunder and under the Notes.

(G)  <u>Control Account</u>. The Register maintained by the Administrative Agent pursuant to <u>Section 13.3(C)</u> shall include a control account, and a subsidiary account for each Lender, in which accounts (taken together) shall be recorded (i) the date and amount of each Advance made hereunder, (ii) the effective date and amount of each assignment and acceptance delivered to and accepted by it and the parties thereto pursuant to <u>Section 13.3</u>, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder or under the Notes, (iv) the amount of any sum received by the Administrative Agent from the Borrowers hereunder and each Lender's share thereof, and (v) all other appropriate debits and credits as provided in this Agreement, including, without limitation, all fees, charges, expenses and interest.

(H)  <u>Entries Binding</u>. The entries made in the Register and each Loan Account shall be conclusive and binding for all purposes, absent manifest error, unless the Borrower

Representative objects to information contained in the Register and each Loan Account within forty-five (45) days of the Borrowers' receipt of such information.

2.14 <u>Notification of Advances, Interest Rates, Prepayments and Aggregate Revolving Loan Commitment Reductions</u>. Promptly after receipt thereof, the Administrative Agent will notify each applicable Lender of the contents of each Borrowing Notice. The Administrative Agent will give each Lender prompt notice of each change in the Alternate Base Rate.

2.15 <u>Lending Installations</u>. Each Lender may book its Loans at any Lending Installation selected by such Lender and may change its Lending Installation from time to time. All terms of this Agreement shall apply to any such Lending Installation and the Notes shall be deemed held by each Lender for the benefit of such Lending Installation. Each Lender may, by written or facsimile notice to the Administrative Agent and the Borrower Representative, designate a Lending Installation through which Loans will be made by it and for whose account Loan payments are to be made.

2.16 <u>Non-Receipt of Funds by the Administrative Agent</u>. Unless the Borrower Representative or a Lender, as the case may be, notifies the Administrative Agent prior to the date on which and time at which it is scheduled to make payment to the Administrative Agent of (i) in the case of a Lender, the proceeds of a Loan or (ii) in the case of the Borrowers, a payment of principal, interest or fees to the Administrative Agent for the account of the Lenders, that it does not intend to make such payment, the Administrative Agent may assume that such payment has been made. The Administrative Agent may, but shall not be obligated to, make the amount of such payment available to the intended recipient in reliance upon such assumption. If such Lender or the Borrowers, as the case may be, has not in fact made such payment to the Administrative Agent, the recipient of such payment shall, on demand by the Administrative Agent, repay to the Administrative Agent the amount so made available together with interest thereon in respect of each day during the period commencing on the date such amount was so made available by the Administrative Agent until the date the Administrative Agent recovers such amount at a rate per annum equal to (i) in the case of payment by a Lender, the Federal Funds Effective Rate for such day or (ii) in the case of payment by the Borrowers, the interest rate applicable to the relevant Loan.

2.17 <u>Termination Date</u>. This Agreement shall be effective until the Termination Date. Notwithstanding the termination of this Agreement on the Termination Date, until all of the Obligations (other than contingent indemnity obligations) shall have been fully and indefeasibly paid and satisfied and all financing arrangements among the Borrowers and the Lenders shall have been terminated on terms acceptable to the Administrative Agent (collectively, the "Termination Conditions"), all of the rights and remedies under this Agreement and the other Loan Documents shall survive and the Administrative Agent shall be entitled to retain its security interest in and to all existing and future Collateral for the benefit of itself and the Lenders.

2.18 <u>Replacement of Certain Lenders</u>. In the event a Lender ("<u>Affected Lender</u>") shall have: (i) failed to fund its Pro Rata Share of any Advance requested by the Borrower Representative which such Lender is obligated to fund under the terms of this Agreement and which failure has not been cured, (ii) requested compensation from the Borrowers under <u>Sections</u>

2.13(E), 4.1 or 4.2 to recover Taxes, Other Taxes or other additional costs incurred by such Lender which are not being incurred generally by the other Lenders, or (iii) has invoked Section 10.2, then, in any such case, the Borrower Representative or the Administrative Agent may make written demand on such Affected Lender (with a copy to the Administrative Agent in the case of a demand by the Borrower Representative and a copy to the Borrower Representative in the case of a demand by the Administrative Agent) for the Affected Lender to assign, and such Affected Lender shall use its best efforts to assign pursuant to one or more duly executed assignments and acceptances in substantially the form of Exhibit H five (5) Business Days after the date of such demand, to one or more financial institutions that comply with the provisions of Section 13.3(A) which the Borrower Representative or the Administrative Agent, as the case may be, shall have engaged for such purpose ("Replacement Lender"), all of such Affected Lender's rights and obligations under this Agreement and the other Loan Documents (including, without limitation, its Revolving Loan Commitment and all Loans owing to it) in accordance with Section 13.3; provided, however, that the Borrowers shall pay all costs, expenses, and fees associated with such assignment. The Administrative Agent agrees, upon the occurrence of such events with respect to an Affected Lender and upon the written request of the Borrower Representative, to use its reasonable efforts to obtain the commitments from one or more financial institutions to act as a Replacement Lender. The Administrative Agent is authorized to execute one or more of such assignment agreements as attorney-in-fact for any Affected Lender failing to execute and deliver the same within five (5) Business Days after the date of such demand. Further, with respect to such assignment the Affected Lender shall have concurrently received, in cash, all amounts due and owing to the Affected Lender hereunder or under any other Loan Document, including, without limitation, the aggregate outstanding principal amount of the Loans owed to such Lender, together with accrued interest thereon through the date of such assignment, amounts payable under Sections 2.13(E), 4.1, and 4.2 with respect to such Affected Lender and compensation payable under Section 2.13(C) in the event of any replacement of any Affected Lender under clause (ii) or clause (iii) of this Section 2.18; provided that upon such Affected Lender's replacement, such Affected Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13(E), 4.1, 4.2, 4.3, and 10.7, as well as to any fees accrued for its account hereunder and not yet paid, and shall continue to be obligated under Section 11.8 with respect to losses, obligations, liabilities, damages, penalties, actions, judgments, costs, expenses or disbursements for matters which occurred prior to the date the Affected Lender is replaced. Upon the replacement of any Affected Lender pursuant to this Section 2.18, the provisions of Section 9.2 shall continue to apply with respect to Advances which are then outstanding with respect to which the Affected Lender failed to fund its Pro Rata Share and which failure has not been cured.

2.19    Priority and Liens.

(A)    Each of the Borrowers hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of the Borrowers hereunder and under the Loan Documents and in respect of Indebtedness arising after the Filing Date owed to any Lender shall: (i) constitute an allowed administrative expense claim in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code; (ii) be secured by a perfected first priority Lien, pursuant to section 364(c)(2) of the

Bankruptcy Code, upon all unencumbered property of the Borrowers and all other property of the Borrowers that is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases (other than on Collateral of PTVW that is located in Germany and any Capital Stock of Wiederholt (prior to the satisfaction of the conditions set forth in <u>Section 7.2(P)</u> of this Agreement) or any Foreign Subsidiary); (iii) be secured by a perfected Lien, pursuant to section 364(c)(3) of the Bankruptcy Code, upon all property of the Borrowers (other than on Collateral of PTVW that is located in Germany and any Capital Stock of Wiederholt (prior to the satisfaction of the conditions set forth in <u>Section 7.2(P)</u> of this Agreement) or any Foreign Subsidiary) that is subject to valid, perfected and non-avoidable Liens in existence on the Filing Date or a valid Lien perfected (but not granted) after the Filing Date to the extent such post-Filing Date perfection in respect of a pre-Filing Date claim is expressly permitted under the Bankruptcy Code (in each case, other than Liens that secure the Pre-Petition Obligations), junior to such valid, perfected and non-avoidable Liens; and (iv) be secured by a Priming Lien, pursuant to section 364(d)(1) of the Bankruptcy Code, upon all present and after acquired property of the Borrowers (other than on Collateral of PTVW that is located in Germany and any Capital Stock of Wiederholt (prior to the satisfaction of the conditions set forth in <u>Section 7.2(P)</u> of this Agreement) or any Foreign Subsidiary) that is (or is intended or is purported to be) subject to a Lien or security interest on the Filing Date to secure the Pre-Petition Obligations (other than Liens on Second Priority Agreement Primary Collateral (as defined in the Pre-Petition Intercreditor Agreement)); in the case of each of clauses (i) through (iv) subject only to (x) in the event of the occurrence and during the continuance of a Default or an Unmatured Default, the payment of allowed and unpaid professional fees and disbursements incurred after the occurrence of such Default or Unmatured Default by the Borrowers and any Committee in an aggregate amount not in excess of $250,000 (without application of any retainers held by such professionals), (y) payment of allowed and unpaid professional fees and disbursements of the Borrowers' and any Committees' professionals (not to exceed the amounts provided therefor in the Approved Budget through the date of such Default or Unmatured Default) incurred prior to such Default or Unmatured Default which have not yet been paid shall be permitted (without application of any retainers held by such professionals), as the same may be due and payable and (z) the payment of unpaid fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Bankruptcy Court ((x), (y) and (z), collectively, the "<u>Carve-Out</u>"), <u>provided</u> that, other than as expressly provided in the Interim Order, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any investigation, motion, action, claim or litigation against or any challenge to the amount, extent, or enforcement of the indebtedness of any Borrower owing to the Administrative Agent, any Lender, any Pre-Petition Creditor or to the priority, validity, or perfection of any collateral securing any such indebtedness. The Lenders agree that, in addition to the payments permitted by <u>Section 2.19(A)(x), (y)</u> and <u>(z)</u> above, (1) so long as no Default or Unmatured Default shall have occurred, the Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, and (2) payment of allowed and unpaid professional fees and disbursements incurred by the Borrowers and any Committee prior to such Default or Unmatured Default which has not yet been paid shall be permitted (without application of any retainers held by such professionals), as the same may be due and payable, and in the case of each of (1) and (2) above the same shall neither exceed the applicable Approved Budget nor reduce the Carve-Out.

(B)     Subject to the priorities set forth in Section 2.19(A) above and to the Carve-Out, as to all real property the title to which is held by any Borrower, or the possession of which is held by any Borrower pursuant to leasehold interest, such Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto Administrative Agent on behalf of the Secured Parties all of the right, title and interest of such Borrower in all of such owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of such Borrower in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof.  Each Borrower acknowledges that, pursuant to the Orders, the Liens in favor of Administrative Agent on behalf of the Secured Parties on all of such Borrower's right, title and interest in all Collateral, including all such real property and leasehold interests, shall be perfected without the filing or recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment and without the necessity of any party delivering, filing, registering or recording any other financing statements, filings, notices, recordings or other instruments or otherwise taking any other action to perfect such security interests or Liens.  Each Borrower further agrees that, upon the request of the Administrative Agent, it shall enter into separate mortgages, deeds of trust or similar instruments in recordable form with respect to its owned and leased real properties on terms reasonably satisfactory to the Administrative Agent.

(C)     Each Borrower acknowledges and agrees that, as adequate protection for the use of the Pre-Petition Creditors' cash collateral, the use, sale, or lease of the Pre-Petition Collateral (other than such cash collateral), the Pre-Petition Creditors' interests in the Liens that are being primed as set forth in Section 2.19(A)(iv) of this Agreement and the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Pre-Petition Creditors shall, pursuant to the Orders, receive to the extent of any diminution (if any) in the value of the Pre-Petition Collateral, the junior superpriority administrative expense claims and replacement Liens provided for in the Orders.

2.20     No Discharge; Survival of Claims.  Each Borrower agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan (and each Borrower, pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the super-priority claim granted to the Administrative Agent and the Lenders pursuant to the Orders and described in Section 2.19 and the Liens granted to the Administrative Agent pursuant to the Orders and described in Section 2.19 shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

2.21     Use of Cash Collateral.  Notwithstanding anything to the contrary contained herein, the Borrowers shall not be permitted to request an Advance unless (i) the Bankruptcy Court shall have entered the Interim Order and (ii) the Borrowers shall at that time have the use of all cash collateral subject to the Orders.

2.22     Waiver of any Priming Rights.  Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, each Borrower hereby irrevocably waives any right, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens

securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, except as expressly permitted under the Orders.

2.23    Nature and Extent of Each Borrower's Liability.

(A)    Joint and Several Liability.  Each Borrower shall be liable for, on a joint and several basis, all of the Loans and other Obligations, regardless of which Borrower actually may have received the proceeds of any Loans or other extensions of credit hereunder or the amount of such Loans received or the manner in which the Administrative Agent or any Lender accounts for such Loans or other extensions of credit on its books and records, it being acknowledged and agreed that Loans to any Borrower inure to the mutual benefit of all Borrowers and that the Administrative Agent and the Lenders are relying on the joint and several liability of the Borrowers in extending the Loans and other financial accommodations hereunder. Each Borrower hereby unconditionally and irrevocably agrees that upon default in the payment when due (whether at stated maturity, by acceleration or otherwise) of any principal of, or interest owed on, any of the Loans or other Obligations, such Borrower shall forthwith pay the same.

(B)    Unconditional Nature of Liability.  Each Borrower's joint and several liability hereunder with respect to the Loans and other Obligations shall, to the fullest extent permitted by applicable law, be the unconditional liability of such Borrower irrespective of (i) the validity, enforceability, avoidance or subordination of any of the Obligations or of any other document evidencing all or any part of the Obligations, (ii) the absence of any attempt to collect any of the Obligations from any other Borrower or any Collateral or other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance or granting of any indulgence by the Administrative Agent or any Lender with respect to any provision of any instrument executed by any other Borrower evidencing or securing the payment of any of the Obligations, or any other agreement now or hereafter executed by any other Borrower and delivered to the Administrative Agent or any Lender, (iv) the failure by the Administrative Agent to take any steps to perfect or maintain the perfected status of its security interest in or Lien upon, or to preserve its rights to, any of the Collateral or other security for the payment or performance of any of the Obligations or the Administrative Agent's release of any Collateral or of its Liens upon any Collateral, (v) the Administrative Agent's or any Lender's election, in any proceeding instituted under the Bankruptcy Code, for the application of section 1111(b)(2) of the Bankruptcy Code, (vi) any borrowing or grant of a security interest by any other Borrower, as debtor-in-possession under section 364 of the Bankruptcy Code, (vii) the release or compromise, in whole or in part, of the liability of any other Borrower for the payment of any of the Obligations, (viii) any increase in the amount of the Obligations beyond any limits imposed herein or in the amount of any interest, fees or other charges payable in connection therewith, or any decrease in the same, (ix) the disallowance of all or any portion of the Administrative Agent's or any Lender's claims against any other Borrower for the repayment of any of the Obligations under section 502 of the Bankruptcy Code, or (x) any other circumstance that might constitute a legal or equitable discharge or defense of any other Borrower.  After the occurrence and during the continuance of any Default, the Administrative Agent may proceed directly and at once, without notice to any Borrower (except as provided

herein), against any or all of the Borrowers to collect and recover all or any part of the Obligations, without first proceeding against any other Borrower or against any Collateral or other security for the payment or performance of any of the Obligations, and each Borrower waives any provision that might otherwise require the Administrative Agent under applicable law to pursue or exhaust its remedies against any Collateral or other Borrower before pursuing another Borrower. Each Borrower consents and agrees that the Administrative Agent shall be under no obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of the Obligations.

## ARTICLE III: [RESERVED]

## ARTICLE IV: CHANGE IN CIRCUMSTANCES

4.1   _Yield Protection._ If any law or any governmental or quasi-governmental rule, regulation, policy, guideline or directive (whether or not having the force of law) adopted after the date of this Agreement and having general applicability to all banks within the jurisdiction in which such Lender operates (excluding, for the avoidance of doubt, the effect of and phasing in of capital requirements or other regulations or guidelines passed prior to the date of this Agreement), or any interpretation or application thereof by any Governmental Authority charged with the interpretation or application thereof, or the compliance of any Lender therewith,

> (i)      subjects any Lender or any applicable Lending Installation to any tax, duty, charge or withholding on or from payments due from the Borrowers (excluding federal taxation of the overall net income of any Lender or applicable Lending Installation), or changes the basis of taxation of payments to any Lender in respect of its Loans or other amounts due it hereunder, or

> (ii)     imposes or increases or deems applicable any reserve, assessment, insurance charge, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or any applicable Lending Installation with respect to its Loans, or

> (iii)    imposes any other condition the result of which is to increase the cost to any Lender or any applicable Lending Installation of making, funding or maintaining the Loans or reduces any amount received by any Lender or any applicable Lending Installation in connection with Loans, or requires any Lender or any applicable Lending Installation to make any payment calculated by reference to the amount of Loans held or interest received by it by an amount deemed material by such Lender;

and the result of any of the foregoing is to increase the cost to that Lender of making, renewing or maintaining its Loans or to reduce any amount received under this Agreement, then, within fifteen (15) days after receipt by the Borrower Representative of written demand by such Lender pursuant to Section 4.4, the Borrowers shall pay such Lender that portion of such increased

expense incurred or reduction in an amount received which such Lender determines is attributable to making, funding and maintaining its Loans and its Revolving Loan Commitments.

4.2    Changes in Capital Adequacy Regulations. If a Lender determines (i) the amount of capital required or expected to be maintained by such Lender, any Lending Installation of such Lender or any corporation controlling such Lender is increased as a result of a "Change" (as defined below), and (ii) such increase in capital will result in an increase in the cost to such Lender of maintaining its Loans or its obligation to make Loans hereunder, then, within 15 days after receipt by the Borrower Representative of written demand by such Lender pursuant to Section 4.4, the Borrowers shall pay such Lender the amount necessary to compensate for any shortfall in the rate of return on the portion of such increased capital which such Lender determines is attributable to this Agreement, its Loans or its obligation to make Loans hereunder (after taking into account such Lender's policies as to capital adequacy). "Change" means (i) any change after the date of this Agreement in the "Risk-Based Capital Guidelines" (as defined below) excluding, for the avoidance of doubt, the effect of any phasing in of such Risk-Based Capital Guidelines or any other capital requirements passed prior to the date hereof, or (ii) any adoption of or change in any other law, governmental or quasi-governmental rule, regulation, policy, guideline, interpretation, or directive (whether or not having the force of law) after the date of this Agreement and having general applicability to all banks and financial institutions within the jurisdiction in which such Lender operates which affects the amount of capital required or expected to be maintained by any Lender or any Lending Installation or any corporation controlling any Lender. "Risk-Based Capital Guidelines" means (i) the risk-based capital guidelines in effect in the United States on the date of this Agreement, including transition rules, and (ii) the corresponding capital regulations promulgated by regulatory authorities outside the United States implementing the July 1988 report of the Basel Committee on Banking Regulation and Supervisory Practices Entitled "International Convergence of Capital Measurements and Capital Standards," including transition rules, and any amendments to such regulations adopted prior to the date of this Agreement.

4.3    Funding Losses. If for any reason (a) any repayment of a LIBOR Loan occurs on a day other than the end of its Interest Period, or (b) Borrowers fail to repay a LIBOR Loan when required hereunder, then Borrower shall pay to Administrative Agent its customary administrative charge and to each affected Lender all losses and expenses that it sustains as a consequence thereof, including any loss or expense arising from liquidation or redeployment of funds or from fees payable to terminate deposits of matching funds. Lenders shall not be required to purchase Dollar deposits in the London interbank market or any other offshore Dollar market to fund any LIBOR Loan, but the provisions hereof shall be deemed to apply as if each Lender had purchased such deposits to fund its LIBOR Loans.

4.4    Lender Statements; Survival of Indemnity. Each Lender requiring compensation pursuant to Section 2.13(E) or this Article IV shall use commercially reasonable efforts to notify the Borrower Representative and the Administrative Agent in writing of any Change, law, policy, rule, guideline or directive giving rise to such demand for compensation not later than ninety (90) days following the date upon which the responsible account officer of such Lender knows or should have known of such Change, law, policy, rule, guideline or directive. Any demand for compensation pursuant to this Article IV shall be in writing and shall state the amount due, if any, under Section 4.1, 4.2 or 4.3 and shall set forth in reasonable detail the calculations upon which

such Lender determined such amount. Such written demand shall be rebuttably presumed correct for all purposes. The obligations of the Borrowers under Sections 4.1, 4.2 and 4.3 shall survive payment of the Obligations and termination of this Agreement.

## ARTICLE V:  CONDITIONS PRECEDENT

5.1     <u>Effectiveness</u>.  This Agreement shall become effective when, and only when, each of the following conditions precedent shall have been satisfied to the satisfaction of the Administrative Agent and the Lenders.

(A)     <u>Delivery of Documents</u>.  The Borrowers shall have furnished to the Administrative Agent each of the following, with sufficient photocopies for the Lenders, all in form and substance satisfactory to the Administrative Agent and the Lenders:

(1)     Executed copies of this Agreement and each of the other Loan Documents required to be executed and delivered by the Borrowers on or prior to the Closing Date, each in form and substance acceptable to the Administrative Agent;

(2)     A certificate, in form and substance satisfactory to the Administrative Agent, signed by an Authorized Officer of each of the Borrowers, stating that on Closing Date (a) the representations and warranties of each of the Borrowers in the Transaction Documents are accurate in all material respects as of the Closing Date, and (b) no Default or Unmatured Default has occurred and is continuing;

(3)     A written opinion of the Borrowers' counsel, addressed to the Administrative Agent and the Lenders, in form and substance satisfactory to the Administrative Agent;

(4)     Notes payable to the order of each of the Lenders requesting the same;

(5)     Written money transfer instructions addressed to the Administrative Agent and signed by an Authorized Officer of the Borrower Representative;

(6)     A copy of the certificate of incorporation or formation of each of the Borrowers, as amended, certified as of a recent date by the Secretary of State of the state of its incorporation or formation;

(7)     A certificate of the Secretary of State of the state of each Borrower's incorporation or formation, dated as of a recent date, as to the good standing of and payment of taxes by such Borrower;

(8)     A certificate of the Secretary or an Assistant Secretary of each Borrower dated the Closing Date and certifying on behalf of each Borrower (A) that attached thereto is a true and complete copy of the by-laws or limited liability company agreement of such Borrower as in effect on the date of such certification, (B) that attached thereto is a true and complete copy of resolutions adopted by the board of directors, managers, or sole member, as the case may be, of such Borrower authorizing the filing of its bankruptcy petition and authorizing the execution, delivery and performance in accordance with the terms of this Agreement, each of the Loan Documents, and any other documents required or contemplated hereunder or thereunder, the granting of the security interests contemplated by the Loan Documents, and the other Transactions, (C) that the certificate of incorporation or formation of such Borrower has not been amended since the date of the last amendment thereto indicated on the certificate of the Secretary of State furnished pursuant to clause (6) above, and (D) as to the incumbency and specimen signature of each officer or manager of that entity executing this Agreement and the other Loan Documents or any other document delivered by it in connection herewith or therewith (such certificate to contain a certification by another officer or manager of such Borrower as to the incumbency and signature of the officer signing the certificate referred to in this clause (8));

(9)     An initial Borrowing Base Certificate dated as of the Closing Date (based upon information as of August 31, 2009, with respect to Inventory, and as of a date within three (3) days prior to the Closing Date, with respect to Receivables);

(10)     Copies of (a) unqualified, audited financial statements for Borrowers' 2008 fiscal year, (b) unaudited financial statements for January through July 2009, and (c) the business plan and forecast (including a projected consolidated balance sheet, income statement and cash flow statement) of the Borrowers for each month of Borrowers' 2009 and 2010 fiscal years, and all such financial statements and forecasts shall be reasonably satisfactory in form to the Administrative Agent;

(11)     Copies of the Original Budget, as approved by the Administrative Agent in its sole discretion; and

(12)     Such other documents as the Administrative Agent or any Lender or its counsel may have reasonably requested.

(B)     All necessary governmental, shareholder, member and third-party approvals and consents in connection with the Transactions shall have been received and shall be in full force and effect, and background checks on management of the Borrowers shall have been completed to the Administrative Agent satisfaction.

(C)     The Borrowers shall be in compliance with applicable material laws and regulations (including but not limited to ERISA, margin regulations, bank regulatory limitations and environmental laws).

(D)     [Reserved].

(E)     All costs, fees, expenses (including, without limitation, legal fees and expenses) and other compensation payable to the Administrative Agent shall have been paid to the extent due.

(F)     The Administrative Agent shall have received evidence satisfactory to it (including the results of a recent lien search) that each Borrower shall have taken or caused to be taken all such actions, executed and delivered or caused to be executed and delivered all such agreements, documents and instruments, and made or caused to be made all such filings and recordings (or caused documents to be delivered to the Administrative Agent for filing or recording) that may be necessary or, in the opinion of Administrative Agent, desirable in order to create in favor of Administrative Agent, for the benefit of the Secured Parties, a valid and (upon such filing and recording) perfected first priority Lien (subject to Permitted Existing Liens) on the Collateral (other than on Collateral of PTVW that is located in Germany and any Capital Stock of Wiederholt or any Foreign Subsidiary).

(G)     The Administrative Agent shall have obtained a copy (to be followed by a certified copy when available) of the Interim Order granting interim approval of the Loan Documents and granting the super-priority claim status and Liens described in Section 2.19, which Interim Order (i) shall have been entered, with the consent of the Pre-Petition Credit Agreement Agent, upon an application or motion of the Borrowers satisfactory in form and substance to Administrative Agent, on such prior notice to such parties as may in each case be satisfactory to Administrative Agent, (ii) shall authorize extensions of credit in amounts satisfactory to Administrative Agent, (iii) shall approve the payment by the Borrowers of all of the fees contemplated under this Agreement and the fees of professionals of the Administrative Agent, (iv) shall be in full force and effect, and (v) shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of Administrative Agent; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of Loans nor the performance by the Borrowers of any of their respective obligations hereunder or under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal, and in the event the Interim Order is reversed or modified on appeal, the validity of any action taken pursuant to the Interim Order shall not be affected as provided in section 364(e) of the Bankruptcy Code.

(H)     The Borrowers shall be in compliance in all respects with the Interim Order.

(I) No trustee or examiner shall have been appointed with respect to the Borrowers or their respective properties.

(J) The Administrative Agent shall have obtained a copy of such other order or orders of the Bankruptcy Court as the Administrative Agent may deem necessary or desirable, including, without limitation, an order or orders entered by the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent (i) with each Borrower acknowledging the validity and enforceability of the Pre-Petition Obligations and the priority and Liens therefor against such Borrower (subject to a limited reservation of rights for the Committee, if any) and (ii) granting and approving adequate protection of the interests of the Pre-Petition Creditors on account of the priming of the Pre-Petition Creditors' Liens by the Liens of the Administrative Agent under the Loan Documents and the use of the Pre-Petition Creditors' cash collateral as provided in Section 2.21, which orders shall be in full force and effect and shall not have been stayed, reversed, vacated or rescinded.

(K) All orders approving all of the First Day Motions ("First Day Orders") shall have been entered by the Bankruptcy Court at the commencement of the Cases, and they shall be substantially similar in form and substance to those agreed to by the Administrative Agent immediately prior to the commencement of the Cases.

(L) The Administrative Agent shall have received an executed copy of a letter from PTC to Marsh, Inc., requesting that the Administrative Agent be added as an additional insured to the Borrowers' primary liability insurance policies and as loss payee to the Borrowers' property insurance policy.

(M) The Administrative Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, requested by such Person.

5.2 Revolving Loans. The Lenders shall not be required to make any Revolving Loans (including the initial Revolving Loans hereunder) unless on the applicable Borrowing Date both before and after taking into account the requested Loans:

(A) There exists no Default or Unmatured Default;

(B) The representations and warranties contained in this Agreement and each of the other Loan Documents are true and correct in all material respects as of such Borrowing Date except for changes reflecting events, conditions or transactions permitted or not prohibited by this Agreement; provided, that the words "in all material respects" in this clause (ii) shall, as to any representation or warranty that contains a materiality standard, operate without duplication with such standard; and

(C)     During the Interim Availability Period (i) the Interim Order shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent and (ii) the Revolving Credit Obligations shall not exceed the Interim Availability Amount. During the Maximum Availability Period (i) the Final Order shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent and (ii) the Revolving Credit Obligations shall not exceed the Revolving Credit Maximum Amount. If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, neither the making of the Revolving Loans nor the performance by the Borrowers of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(D)     All costs, fees, expenses (including, without limitation, legal fees and expenses) and other compensation payable to the Administrative Agent shall have been paid to the extent due. Any such amounts may be paid with proceeds of Loans made on such date and reflected in the funding instructions given by the Borrowers to the Administrative Agent on or before such date.

(E)     Before and after giving effect to the requested Revolving Loans and the application of the proceeds thereof, the Borrowers shall be in compliance in all respects with the Approved Budget.

(F)     [Reserved].

(G)     For each Revolving Loan made on or after the fourteenth (14th) day following the Filing Date, the Bankruptcy Court shall have entered an order approving the bid and auction procedures for the sale of substantially all of the Borrowers' assets, in whole or in part, which bid and auction procedures shall be reasonably satisfactory to the Administrative Agent and the Required Lenders, which order shall not be subject to a stay pending appeal (the "Bid Procedures Order"). The Bid Procedures Order (or another order entered contemporaneously therewith) may set forth any reasonable and customary "Break-up Fee" or other bid protections required to be approved.

(H)     For each Revolving Loan made on or after the seventh (7th) day following the Bid Deadline, an auction shall have commenced pursuant to the Bid Procedures Order (the "Auction"). For each Advance made on or after the sixtieth (60th) day following the Filing Date, an order reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders (the "Sale Order") shall have been entered by the Bankruptcy Court approving a sale pursuant to the Bid Procedures Order and the Auction, which shall provide sufficient funds to pay in full the Obligations in cash, which Sale Order shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent; and if the Sale Order is the subject of a pending appeal in any respect,