neither the sale nor the performance by the Borrowers of any of their respective obligations with respect to such sale shall be the subject of a presently effective stay pending appeal.

Each Borrowing Notice with respect to each such Revolving Loan shall constitute a representation and warranty by the Borrowers that the conditions contained in Section 5.2 have been satisfied. The Administrative Agent or any Lender may require a duly completed Officer's Certificate in and/or a duly completed Compliance Certificate as a condition to making a Revolving Loan.

## ARTICLE VI: REPRESENTATIONS AND WARRANTIES

In order to induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans and the other financial accommodations to the Borrowers, each of the Borrowers represents and warrants as follows to each Lender and the Administrative Agent as of the Closing Date and thereafter on each date as required by Section 5.2:

6.1    Organization; Corporate Powers.  Each of the Borrowers (i) is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) is duly qualified to do business as a foreign corporation or limited liability company, as the case may be, and is in good standing under the laws of each jurisdiction in which failure to be so qualified and in good standing could reasonably be expected to have a Material Adverse Effect, (iii) has filed and maintained effective (unless exempt from the requirements for filing) a current Business Activity Report with the appropriate Governmental Authority in the States in which it is required to do so and (iv) has all requisite corporate or limited liability company, as the case may be, power and authority to own, operate and encumber its property and to conduct its business as presently conducted and as proposed to be conducted.

6.2    Authority.

(A)    Each of the Borrowers has the requisite organizational power and authority (i) to execute, deliver and perform each of the Transaction Documents which have been executed by it as required by this Agreement or the other Transaction Documents on or prior to Closing Date and (ii) to file the Transaction Documents which must be filed by it or which have been filed by it as required by this Agreement or the other Transaction Documents on or prior to the Closing Date with any Governmental Authority.

(B)    The execution, delivery, performance and filing, as the case may be, of each of the Transaction Documents which must be executed or filed by each Borrower or which have been executed or filed as required by this Agreement or any of the other Transaction Documents on or prior to the Closing Date and to which such Borrower is party, and the consummation of the transactions contemplated hereby and thereby, have been duly approved by the respective boards of directors and, if necessary, the shareholders or members of such

Borrower, and such approvals have not been rescinded. No other organizational action or proceeding on the part of such Borrower is necessary to consummate such transactions.

(C)    Each of the Transaction Documents to which each Borrower is a party has been duly executed, delivered or filed, as the case may be, by such Borrower and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms (except as enforceability may be limited by bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally), and is in full force and effect, and no material term or condition thereof has been amended, modified or waived from the terms and conditions contained in the Transaction Documents delivered to the Administrative Agent pursuant to Section 5.1 without the prior written consent of the Administrative Agent, and each Borrower has, and, to the Borrowers' knowledge, all other parties thereto have, performed and complied with all the material terms, provisions, agreements and conditions set forth therein and required to be performed or complied with by such parties on or before the Closing Date, and no unmatured default, default or breach of any material covenant by any such party exists thereunder.

6.3    No Conflict; Governmental Consents. The execution, delivery and performance of this Agreement and the other Transaction Documents to which each Borrower is a party do not and will not (i) conflict with the certificate or articles of incorporation or by-laws or similar organizational documents of such Borrower, (ii) constitute a tortious interference with any Contractual Obligation of any Borrower or conflict with, result in a breach of or constitute (with or without notice or lapse of time or both) a default under any Requirement of Law (including, without limitation, any Environmental Property Transfer Act) or Contractual Obligation of any Borrower (other than a Pre-Petition Agreement), or require termination of any Contractual Obligation, except such interference, breach, default or termination which individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien whatsoever upon any of the property or assets of any Borrower, other than Liens permitted by the Loan Documents or contemplated by the Orders, or (iv) require any approval of any Borrower's shareholders or members, except such as have been obtained. The execution, delivery and performance of each of the Transactions Documents to which each Borrower is a party do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by any Governmental Authority, including under any Environmental Property Transfer Act, except (i) the Orders, and (ii) filings, consents or notices which have been made, obtained or given, or which, if not made, obtained or given, individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

6.4    Financial Statements. Complete and accurate copies of the following financial statements and the following related information have been delivered to the Administrative Agent: (a) unqualified, audited financial statements for Borrowers' 2008 fiscal year, and (b) unaudited financial statements for the month ending July 31, 2009.

6.5    No Material Adverse Change. Since December 31, 2008, there has occurred no material adverse change in the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrowers taken individually (other than PVTW) or

as a whole, or any other event which has had or could reasonably be expected to have a Material Adverse Effect, other than those which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Cases.

6.6     Taxes.

(A)     Tax Examinations.  All deficiencies which have been asserted against any of the Borrowers as a result of any federal, state, local or foreign tax examination for each taxable year in respect of which an examination has been conducted have been fully paid or finally settled or are being contested in good faith, and as of the Closing Date no issue has been raised by any taxing authority in any such examination which, by application of similar principles, reasonably can be expected to result in assertion by such taxing authority of a material deficiency for any other year not so examined which has not been reserved for in the Borrowers' consolidated financial statements to the extent, if any, required by Agreement Accounting Principles.  Except as permitted pursuant to Section 7.2(D), none of the Borrowers anticipates any material tax liability with respect to the years which have not been closed pursuant to applicable law.

(B)     Payment of Taxes.  All tax returns and reports of the Borrowers required to be filed have been timely filed, and all taxes, assessments, fees and other governmental charges thereupon and upon their respective property, assets, income and franchises, whether or not shown on such returns or reports, have been paid, except for payments which have been reserved for in accordance with Agreement Accounting Principles, and except for those items which are being contested in good faith and have been reserved for in accordance with Agreement Accounting Principles.  None of the Borrowers has any knowledge of any proposed tax assessment against any Borrower that will have or could reasonably be expected to have a Material Adverse Effect.

6.7     Litigation; Loss Contingencies and Violations.  Schedule 6.7 reflects all material actions, suits, proceedings, arbitrations and investigations before or by any Governmental Authority or private arbitrator pending or, to the Borrowers' knowledge, threatened against any Borrower or any property of any of them as of the Closing Date (the "Disclosed Litigation").  Neither the Disclosed Litigation nor any action, suit, proceeding, arbitration or investigation before or by any Governmental Authority or private arbitrator commenced or, to the Borrowers' knowledge, threatened against any Borrower or any property of any of them after the Closing Date (i) challenges the validity or the enforceability of any material provision of the Transaction Documents or (ii) has or could reasonably be expected to have a Material Adverse Effect.  There is no material loss contingency within the meaning of Agreement Accounting Principles which has not been reflected in the consolidated financial statements referenced in Section 6.4 above or the consolidated financial statements of the Borrowers prepared and delivered pursuant to Section 7.1(A) the fiscal period during which such material loss contingency was incurred.  None of the Borrowers nor any of their Subsidiaries is (A) in violation of any applicable Requirements of Law which violation will have or could reasonably be expected to have a Material Adverse Effect, or (B) subject to or in default with respect to any final judgment, writ, injunction, restraining order or order of any nature, decree, rule or regulation of any court or Governmental Authority which will have or could be expected to have a Material Adverse Effect.

6.8    Subsidiaries. Schedule 6.8 to this Agreement (i) contains a complete and accurate description of the organizational structure of the Borrowers, their respective Subsidiaries and any other Person in which any Borrower or any of its Subsidiaries holds an Equity Interest; and (ii) accurately sets forth (A) the correct legal name, the jurisdiction of organization and the jurisdictions in which each of the Borrowers and its direct and indirect Subsidiaries is qualified to transact business as a foreign corporation or limited liability company, as the case may be, (B) the authorized, issued and outstanding shares of each class of Capital Stock of each the Borrowers and each of its Subsidiaries and the owners of such shares, and (C) a summary of the direct and indirect partnership, joint venture, or other Equity Interests, if any, of each Borrower and each of its Subsidiaries in any Person that is not a corporation. Except as set forth on Schedule 6.8, none of the issued and outstanding Capital Stock of any Borrower or any of its Subsidiaries is subject to any vesting, redemption, or repurchase agreement, and there are no warrants or options outstanding with respect to such Capital Stock. The outstanding Capital Stock of each Borrower and each of its Subsidiaries is duly authorized, validly issued, fully paid and nonassessable and is not Margin Stock. No Borrower has any Subsidiaries other than those reflected on Schedule 6.8.

6.9    ERISA. No Benefit Plan has failed to meet the applicable minimum funding standard (within the meaning of Sections 302(a)(2) of ERISA and 412(a) of the Code) that is not a waived funding deficiency. No Borrower or any member of the Controlled Group has incurred any liability to the PBGC which remains outstanding other than the payment of premiums, and there are no premium payments which have become due which are unpaid. Schedule B to the most recent annual report filed with the IRS with respect to each Benefit Plan and furnished to the Lenders is complete and accurate. Except as set forth on Schedule 6.9, since the date of each such Schedule B, there has been no material adverse change in the funding status or financial condition of the Benefit Plan relating to such Schedule B. No Borrower nor any member of the Controlled Group has (i) failed to make a required contribution or payment to a Multiemployer Plan or (ii) made a complete or partial withdrawal under Sections 4203 or 4205 of ERISA from a Multiemployer Plan where all such failures or such withdrawals could reasonably be expected to subject any Borrower to liability individually or in the aggregate in excess of $1,000,000. No Borrower or any member of the Controlled Group has failed to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or other payment. No Borrower nor any member of the Controlled Group is required to provide security to a Benefit Plan under Section 401(a)(29) of the Code due to a Plan amendment that results in an increase in current liability for the plan year. Each Plan which is intended to be qualified under Section 401(a) of the Code as currently in effect has been determined by the IRS to be so qualified (or has been submitted to the IRS by letter request for such a favorable determination), and each trust related to any such Plan has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code as currently in effect and, to the Borrowers' knowledge, no event has occurred which would cause any such Plan to cease being so qualified or any such related trust to cease to be so exempt. The Borrowers are in compliance in all respects with the responsibilities, obligations and duties imposed on them by ERISA and the Code with respect to all Plans, except where such noncompliance could not reasonably be expected to subject any Borrower to liability individually or in the aggregate in excess of $1,000,000. To the knowledge of the Borrowers, no Borrower or any of its Subsidiaries (other than Wiederholt) or any fiduciary of any Plan has engaged in a nonexempt prohibited transaction described in Sections 406 of ERISA or 4975 of

the Code which could reasonably be expected to subject any Borrower to liability individually or in the aggregate in excess of $1,000,000. No Borrower or any member of the Controlled Group has taken or failed to take any action which would constitute or result in a Termination Event, which action or inaction could reasonably be expected to subject any Borrower to liability individually or in the aggregate in excess of $1,000,000. No Borrower is subject to any liability under Sections 4063, 4064, 4069, 4204 or 4212(c) of ERISA and no other member of the Controlled Group is subject to any liability under Sections 4063, 4064, 4069, 4204 or 4212(c) of ERISA which could reasonably be expected to subject any Borrower to liability individually or in the aggregate in excess of $1,000,000. No Borrower or any of its Subsidiaries has, by reason of the transactions contemplated hereby, any obligation to make any payment to any employee pursuant to any Plan or existing contract or arrangement. Each Foreign Pension Plan is in compliance in all material respects with all laws, regulations and rules applicable thereto and the respective requirements of the governing documents for such Plan. No Borrower or any of its Subsidiaries has a Foreign Employee Benefit Plan that has assets held in the trust or other funding vehicle for such Plan.

6.10 <u>Accuracy of Information</u>. The information, exhibits and reports furnished by or on behalf of the Borrowers to the Administrative Agent or to any Lender in connection with the negotiation of, or compliance with, the Loan Documents, the representations and warranties of the Borrowers contained in the Loan Documents, and all certificates and documents delivered to the Administrative Agent and the Lenders pursuant to the terms thereof, taken as a whole, do not contain as of the date furnished any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading.

6.11 <u>Securities Activities</u>. None of the Borrowers nor any of their respective Subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

6.12 <u>Material Agreements</u>. None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) has received notice or has knowledge that (i) it is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Contractual Obligation (other than the Pre-Petition Agreements and covenant defaults resulting solely from the filing of the Cases), or (ii) any condition exists which, with the giving of notice or the lapse of time or both, would constitute a default with respect to any such Contractual Obligation, in each case, except where such default or defaults, if any, individually or in the aggregate will not have or could not reasonably be expected to have a Material Adverse Effect.

6.13 <u>Compliance with Laws</u>. The Borrowers are in compliance with all Requirements of Law applicable to them and their respective businesses, in each case where the failure to so comply individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

6.14 <u>Assets and Properties</u>. Each of the Borrowers has good and marketable title to all of its assets and properties (tangible and intangible, real or personal) owned by it or a valid leasehold interest in all of its leased assets (except insofar as marketability may be limited by any

laws or regulations of any Governmental Authority affecting such assets), and all such assets and property are free and clear of all Liens, except Liens securing the Obligations, Liens securing the Pre-Petition Obligations, and Liens permitted under Section 7.3(C). Substantially all of the assets and properties owned by, leased to or used by the Borrowers are in adequate operating condition and repair, ordinary wear and tear excepted. Except for Liens granted to the Administrative Agent for the benefit of the Administrative Agent and the Lenders, neither this Agreement nor any other Loan Document, nor any transaction contemplated under any such agreement, will affect any right, title or interest of any Borrower in and to any of such assets in a manner that would have or could reasonably be expected to have a Material Adverse Effect.

6.15    Statutory Indebtedness Restrictions. No Borrower is subject to regulation under the Federal Power Act, the Interstate Commerce Act, or the Investment Company Act of 1940, or any other federal or state statute or regulation which limits its ability to incur indebtedness or its ability to consummate the transactions contemplated hereby.

6.16    Insurance. Schedule 6.16 to this Agreement accurately sets forth all insurance policies and programs currently in effect with respect to the respective properties and assets and business of each Borrower, specifying, for each such policy and program, (i) the amount thereof, (ii) the risks insured against thereby, (iii) the name of the insurer and each Borrower insured thereunder, (iv) the policy or other identification number thereof, (v) the expiration date thereof, (vi) the annual premium with respect thereto, and (vii) any reserves relating to any self-insurance program that is in effect. Such insurance policies and programs reflect coverage that is reasonably consistent with prudent industry practice.

6.17    Labor Matters.


(A)    Except as listed on Schedule 6.17 to this Agreement, there are on the Closing Date no collective bargaining agreements, other labor agreements or Multiemployer Plans covering any of the employees of any Borrower. As of the Closing Date, no attempt to organize the employees of any Borrower, and no labor disputes, strikes or walkouts affecting the operations of any Borrower, is pending, or, to any Borrower's knowledge, threatened, planned or contemplated.


(B)    Set forth in Schedule 6.17 to this Agreement is a list, as of the Closing Date, of all material consulting agreements, employment agreements, non-compete agreements, executive compensation plans, deferred compensation agreements, employee pension plans or retirement plans, employee profit sharing plans, employee stock purchase and stock option plans, severance plans, group life insurance, hospitalization insurance or other plans or arrangements of each Borrower providing for benefits for employees of such Borrower.

6.18    Environmental Matters.


(A)    Except as disclosed on Schedule 6.18 to this Agreement (the "Disclosed Environmental Matters"):

(i)     the operations of the Borrowers comply in all material respects with Environmental, Health or Safety Requirements of Law;

(ii)     the Borrowers have all permits, licenses or other authorizations required under Environmental, Health or Safety Requirements of Law and are in material compliance with such permits;

(iii)     neither the Borrowers, nor any of their respective present property or operations, or, to the best of, the Borrowers' knowledge, any of their respective past property or operations, are subject to or the subject of, any investigation known to any Borrower, any judicial or administrative proceeding, order, judgment, decree, settlement or other agreement respecting: (A) any material violation of Environmental, Health or Safety Requirements of Law; (B) any remedial action; or (C) any material claims or liabilities arising from the Release or threatened Release of a Contaminant into the environment;

(iv)     (x) there is not now, nor to the best of the Borrowers' knowledge has there ever been on or in the property of any Borrower any landfill or waste pile of hazardous waste, and (y) there is not now, nor to the best of the Borrowers' knowledge has there ever been, on or in the property of any Borrower, any underground storage tanks, aboveground storage tanks, surface impoundment or hazardous waste storage facility of any kind, polychlorinated biphenyls (PCBs) used in hydraulic oils, electric transformers or other equipment, or asbestos containing material, except, in each case, in compliance in all material respects with current Environmental, Health or Safety Requirements or Law; and

(v)     none of the Borrowers or any of their respective Subsidiaries (other than Wiederholt) has any material Contingent Obligation or any material liability under Environmental Laws, either in connection with any Disclosed Environmental Matters, or with respect to any other any Release or threatened Release of a Contaminant into the environment or non-compliance with any Environmental Law.

(B)     For purposes of this Section 6.18 "material" means any noncompliance or basis for liability which could reasonably be likely to subject the Borrowers and any of their respective Subsidiaries to liability individually or in the aggregate in excess of $1,000,000.

6.19     Secured, Super-Priority Obligation for the Borrowers' Assets. On and after the Closing Date:

(A)    the provisions of the Loan Documents and the Orders are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral (other than on Collateral of PTVW that is located in Germany and any Capital Stock of Wiederholt (prior to the satisfaction of the conditions set forth in Section 7.2(P) of this Agreement) or any Foreign Subsidiary), having the priority provided for herein and in the Order and enforceable against the Borrowers;

(B)    pursuant to clause (d)(1) of section 364 of the Bankruptcy Code and the Orders, all Obligations are secured by a Priming Lien on the Collateral (other than on Collateral of PTVW that is located in Germany and any Capital Stock of Wiederholt (prior to the satisfaction of the conditions set forth in Section 7.2(P) of this Agreement) or any Foreign Subsidiary), which Priming Lien primes the Primed Liens;

(C)    pursuant to subclauses (2) and (3) of clause (c) of section 364 of the Bankruptcy Code and the Orders, all Obligations are secured by a first priority, perfected Lien on the Collateral owned by the Borrowers (other than on Collateral of PTVW that is located in Germany and any Capital Stock of Wiederholt (prior to the satisfaction of the conditions set forth in Section 7.2(P) of this Agreement) or any Foreign Subsidiary), subject only to (i) valid, perfected, non-avoidable and enforceable Liens existing as of the Filing Date and set forth on Schedule 1.1.5 hereto, (ii) to the extent such Post-Petition perfection is expressly permitted by the Bankruptcy Code, valid, non-avoidable and enforceable Liens existing as of the Filing Date, but perfected after the Filing Date, (iii) the Carve-Out;

(D)    pursuant to clause (c)(1) of section 364 of the Bankruptcy Code and the Orders, all Obligations and all other obligations of the Borrowers under the Loan Documents at all times shall constitute allowed super-priority administrative expense claims in the Cases having priority over all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code, subject only to the Carve-Out; and

(E)    the Interim Order and, to the extent the Final Order is effective, the Final Order, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of Administrative Agent.

6.20    Patriot Act and AML Laws.

(A)    None of the Borrowers or any of their respective Subsidiaries, and to the knowledge of the Borrowers or any of their respective Subsidiaries, none of their respective Affiliates are in violation of any law relating to terrorism or money laundering (collectively, the "AML Laws"), including, but not limited to, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order") and Title III of United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) of 2001 (signed into law October 26,

2001), and the rules and regulations promulgated from time to time thereunder (the "<u>Patriot Act</u>").

(B)     None of the Borrowers or any of their respective Subsidiaries, and to the knowledge of the Borrowers or any of their respective Subsidiaries, no Affiliate or broker or other agent of any of the Borrowers or any of their respective Subsidiaries acting or benefiting in any capacity in connection with the Loans is any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of the Executive Order or any other applicable regulations published by the U.S. Treasury Department Office of Foreign Assets Control ("<u>OFAC</u>");

(ii)     a Person owned or controlled by, or acting on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order or any other applicable OFAC regulations;

(iii)     a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any applicable AML Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order or any other applicable OFAC regulations; or

(v)     a Person that is named as a "specifically designated national" or "blocked person" on the most current list published by OFAC at its official website, currently available at www.treas.gov/offices/enforcement/ofac/ or any replacement website or other replacement official publication of such list.

(C)     None of the Borrowers or any of their respective Subsidiaries, and to the knowledge of the Borrowers or any of their respective Subsidiaries, no broker or other agent of any of the Borrowers or any of their respective Subsidiaries acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in paragraph (B) above, (ii) deals in, or otherwise engages in any transaction relating to, any Property or interests in Property blocked pursuant to the Executive Order or other applicable OFAC regulations, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any applicable AML Law.

# ARTICLE VII:  COVENANTS

Each of the Borrowers jointly and severally covenants and agrees that until the Termination Date, unless the Required Lenders shall otherwise give prior written consent:

7.1     Reporting.  The Borrowers shall:

(A)     Financial Reporting.  Furnish to the Lenders:

(i)     Monthly Reports.  As soon as practicable, and in any event within twenty-five (25) days after the end of each calendar month, the consolidated balance sheet of PTC and its Domestic Subsidiaries as at the end of such period and the related consolidated statements of income and cash flow of PTC and its Domestic Subsidiaries for such calendar month, certified by the chief financial officer of PTC on behalf of the Borrowers as fairly presenting the consolidated financial position of PTC and its Domestic Subsidiaries as at the dates indicated and the results of their operations and cash flows for the calendar months indicated in accordance with Agreement Accounting Principles, subject to normal year end adjustments.  Each income statement delivered pursuant to this paragraph shall include (a) a comparison of the results for such month to the corresponding month in the immediately preceding year, (b) a comparison of the year-to-date totals as of such month to the year-to-date totals as of the corresponding month in the immediately preceding year, and (c) an EBITDA calculation for the twelve month period ending as of such month.  Until the Termination Date, the Borrowers shall also furnish to the Lenders, as soon as practicable, and in any event within twenty-five (25) days after the end of each calendar month, a certificate certified by an Authorized Officer of PTC setting forth the costs for materials and labor used during such calendar month in the manufacture and production of goods, including, without limitation, the amount in tons and the cost per ton of raw steel acquired by the Borrowers.

(ii)     Quarterly Reports.  As soon as practicable, and in any event within forty-five (45) days after the end of each of the first three fiscal quarters in each fiscal year, the consolidated balance sheet of PTC and its Subsidiaries as at the end of such period and the related consolidated statements of income and cash flows of PTC and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then-current fiscal year to the end of such fiscal quarter, certified by the chief financial officer of PTC on behalf of the Borrowers as fairly presenting the consolidated financial position of PTC and its Subsidiaries as at the dates indicated and the results of their operations and cash flows for the periods indicated in accordance with Agreement Accounting Principles, subject to the absence of notes thereto and to normal year end adjustments, and a forecasted consolidated balance sheet and consolidated statements of income and cash flows of PTC and its Subsidiaries for and as of the end of the next succeeding fiscal quarter and a comparison of the statements of income and cash flows to the same period of the prior year.  Together with the foregoing, the Borrowers shall deliver consolidating balance sheets, income statements, and cash flow statements for PTC and its Subsidiaries

70

which shall be certified by the chief financial officer of PTC on behalf of the Borrowers in accordance with the foregoing.

(iii) <u>Annual Reports</u>. As soon as practicable, and in any event within ninety (90) days after the end of each fiscal year, (a) the consolidated balance sheet of PTC and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income, stockholders' equity and cash flows of PTC and its Subsidiaries for such fiscal year, and in comparative form the corresponding figures for the previous fiscal year, in form and substance sufficient to calculate the financial covenants set forth in <u>Section 7.4</u>, (b) a schedule setting forth for each item in <u>clause (a)</u> hereof, the corresponding figures from the consolidated financial statements from the prior fiscal year, and (c) an audit report on the items listed in <u>clause (a)</u> hereof of independent certified public accountants of recognized national standing, which audit report shall be unqualified (other than with respect to the Cases or a going concern qualification) and shall state that such financial statements fairly present the consolidated financial position of PTC and its Subsidiaries as at the dates indicated and the results of their operations and cash flows for the periods indicated in conformity with Agreement Accounting Principles and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards. The deliveries made pursuant to this <u>clause (iii)</u> shall be accompanied by a certificate of such accountants that, in the course of their examination necessary for their certification of the foregoing, they have obtained no knowledge of any Default or Unmatured Default, or if, in the opinion of such accountants, any Default or Unmatured Default shall exist, stating the nature and status thereof. In addition, promptly after receipt thereof, the Borrowers shall deliver any management letter or similar communication prepared by the above-referenced accountants. In addition, as soon as practicable, and in any event within ninety (90) days after the end of each fiscal year the Borrowers shall furnish to the Lenders the audited financial statements (translated into English) for Wiederholt accompanied by the audit report (translated into English) of the certified public accountants (or equivalent thereof) who prepared the same. Together with the foregoing, the Borrowers shall deliver consolidating balance sheets, income statements, and cash flow statements for PTC and its Subsidiaries which shall be subject to and covered by the above described audit reports and certificates delivered by the above described independent certified public accountants of recognized national standing.

(iv) <u>Certificates</u>. Together with each delivery of any financial statement pursuant to <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> of this <u>Section 7.1(A)</u>, (a) an Officer's Certificate of the Borrowers stating that no Default or Unmatured Default exists, or if any Default or Unmatured Default exists, stating the nature and status thereof and (b) a Compliance Certificate setting forth calculations for the period then ended which demonstrate compliance with <u>Section 2.3(B)</u>, if applicable, and the provisions of <u>Section 7.4</u>.

(v) <u>Forecasts; Business Plans; Financial Projections</u>. As soon as practicable and in any event not later than thirty (30) days prior to the beginning of each fiscal year, a copy of the plan and forecast (including a projected balance sheet, income statement and funds flow statement) of the Borrowers for the upcoming fiscal year prepared in such detail as shall be reasonably satisfactory to the Administrative Agent.

(vi) <u>Management Discussion and Analysis</u>. Together with the delivery of any financial statement pursuant to <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> of this <u>Section 7.1(A)</u>, a written discussion and analysis by the Borrowers' management regarding business trends, variances, and any other matters or developments as may be useful in connection with the review of such financial statements.

(vii) <u>Borrowing Base Certificate</u>. As soon as practicable, and in any event within twenty-five (25) days after the close of each calendar month, the Borrowers shall provide the Administrative Agent and the Lenders with a Borrowing Base Certificate, together with such supporting documents as the Administrative Agent reasonably deems desirable, all certified as being true and correct by an Authorized Officer of each of the Borrowers. Such supporting documents shall include, in any event, (i) an accounts receivable aging of the Borrowers detailed by Account Debtor, (ii) an accounts payable aging of the Borrowers detailed by vendor, (iii) a report of raw materials, work-in-process, and finished goods Inventory by location, and (iv) a report of top ten Account Debtors of the Borrowers by total Receivables balance. The Borrowers (a) shall update the gross Receivables portion of the Borrowing Base not later than the second (2nd) Business Day of each week and shall update the ineligible Receivables portion of the Borrowing Base not later than the second (2nd) Business Day of every second week, and (b) may update the Borrowing Base Certificate more frequently than as required hereby, and the most recently delivered Borrowing Base Certificate shall be the applicable Borrowing Base Certificate for purposes of determining the Borrowing Base at any time.

(viii) <u>Budget</u>.

(1) Not later than the third (3rd) Business Day of each week after the date of this Agreement, the Borrowers shall deliver to the Administrative Agent and each Lender, (A) an updated rolling cash flow forecast (a "<u>Proposed Budget</u>"), setting forth on a line-item basis anticipated cash receipts and expenditures for each Borrower and on an aggregate basis for the Borrowers for the succeeding 13-week period. Each such Proposed Budget shall become effective upon approval of the Administrative Agent, in its reasonable discretion (each such approved Proposed Budget and the Original Budget, an "<u>Approved Budget</u>"), it being understood that such Proposed Budget shall be deemed an Approved Budget three (3) Business Days after its receipt by the Administrative Agent if the Administrative Agent has not notified the Borrowers otherwise orally or in writing; <u>provided</u>, <u>however</u>, that if the Administrative Agent shall indicate objections to the Proposed Budget in connection with its failure to approve the

Proposed Budget, then the Borrower shall have one (1) Business Day to deliver a revised Proposed Budget that shall be subject to the approval or disapproval of the Administrative Agent, in its reasonable discretion, within one (1) Business Day following receipt thereof, it being understood that such revised Proposed Budget shall be deemed an Approved Budget one (1) Business Day after its receipt by the Administrative Agent if the Administrative Agent has not notified the Borrowers otherwise orally or in writing, and (B) the consolidated cash balance of the Borrowers as of the end of the immediately preceding week.

(2)     Each Proposed Budget delivered to the Administrative Agent pursuant to this <u>Section 7.1(A)(viii)</u> shall be accompanied by a memorandum or worksheet detailing all changes in material assumptions used in the preparation of such Proposed Budget, shall contain a line item for each expense category reasonably requested by the Administrative Agent (provided that items on the Proposed Budget that are subject to Bankruptcy Court approval shall not be funded until approved by the Bankruptcy Court, and inclusion and acceptance of any such item is not a waiver of any party's objection thereto), and shall specify for each week and for each such expense category the amount budgeted for such category for such week.

(ix)     <u>Variance Report</u>.  Not later than the third (3rd) Business Day of each week, the Borrowers shall deliver to the Administrative Agent and the Lenders, a Budget Variance Report as of the last day of the prior week reflecting on a line-item basis the actual cash receipts and disbursements for the immediately preceding week and the variance of such actual results from those reflected in the Approved Budget for the immediately preceding week.

(x)     <u>Accounts Payable Balance for Outside Processors</u>.  Not later than the second (2nd) Business Day of each week, the Borrowers shall deliver to the Administrative Agent a report in reasonable detail of the Borrowers' accounts payable balances as of the end of the immediately preceding week for each outside processor of Inventory for which the Borrowers' aggregate accounts payable balance is at least $25,000.

(B)     <u>Notice of Default</u>.  Promptly upon any of the chief executive officer, chief operating officer, chief financial officer, treasurer or controller of any Borrower obtaining knowledge (i) of any condition or event which constitutes a Default or Unmatured Default, or becoming aware that any Lender or Administrative Agent has given any written notice with respect to a claimed Default or Unmatured Default under this Agreement, or (ii) that any Person has given any written notice to any Borrower or taken any other action with respect to a claimed default or event or condition of the type referred to in <u>Section 8.1(e)</u>, deliver to the Administrative Agent and the Lenders an Officer's Certificate specifying (a) the nature and period of existence of any such claimed default, Default, Unmatured Default, condition or event, (b) the notice given or action taken by such Person in connection therewith, and (c) what action the Borrowers have taken, are taking and propose to take with respect thereto.

(C)  Lawsuits.  (i) Promptly upon any Borrower obtaining knowledge of the institution of, or written threat of, any action, suit, proceeding, governmental investigation or arbitration against or affecting any Borrower or any property of any Borrower not previously disclosed pursuant to Section 6.7, which action, suit, proceeding, governmental investigation or arbitration exposes, or in the case of multiple actions, suits, proceedings, governmental investigations or arbitrations arising out of the same general allegations or circumstances which expose, in the Borrowers' reasonable judgment, the applicable Borrower to liability in an amount aggregating $1,000,000 or more (exclusive of claims covered by insurance policies of the Borrowers unless the insurers of such claims have disclaimed coverage or reserved the right to disclaim coverage on such claims and exclusive of claims covered by the indemnity of a financially responsible indemnitor in favor of the Borrowers unless the indemnitor has disclaimed or reserved the right to disclaim coverage thereof), give written notice thereof to the Administrative Agent and the Lenders and provide such other information as may be reasonably available to enable each Lender and the Administrative Agent and its counsel to evaluate such matters; and (ii) in addition to the requirements set forth in clause (i) of this Section 7.1(C), upon request of the Administrative Agent or the Required Lenders, promptly give written notice of the status of any action, suit, proceeding, governmental investigation or arbitration covered by a report delivered pursuant to clause (i) above and provide such other information as may be reasonably available to it that would not violate any attorney-client privilege by disclosure to the Lenders to enable each Lender and the Administrative Agent and its counsel to evaluate such matters.

(D)  ERISA Notices.  Deliver or cause to be delivered to the Administrative Agent and the Lenders, at the Borrowers' expense, the following information and notices as soon as reasonably possible, and in any event:

(i)  (a) within ten (10) Business Days after any officer of any Borrower obtains knowledge that a Termination Event has occurred which, when aggregated with any previous Termination Events during the twelve (12) months prior to such Termination Event, could reasonably be expected to subject any Borrower to liability individually or in the aggregate in excess of $1,000,000, a written statement of the chief financial officer of the Borrower Representative describing such Termination Event(s) and the action, if any, which the Borrowers have taken, are taking or propose to take with respect thereto, and when known, any action taken or threatened by the IRS, DOL or PBGC with respect thereto and (b) within fifteen (15) Business Days after any officer of any member of the Controlled Group obtains knowledge that a Termination Event has occurred which, when aggregated with any previous Termination Events during the twelve months prior to such Termination Event, could reasonably be expected to subject the Borrowers to liability individually or in the aggregate in excess of $1,000,000, a written statement of the chief financial officer of the Borrower describing such Termination Event(s) and the action, if any, which the member of the Controlled Group has taken, is taking or proposes to take with respect thereto, and when known, any action taken or threatened by the IRS, DOL or PBGC with respect thereto;

(ii)      within ten (10) Business Days after any officer of any Borrower obtains knowledge that a prohibited transaction (defined in Sections 406 of ERISA and Section 4975 of the Code) has occurred which, when aggregated with any previous prohibited transactions during the twelve (12) months prior to such prohibited transaction, could reasonably be expected to subject any Borrower to liability in excess of $1,000,000, a statement of the chief financial officer of the Borrower Representative describing such transaction(s) and the action which the Borrowers have taken, are taking or propose to take with respect thereto;

(iii)      within fifteen (15) Business Days after the material increase in the benefits of any existing Plan or the establishment of any new Benefit Plan or the commencement of, or obligation to commence, contributions to any Benefit Plan or Multiemployer Plan to which any Borrower or any member of the Controlled Group was not previously contributing where the aggregate annual contributions to such Plan(s) resulting therefrom are or could reasonably be expected to exceed $1,000,000, notification of such increase, establishment, commencement or obligation to commence and the amount of such contributions;

(iv)      within fifteen (15) Business Days after any Borrower receives notice of any unfavorable determination letter from the IRS regarding the qualification of a Plan under Section 401(a) of the Code, copies of each such letter;

(v)      within fifteen (15) Business Days after the establishment of any Foreign Employee Benefit Plan or the commencement of, or obligation to commence, contributions to any Foreign Employee Benefit Plan to which the Borrower or any Domestic Subsidiary was not previously contributing, where the aggregate annual contribution by the Borrower or any Domestic Subsidiary to such Plan are or could reasonably be expected to exceed $1,000,000, notification of such establishment, commencement or obligation to commence and the amount of such contributions;

(vi)      within fifteen (15) Business Days after the filing thereof with the DOL, IRS or PBGC, copies of each annual report (form 5500 series), including Schedule B thereto, filed with respect to each Benefit Plan;

(vii)      within fifteen (15) Business Days after receipt by any Borrower or any member of the Controlled Group of each actuarial report for any Benefit Plan or Multiemployer Plan and each annual report for any Multiemployer Plan, copies of each such report;

(viii)      within fifteen (15) Business Days after the filing thereof with the IRS, a copy of each funding waiver request filed with respect to any Benefit Plan and all

communications received by any Borrower or a member of the Controlled Group with respect to such request;

(ix)    within fifteen (15) Business Days after receipt by any Borrower or any member of the Controlled Group of the PBGC's intention to terminate a Benefit Plan or to have a trustee appointed to administer a Benefit Plan, copies of each such notice;

(x)    within fifteen (15) Business Days after receipt by any Borrower or any member of the Controlled Group of a notice from a Multiemployer Plan regarding the imposition of withdrawal liability which, when aggregated with any previous withdrawal liability with respect to which any such Person has received a notice during the twelve (12) months prior to such notice, could reasonably be expected to subject any Borrower to liability individually or in the aggregate in excess of $1,000,000, copies of each such notice;

(xi)    within fifteen (15) Business Days after any Borrower or any member of the Controlled Group fails to make a required installment or any other required payment under Sections 412 or 430 of the Code on or before the due date for such installment or payment, a notification of such failure; and

(xii)    within fifteen (15) Business Days after any officer of any Borrower or any member of the Controlled Group knows or has reason to know that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, or (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan, if any such termination or proceedings, individually or in the aggregate, could reasonably be expected to subject any Borrower to liability in excess of $1,000,000.

For purposes of this Section 7.1(D), any Borrower and any member of the Controlled Group shall be deemed to know all facts known by the Plan Administrator (as defined in Section 3(16)(A) of ERISA) of any Plan of which any Borrower or any member of the Controlled Group or such Domestic Subsidiary is the plan sponsor.

(E)    Labor Matters.  Notify the Administrative Agent in writing, promptly upon any Borrower's learning thereof, of (i) any material labor dispute to which any Borrower may become a party, including, without limitation, any strikes, lockouts or other disputes relating to such Persons' plants and other facilities and (ii) any failure to comply with the Worker Adjustment and Retraining Notification Act with respect to the closing of any plant or other facility of any Borrower.

(F)    Other Indebtedness.  Deliver to the Administrative Agent (i) a copy of each regular report, notice or other written communication regarding potential or actual defaults

(including any accompanying officer's certificate) delivered by or on behalf of any Borrower to the holders of funded Indebtedness, the outstanding principal amount of which Indebtedness is in excess of $1,000,000, pursuant to the terms of the agreements governing such Indebtedness, such delivery to be made at the same time and by the same means as such notice or other communication is delivered to such holders, and (ii) a copy of each notice or other written communication received by any Borrower from the holders of funded Indebtedness, the outstanding principal amount of which Indebtedness is in excess of $1,000,000, pursuant to the terms of such Indebtedness, such delivery to be made promptly after such notice or other communication is received by any Borrower.

(G)     Pleadings and Motions.  Promptly after the same is available (to the extent not otherwise previously delivered), the Borrowers shall furnish to the Administrative Agent's counsel all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrowers with the Bankruptcy Court or the United States Trustee in the Cases, or distributed by or on behalf of the Borrowers to the Committee, if any (other than confidential information provided to any Borrower by any other bidder for the Borrowers' assets in compliance with the Bid Procedures Order).

(H)     Bankruptcy Filings.  The Borrowers shall file their bankruptcy schedules and statements of financial affairs no later than the date set forth in the Federal Rules of Bankruptcy Procedure or in any order entered by the Bankruptcy Court on or about the Filing Date with respect to an extension of time to file such schedules and statements (and shall not, without the consent of the Administrative Agent, seek a further extension of time to file such schedules and statements) and shall promptly deliver a copy thereof to the Administrative Agent and its counsel.

(I)     Other Reports.  Deliver or cause to be delivered to the Administrative Agent copies of all financial statements, reports and notices, if any, sent or made available generally by any Borrower to its securities holders or filed with the Commission by any Borrower, all press releases made available generally by any Borrower to the public concerning material developments in the business of such Borrower and all notifications received from the Commission by any Borrower pursuant to the Securities Exchange Act of 1934 and the rules promulgated thereunder.

(J)     Environmental Notices.  As soon as possible and in any event within ten (10) days after receipt by any Borrower, a copy of (i) any notice or claim to the effect that any Borrower is or may be liable to any Person as a result of the Release or threatened Release by any Borrower, or any other Person of any Contaminant into the environment, and (ii) any notice alleging any violation of any Environmental, Health or Safety Requirements of Law by any Borrower or any if, in either case, such notice or claim relates to an event which could reasonably be expected to subject any Borrower to liability individually or in the aggregate in excess of $1,000,000.

(K)     Other Information.  Promptly upon receiving a request therefor from the Administrative Agent, prepare and deliver to the Administrative Agent such other information with respect to any Borrower or the Collateral, including, without limitation, schedules identifying and describing the Collateral and any dispositions thereof or any Asset Sale (other

than those Asset Sales permitted pursuant to Section 7.3(B)(i)) (and the use of the Net Cash Proceeds thereof), as from time to time may be reasonably requested by the Administrative Agent or any Lender.

7.2    Affirmative Covenants.

(A)    Existence, Etc. Each of the Borrowers shall at all times maintain its organizational existence and preserve and keep, or cause to be preserved and kept, in full force and effect its rights and franchises material to its businesses.

(B)    Powers; Conduct of Business. Each of the Borrowers shall qualify and remain qualified to do business in each jurisdiction in which the nature of its business requires it to be so qualified and where the failure to be so qualified will have or could reasonably be expected to have a Material Adverse Effect. Each of the Borrowers shall carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

(C)    Compliance with Laws, Etc. Each of the Borrowers shall (a) comply with all Requirements of Law and all restrictive covenants affecting such Person or the business, properties, assets or operations of such Person, and (b) obtain as needed all permits necessary for its operations and maintain such permits in good standing unless failure to comply or obtain could not reasonably be expected to have a Material Adverse Effect.

(D)    Payment of Taxes and Claims; Tax Consolidation. Each of the Borrowers shall pay (i) all Post-Petition taxes, assessments and other governmental charges imposed upon it or on any of its properties or assets or in respect of any of its franchises, business, income or property before any penalty or interest accrues thereon, and (ii) all Post-Petition claims (including, without limitation, claims for labor, services, materials and supplies) for sums which have become due and payable and which by law have or may become a Lien (other than a Lien permitted by Section 7.3(C)) upon any of such Borrower's property or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, however, that no such taxes, assessments and governmental charges referred to in clause (i) above or claims referred to in clause (ii) above (and interest, penalties or fines relating thereto) need be paid if being contested in good faith by appropriate proceedings diligently instituted and conducted and if such reserve or other appropriate provision, if any, as shall be required in conformity with Agreement Accounting Principles shall have been made therefor. The Borrowers will not file or consent to the filing of any consolidated income tax return with any Person other than the Borrowers and any of their respective Subsidiaries.

(E)    Insurance. Each of the Borrowers shall maintain in full force and effect the insurance policies and programs listed on Schedule 6.16 to this Agreement or substantially similar policies and programs or other policies and programs as reflect coverage that is reasonably consistent with prudent industry practice. Not later than ten (10) Business Days following the Closing Date (or such later date as the Administrative Agent may agree), each of the Borrowers shall deliver to the Administrative Agent endorsements in form and substance acceptable to the Administrative Agent (y) to all "All Risk" physical damage insurance policies on all of such Borrower's tangible real and personal property and assets and business interruption

insurance policies naming the Administrative Agent as loss payee, and (z) to all general liability and other liability policies naming the Administrative Agent as an additional insured. In the event any Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies or insurance required herein or to pay any premium in whole or in part relating thereto, then the Administrative Agent, without waiving or releasing any obligations or resulting Default hereunder, may at any time or times thereafter (but shall be under no obligation to do so) obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto which the Administrative Agent deems advisable. All sums so disbursed by the Administrative Agent shall constitute part of the Obligations, payable as provided in this Agreement. In connection with any such disbursements by the Administrative Agent and/or the Administrative Agent on behalf of any Borrower and in accordance with the provisions of applicable law, the Administrative Agent hereby gives such Borrower the following notice:

> Unless you (the Borrower) provide us (the Administrative Agent) with evidence of the insurance coverage required by your agreement with us (i.e., under this Agreement and the Security Agreement), we may purchase insurance at your expense to protect our interests in your collateral. This insurance may, but need not, protect your interests. The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral. You may later cancel any insurance purchased by us, only after providing us with evidence that you have obtained insurance as required by our agreement. If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to your total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.

(F)     Inspection of Property; Books and Records; Discussions.     Each of the Borrowers shall permit any authorized representative(s) designated by the Administrative Agent to visit and inspect any of the properties of such Borrower to examine, audit, check and make copies of their respective financial and accounting records, books, journals, orders, receipts and any correspondence and other data relating to their respective businesses or the transactions contemplated hereby (including, without limitation, in connection with environmental compliance, hazard or liability), and to discuss their affairs, finances and accounts with their officers and independent certified public accountants, all upon reasonable notice and at such reasonable times during normal business hours, as often as may be reasonably requested. Without limiting the foregoing, each of the Borrowers shall permit any authorized representative(s) designated by either the Administrative Agent to complete each such audit, collateral analysis, appraisal, field examination, environmental survey, or other business analysis with respect to the Borrowers as the Administrative Agent shall request, all upon reasonable notice and at such reasonable times during normal business hours, as often as may be reasonably requested. Each of the Borrowers shall keep and maintain, in all material respects, proper books of record and account in which entries in conformity with Agreement Accounting Principles shall be made of all dealings and transactions in relation to their respective businesses and activities, including, without limitation, transactions and other dealings with respect to the Collateral. If a Default has occurred and is continuing, each of the Borrowers, upon the

Administrative Agent's request, shall turn over any such records to the Administrative Agent or its representatives.

(G)     Insurance and Condemnation Proceeds. Each of the Borrowers directs all insurers under policies of property damage, boiler and machinery and business interruption insurance and payors of any condemnation claim or award relating to the property to pay all proceeds payable under such policies or with respect to such claim or award for any loss with respect to the Collateral directly to the Administrative Agent, for the benefit of the Administrative Agent and the Lenders. The Administrative Agent shall, upon receipt of such proceeds, apply the same to the Obligations in accordance with Section 12.3.

(H)     ERISA Compliance. Each of the Borrowers shall establish, maintain and operate all Plans to comply in all respects with the provisions of ERISA, the Code, all other applicable laws, and the regulations and interpretations thereunder and the respective requirements of the governing documents for such Plans, except where such noncompliance could not reasonably be expected to subject the Borrowers to liability individually or in the aggregate in excess of $1,000,000.

(I)     Maintenance of Property. Each of the Borrowers shall cause all property used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment and shall cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the judgment of the applicable Borrower may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times; provided, however, that nothing in this Section 7.2(I) shall prevent any Borrower from discontinuing the operation or maintenance of any of such property if such discontinuance is, in the judgment of such Borrower, desirable in the conduct of its business and not disadvantageous in any material respect to the Administrative Agent or the Lenders.

(J)     Environmental Compliance. Each of the Borrowers shall comply with all Environmental, Health or Safety Requirements of Law, except where noncompliance will not have or is not reasonably likely to subject the Borrowers to liability individually or in the aggregate in excess of $1,000,000.

(K)     Use of Proceeds. Subject to the Approved Budget, each of the Borrowers shall use the proceeds of the Loans solely (i) to fund the Sale process, (ii) to pay related fees and expenses associated with negotiation, execution, and delivery of this Agreement, (iii) to pay the fees and expenses of the Professionals and any Committee, including but not limited to the Carve-Out, and (iv) for working capital and other general corporate purposes, including the payment of the Permitted Payments under the First Day Orders.

(L)     [Reserved].

(M)     Collection Accounts. No later than fifteen (15) Business Days following the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion), each of the Borrowers shall obtain from each financial institution at which such Borrower maintains a deposit account, a Collection Account Agreement.

(N)     Collection Account Arrangements.

(i)     All collections of Receivables included in the Collateral and other cash proceeds of Collateral shall be deposited in a Collection Account which is subject to a Collection Account Agreement as set forth in Section 7.2(M) or pursuant to another similar arrangement for the collection of such amounts established by each Borrower and the Administrative Agent and shall be transferred in accordance with the provisions of the respective Collection Account Agreements. Any of the foregoing collections received by any Borrower or any of its Subsidiaries or Affiliates and not so deposited, shall be deemed to have been received by such Person as the Administrative Agent's trustee and, upon such Person's receipt thereof, such Borrower shall (or shall cause such Person to) immediately transfer all such amounts into a Collection Account in their original form. Such deposits shall be remitted to the Administrative Agent, a Borrower or as the Administrative Agent may direct, all in accordance with the provisions of the Collection Account Agreement.

(ii)     All payments received by the Administrative Agent, all collections of Receivables included in the Collateral received by the Administrative Agent, and all proceeds of other Collateral received by the Administrative Agent, whether through payment or otherwise, will be the sole property of the Administrative Agent for the benefit of the Secured Parties and will be deemed received by the Administrative Agent for application to the Obligations pursuant to the terms of this Agreement.

(O)     Foreign Employee Benefit Compliance.  Each of the Borrowers shall, and shall cause each of its Subsidiaries and each member of its Controlled Group to, establish, maintain and operate all Foreign Employee Benefit Plans to comply in all material respects with all laws, regulations and rules applicable thereto and the respective requirements of the governing documents for such Plans, except for failures to comply which, in the aggregate, would not reasonably likely to subject the Borrowers or any of their respective Subsidiaries to liability, individually or in the aggregate, in excess of $1,000,000.

(P)     Pledge of Capital Stock of Wiederholt. No later than fifteen (15) Business Days following the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion), PTC shall deliver to the Administrative Agent a pledge agreement pledging 65% of the total outstanding voting Capital Stock of Wiederholt, which pledge agreement shall be governed by the local law of Wiederholt's home jurisdiction and shall be in a form customarily used in such jurisdiction, together with the original certificates being so pledged (if any), accompanied by undated stock powers executed in blank and other proper instruments of transfer, in each case if applicable under the laws of such jurisdiction, together with customary opinions with respect to such pledge agreement in form and substance satisfactory to the Administrative Agent.

(Q)     Collateral Access Agreements.  Set forth on Schedule 7.2(Q) is a true and accurate schedule detailing each location not owned by a Borrower at which Collateral is located, stored, processed or maintained, and whether or not Collateral Access Agreements have been

obtained for such locations. Each Borrower shall use reasonable best efforts to obtain a Collateral Access Agreement with respect to each such location in the United States for which a Collateral Access Agreement has not already been obtained; provided, however, the refusal of such third party to execute such agreements after such reasonable best efforts shall not constitute a Default.

(R)    Monthly Meetings.  At least once per calendar month, upon request of the Administrative Agent, at mutually acceptable times (and with telephonic conferences being acceptable), the Borrowers shall, and shall procure that representatives of the Borrowers' Professionals reasonably requested by the Administrative Agent, meet together with the Administrative Agent to update the Administrative Agent on the status of the Cases and to discuss any other issues in connection therewith as reasonably requested by the Administrative Agent.

(S)    Weekly Updates on Sale Process.  On the third (3rd) Business Day of each week after the date hereof, or at such other times as may be mutually agreeable, upon request of the Administrative Agent, the Borrowers shall update the Administrative Agent on the status of the Borrowers' compliance with Section 7.2(T), which update shall include information on the steps the Borrowers have taken toward complying with such provision and any other related information reasonably requested by the Administrative Agent (other than confidential information provided to any Borrower by any other bidder for the Borrowers' assets in compliance with the Bid Procedures Order).

(T)    Sale.  The Borrowers shall use their commercially reasonable efforts to:

(i)    [Reserved];

(ii)    on or before the fourteenth (14th) day following the Filing Date, obtain entry of the Bid Procedure Order by the Bankruptcy Court, which order shall authorize (1) credit bids and (2) the solicitation of bids for the Sale of the Borrowers collectively;

(iii)    on or before seventh (7th) day following the Bid Deadline, conduct the Auction;

(iv)    on or before the sixtieth (60th) day following the Filing Date, obtain entry of the Sale Order by the Bankruptcy Court; and

(v)    on or before the thirteenth (13th) day following entry of the Sale Order (the "Sale Date"), close the Sale, unless the Borrowers are seeking approval from the Bankruptcy Court pursuant to Section 8.2(g) of the Stalking Horse Purchase Agreement to reject the "Collective Bargaining Agreements" listed on Schedule 5.9(a)(i)

to the Stalking Horse Purchase Agreement, in which case the Sale shall be consummated as promptly as practicable after the Sale Date.

(U)  Professional Fees.  Promptly following receipt thereof, each Borrower shall deliver to the Administrative Agent all monthly fee statements detailing the Professional fees for such month delivered in accordance with the interim compensation procedures approved by the Bankruptcy Court.

(V)  Final Order.  The Borrowers shall cause the Final Order Entry Date to occur no later than the date that is thirty (30) days following the date of entry of the Interim Order (or such later date as the Administrative Agent may agree in its sole discretion).

7.3  Negative Covenants.

(A)  Indebtedness.  None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(i)  the Obligations and the Pre-Petition Obligations;

(ii)  Permitted Existing Indebtedness;

(iii)  intercompany Indebtedness (1) solely among the Borrowers and (2) arising under loans made by any Borrower to any Foreign Subsidiary not to exceed the amounts set forth in the Approved Budget;

(iv)  Indebtedness constituting Contingent Obligations permitted by Section 7.3(E);

(v)  secured or unsecured purchase money Indebtedness (including Capitalized Leases) incurred subsequent to the Filing Date to finance the acquisition of assets used in the business, if (1) at the time of such incurrence, no Default or Unmatured Default has occurred and is continuing or would result from such incurrence, (2) such Indebtedness has a scheduled maturity and is not due on demand, (3) such Indebtedness does not exceed the lower of the fair market value or the cost of the applicable fixed assets on the date acquired, (4) such Indebtedness does not exceed $250,000 in the aggregate outstanding at any time, and (5) any Lien securing such Indebtedness is permitted under Section 7.3(C)(v) (such Indebtedness being referred to herein as "Permitted Purchase Money Indebtedness"); and

(vi)  unsecured Indebtedness with respect to surety, appeal and performance bonds obtained by any Borrower in the ordinary course of business.

(B)    Sales of Assets.    Other than with respect to the Sale, none of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall sell, assign, transfer, lease, convey or otherwise dispose of any property, whether now owned or hereafter acquired, or any income or profits therefrom, or enter into any agreement to do so, except:

(i)    sales of Inventory in the ordinary course of business and sales of Inventory by PTVW;

(ii)    the disposition in the ordinary course of business of Equipment that is obsolete, excess or no longer useful in the applicable Borrower's business in an aggregate amount not to exceed $1,000,000 during the term of this Agreement;

(iii)    transfers of assets solely among the Borrowers;

(iv)    the sale or other disposition of any other property or assets, subject to the prior written approval of the material terms thereof by the Required Lenders in their sole and absolute discretion; and

(v)    any of the Borrowers or any of their respective Subsidiaries may enter into any sales or purchases of goods with Wiederholt or PTC Asia if (x) the terms of such sales or purchases are fair and reasonable and are no more favorable to Wiederholt or PTC Asia, as applicable, than would be obtained in a comparable arms'-length transaction with a Person that is not an Affiliate of such Borrower or Subsidiary, (y) the aggregate accounts receivable (net of any accounts payable) from such sales or purchases with Wiederholt or PTC Asia do not exceed $2,500,000 at any time, and (z) no account receivable (i) remains unpaid one hundred eighty (180) days after the date of the original applicable invoice (net of any credits or credit balances included in such total) or (ii) is converted to anything other than an ordinary course account receivable.

(C)    Liens.    None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to any of their respective property or assets except:

(i)    Liens created by the Loan Documents or otherwise securing the Obligations;

(ii)    Permitted Existing Liens;

(iii)    Customary Permitted Liens;

(iv)     Replacement Liens in favor of the Pre-Petition Creditors as adequate protection granted pursuant to the Orders, which Liens are junior to the Liens contemplated hereby in favor of the Administrative Agent for the benefit of the Secured Parties, provided that the Orders provide that the holders of such junior Liens shall not be permitted to take any action to foreclose with respect to such junior Liens so long as any amounts shall remain outstanding hereunder or any Revolving Loan Commitment shall be in effect; and

(v)     purchase money Liens (including the interest of a lessor under a Capitalized Lease and Liens to which any property is subject at the time of the applicable Borrower's acquisition thereof) securing Permitted Purchase Money Indebtedness; provided that such Liens shall not apply to any property of any Borrower other than that purchased or subject to such Capitalized Lease.

In addition, none of the Borrowers nor any of its Subsidiaries (other than Wiederholt) shall become a party to any agreement, note, indenture or other instrument, or take any other action, which would prohibit the creation of a Lien on any of its properties or other assets in favor of the Administrative Agent for the benefit of the Secured Parties, as additional collateral for the Obligations; provided that any agreement, note, indenture or other instrument in connection with Permitted Purchase Money Indebtedness (including Capitalized Leases) may prohibit the creation of a Lien in favor of the Administrative Agent for the benefit of the Secured Parties on the items of property obtained with the proceeds of such Permitted Purchase Money Indebtedness.

(D)     Investments.     None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall directly or indirectly make or own any Investment except:

(i)     Investments in Cash Equivalents;

(ii)     Each of the Permitted Existing Investments in an amount not greater than the amount of each such Investments on the Closing Date;

(iii)     Investments in trade receivables or received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement (including settlements of litigation) of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(iv)     Investments consisting of deposit accounts that are subject to Collection Account Agreements in accordance with Section 7.2(M);

(v)     Investments consisting of non-cash consideration from a sale, assignment, transfer, lease, conveyance or other disposition of property permitted by Section 7.3(B)(iv);

(vi)     ownership by each Borrower of the capital stock or membership interests of each of its Subsidiaries listed on Schedule 6.8; and

(vii)     (1) Investments by a Borrower in any other Borrower and (2) loans made by any Borrower to any Foreign Subsidiary, to the extent, in the case of this clause (2), the corresponding Indebtedness is permitted under Section 7.3(A)(iii)(2).

(E)     Contingent Obligations.   None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall directly or indirectly create or become or be liable with respect to any Contingent Obligation, except: (i) recourse obligations resulting from endorsement of negotiable instruments for collection in the ordinary course of business; (ii) Permitted Existing Contingent Obligations; (iii) obligations, warranties, and indemnities, not relating to Indebtedness of any Person, which have been or are undertaken or made in the ordinary course of business and not for the benefit of or in favor of an Affiliate of the Borrowers except an Affiliate which is a Borrower; (iv) Contingent Obligations entered into in connection with any Indebtedness of a Borrower permitted by Section 7.3(a)(v); and (v) Contingent Obligations with respect to surety, appeal and performance bonds obtained by a Borrower in the ordinary course of business.

(F)     Restricted Payments.   None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall declare or make any Restricted Payment, except any Borrower or any of its Subsidiaries may pay dividends or other distributions to a Borrower.

(G)     Conduct of Business; Subsidiaries; Prohibition on Acquisitions.

(i)     None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall engage in any business other than the businesses engaged in by the Borrowers or such respective Subsidiaries on the date hereof and any businesses or activities which are substantially similar, related or incidental thereto.

(ii)     None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall make any Acquisitions without the prior written consent of the Required Lenders.

(H)     Transactions with Shareholders, Members and Affiliates.   Except as permitted under Section 7.3(A)(iii) and 7.3(D)(vii) and except as set forth on Schedule 7.3(H), none of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall directly or indirectly (i) pay any management fees or other similar fees or compensation to the Management Group or any other holder or holders of PTC's Equity Interests, other than wages,

salaries, compensation arrangements and bonuses of employees who are also stockholders of PTC in the ordinary course and consistent with past practices or (ii) enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service, but excluding transactions described in <u>clause (i)</u> above) with any holder or holders of any of the Equity Interests of PTC, except as called for by the terms of such Equity Interests, or with any Affiliate of PTC which is not a Borrower, except for the Pre-Petition Obligations; <u>provided</u>, <u>however</u>, that any of the Borrowers or any of their respective Subsidiaries may enter into any sales or purchases of goods with Wiederholt or PTC Asia if (x) the terms of such sales or purchases are fair and reasonable and are no more favorable to Wiederholt or PTC Asia, as applicable, than would be obtained in a comparable arms'-length transaction with a Person that is not an Affiliate of such Borrower or Subsidiary, (y) the aggregate accounts receivable (net of any accounts payable) from such sales or purchases with Wiederholt or PTC Asia do not exceed $2,500,000 at any time, and (z) no account receivable (i) remains unpaid one hundred eighty (180) days after the date of the original applicable invoice (net of any credits or credit balances included in such total) or (ii) is converted to anything other than an ordinary course account receivable.

(I)     <u>Restriction on Fundamental Changes</u>.  None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall enter into any merger or consolidation, or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution), or convey, lease, sell, transfer or otherwise dispose of, in one transaction or series of transactions, all or substantially all of any Borrower's business or property, whether now or hereafter acquired.

(J)     <u>Sales and Leasebacks</u>.  None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall become liable, directly, by assumption or by Contingent Obligation, with respect to any lease, whether an operating lease or a Capitalized Lease, of any property (whether real or personal or mixed) (i) which it or one of its Subsidiaries sold or transferred or is to sell or transfer to any other Person, or (ii) which it or one of its Subsidiaries intends to use for substantially the same purposes as any other property which has been or is to be sold or transferred by it or one of its Subsidiaries to any other Person in connection with such lease.

(K)     <u>Margin Regulations</u>.  None of the Borrowers nor any of their respective Subsidiaries shall use all or any portion of the proceeds of any credit extended under this Agreement to purchase or carry Margin Stock.

(L)     <u>ERISA</u>.  To the extent that any of the following actions or omissions, individually or in the aggregate, could reasonably be expected to subject any Borrower to liability in excess of $1,000,000, none of the Borrowers shall:

(i)     engage, or permit any of its Subsidiaries or a fiduciary of any Plan to engage, in any prohibited transaction described in Sections 406 of ERISA or 4975 of the Code with respect to any Plan for which a statutory or class exemption is not available or a private exemption has not been previously obtained from the DOL;

(ii)     permit to exist any failure to satisfy the applicable minimum funding standard that is not a waived funding deficiency (within the meaning of Sections 302 of ERISA and 412 of the Code) with respect to any Benefit Plan;

(iii)    fail, or permit any Controlled Group member to fail, to pay timely required contributions or annual installments due with respect to any waived funding deficiency to any Benefit Plan;

(iv)    terminate, or permit any Controlled Group member to terminate, any Benefit Plan which would result in any liability of the Borrower or any Controlled Group member under Title IV of ERISA;

(v)     fail to make any contribution or payment to any Multiemployer Plan which the Borrower or any Controlled Group member may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto;

(vi)    fail, or permit any Controlled Group member to fail, to pay any required installment or any other payment required under Sections 412 or 430 of the Code with respect to any Plan on or before the due date for such installment or other payment; or

(vii)   amend, or permit any Controlled Group member to amend, a Plan resulting in an increase in current liability for the plan year such that the Borrower or any Controlled Group member is required to provide security to such Plan under Section 401(a)(29) of the Code.

(M)    <u>Corporate Documents</u>.  None of the Borrowers nor any of their respective Subsidiaries (other than Wiederholt) shall amend, modify or otherwise change any of the terms or provisions in any of their respective constituent documents as in effect on the date hereof, without the prior written consent of the Required Lenders.

(N)    <u>Fiscal Year</u>.  Neither PTC nor any of its consolidated Domestic Subsidiaries shall change its fiscal year for accounting or tax purposes from a period consisting of the 12-month period ending on the last day of each December of each calendar year.

(O)    <u>Subsidiary Covenants</u>.  The Borrowers will not, and will not permit any of their respective Subsidiaries to, create or otherwise cause to become effective any consensual encumbrance or restriction of any kind on the ability of any such Person (other than Wiederholt) to pay dividends, the ability of any such Person to guarantee Indebtedness of a Borrower or any Subsidiary of a Borrower or make any other distribution on its stock, or make any other Restricted Payment, pay any Indebtedness or other Obligation owed to a Borrower or any Subsidiary of a Borrower, make loans or advances or other Investments in a Borrower or any

other Subsidiary of a Borrower, or sell, transfer or otherwise convey any of its property to a Borrower or any Subsidiary of a Borrower.

(P)  Hedging Obligations. The Borrowers shall not and shall not permit any of their respective Subsidiaries (other than Wiederholt) to enter into any interest rate, commodity or foreign currency exchange, swap, collar, cap or similar agreements constituting Hedging Obligations.

(Q)  Other Indebtedness and Obligations. Without the prior written consent of the Administrative Agent, the Borrowers shall not (i) make any payment with respect to pre-petition obligations (other than the Permitted Payments under the First Day Orders or the Orders), (ii) amend, modify or change any agreement or document relating to any pre-petition Indebtedness or other obligations, or (iii) make any payment on any Post-Petition Indebtedness outside of the Borrowers' ordinary course of business; provided, however, that the Borrowers may make the payments specifically contemplated in the First Day Orders or the Approved Budget, or payments in connection with the assumption of any contract or lease approved by the Bankruptcy Court and consented to by the Administrative Agent, and the fees and expenses incurred by the Professionals, including but not limited to the Carve-Out. Without the prior written consent of Administrative Agent, the Borrowers shall not make any non-ordinary course payments, other than (i) non-ordinary course payments including the Permitted Payments under the First Day Orders or the Orders, (ii) the payment of cure amounts in connection with the assumption of contracts approved by the Administrative Agent, and (iii) fees and expenses incurred by the Professionals, including but not limited to the Carve-Out.

(R)  Bankruptcy Matters.

(i)  None of the Borrowers shall, without the prior written consent of Administrative Agent, seek or consent to, any modification, stay, vacation or amendment to any Order.

(ii)  The Borrowers shall not incur, create, assume, suffer to exist or permit (A) any other super-priority claim which is pari passu with or senior to the claims of the Administrative Agent and the Lenders against the Borrowers hereunder, except for the Carve-Out or (B) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than with respect to the Pre-Petition Obligations to the extent contemplated hereunder or as approved by the Administrative Agent.

(iii)  The Borrowers shall not assume or reject the obligations under any executory contracts entered into prior to the Filing Date without the prior written consent of Administrative Agent.

(iv)  The Borrowers shall not, without the prior written consent of Administrative Agent, seek or consent to any order seeking authority to take any action prior to entry of the Sale Order that is prohibited by the terms of this Agreement or the

other Loan Agreements or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Agreements.

(v)    The Borrowers shall not, without the prior written consent of Administrative Agent, seek or consent to any sale, any other sale of all or any substantial portion of any of their assets or plan of reorganization unless all of the Obligations are to be paid in full in cash or other immediately available funds and the arrangements provided for herein terminated pursuant thereto prior to or contemporaneously with the effectiveness of such plan of reorganization.

7.4    Financial Covenants.  The Borrowers shall comply with the following:

(A)    Defined Terms for Financial Covenants.  The following terms used in this Agreement shall have the following meanings (such meanings to be applicable, except to the extent otherwise indicated in a definition of a particular term, both to the singular and the plural forms of the terms defined):

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including Capitalized Leases and Permitted Purchase Money Indebtedness) by PTC and its Domestic Subsidiaries during that period that, in conformity with Agreement Accounting Principles, are required to be included in or reflected by the property, plant, equipment or similar fixed asset accounts reflected in the consolidated cash flow statement of PTC and its Domestic Subsidiaries, but in any event excluding insurance proceeds applied to repair, rebuild, or replace the asset the destruction or damage of which gave rise to such insurance proceeds.

"**EBITDA**" means, for any period, on a consolidated basis for PTC and its Domestic Subsidiaries, the sum, without duplication, of the amounts for such period of (i) Net Income, plus (ii) Interest Expense, plus (iii) charges against income for foreign, federal, state and local taxes, plus (iv) depreciation expense, plus (v) amortization expense, including, without limitation, amortization of goodwill and other intangible assets and Transaction Costs, plus (vi) non-cash restructuring charges of PTC or its Domestic Subsidiaries, plus (vii) non-cash charges resulting in connection with pension and other postretirement benefit plans sponsored by PTC or its Domestic Subsidiaries, plus (viii) reorganization and bankruptcy related charges of the Borrowers, plus (ix) other non-cash charges classified as long-term deferrals (which non-cash charges shall include, without limitation and without duplication, non-cash expenses in connection with stock options, phantom stock, stock appreciation rights or other similar incentive programs); provided that each of the above items may only be included in the calculation of EBITDA if such items are included in accordance with Agreement Accounting Principles.

"**Interest Expense**" means, for any period, the total interest expense of PTC and its consolidated Domestic Subsidiaries, whether paid or accrued (including, without limitation, the interest component of Capitalized Leases), but excluding interest expense not payable in cash