IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PTC Alliance Corp., *et al.*,[1] | ) | Case No. 09-13395 (CSS) |
| | ) | Joint Administration Requested |
| Debtors. | ) | Hearing Date: October 27, 2009 at 9:00 a.m. |
| | ) | Objection Deadline: October 20, 2009 at 4:00 p.m. |

## DEBTORS' APPLICATION TO EMPLOY AND RETAIN CANDLEWOOD PARTNERS, LLC AS INVESTMENT BANKER AND FINANCIAL ADVISOR TO THE DEBTORS AND DEBTORS IN POSSESSION *NUNC PRO TUNC* TO THE PETITION DATE PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AND FED.R.BANKR.P. 2014

PTC Alliance Corp. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), submit this application (this "Application") for an Order, pursuant to 11 U.S.C. §§ 105, 327(a), and 328(a), and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the employment and retention of Candlewood Partners, LLC ("Candlewood" or the "Firm") as financial advisor for the Debtors *nunc pro tunc* as of the Petition Date. In support of this Application, the Debtors rely on the Declaration of Thomas W. Crowley in Support of Chapter 11 Petition and First Day Orders (the "Crowley Declaration") and the Declaration of Glenn Pollack under Fed. R. Bank. P. 2014 in Support of Application for Order under 11 U.S.C. §§ 105, 327(a), and 328(a), Authorizing Employment and Retention of Candlewood as Financial Advisors for Debtors-In-Possession (the "Pollack Declaration"). In further support of this Application, the Debtors submit as follows:

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are: PTC Alliance Corp. (2395), with a principal executive office located at 6051 Wallace Road Ext., Suite 200, Wexford, PA 15090; Alliance Tubular Products Co. (7185), with a principal executive office located at 640 Keystone Street, Alliance, OH 44601; PACD Acquisition (3405), with a principal executive office located at 4400 west 3rd, Beaver Falls, PA 15010; Enduro Industries, Inc. (4669), with a principal executive office located at 2001 Orchard Avenue, Hannibal, MO 64031; PTC Tubular Products, LLC (9342), with a principal executive office located at 23041 E 800 North Road, Fairbury, IL 61739-8824; Mid-West Manufacturing Company (0660), with a principal executive office located at 475 East 16th Street, Chicago Heights, IL 60411; and PT VW (9385), with a principal executive office located at 6051 Wallace Road Ext., Suite 200, Wexford, PA 15090.

## I. JURISDICTION AND VENUE

1. On October 1, 2009 (the "Petition Date"), the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code with this Court. A motion pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for joint administration of the Debtors' chapter 11 cases is pending before the Court.

2. The Debtors continue in the management and operation of their business and property as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or committee of creditors has been appointed in the above-captioned bankruptcy cases (these "Cases").

3. The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these Cases and this Application in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief requested herein are sections 105, 327(a), and 328(a) of the Bankruptcy Code and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II. BACKGROUND

### A. Background and Current Business Operations

5. PTC Alliance Corp. ("PTC") and its subsidiaries (collectively, the "Company") are leading manufacturers and marketers of welded and cold drawn mechanical steel tubing and tubular shapes, chrome-plated bar products, fabricated parts, and precision components. PTC was formed in 2000 by the merger of Pittsburgh Tube Company and J.H. Roberts Industries, Inc. Today, the Company is comprised of (i) Alliance Tubular Products Co. ("Alliance"), PTC Tubular Products LLC, Enduro Industries, Inc., and PT/VW Corporation, each a wholly-owned

subsidiary of PTC (the "Direct Subsidiaries"); (ii) PACD Acquisition LLC, and Mid-West Mfg. Co., each a wholly-owned subsidiary of Alliance and an indirect subsidiary of PTC (the "Indirect Subsidiaries" and together with the Direct Subsidiaries, the "Domestic Subsidiaries"); and (iii) Wiederholt, GmbH, PTC Alliance Precision Products (Asia) Private Limited, and PTC Alliance (UK) Limited (the "Foreign Subsidiaries" and, together with the Domestic Subsidiaries, the "Subsidiaries"). The Debtors are PTC and the Domestic Subsidiaries. The Debtors have operations in seven states: Pennsylvania, Ohio, Missouri, Illinois, Indiana, Kentucky, and West Virginia.

6. The Company is one of the largest, independent manufacturers of engineered drawn-over-mandrel ("DOM") tubular steel products and chrome plated bar. It is the only producer offering both products globally. The Company further offers value added services ranging from cutting and machining, to fabricated parts and components. Typical end uses for the Company's tubular products include hydraulic cylinders, tubes and rods for earth moving equipment, dump trucks, forklift trucks, mining equipment, agricultural machinery, and automobiles, among other things.

7. In North America, the Company primarily sells to three types of customers: (1) steel service centers (55% of sales); (2) original equipment manufacturers (30% of sales), and (3) tier 1, 2, and 3 automotive suppliers (15% of sales). The Company maintains a diverse customer base including a wide variety of "blue chip" companies. Major customers include Caterpillar, John Deere, Daimler, Chrysler, Volkswagen, NACCO, Hendrickson, BMW, Volvo, Delphi, JCB, Marmon/Keystone, Earle M. Jorgensen, and Ryerson. Many of these customer relationships span many decades.

8. The Debtors' net sales for year ending December 31, 2008 were $378.6 million and EBITDA of $57.4 million. As of December 31, 2008, the Debtors' books and records reflected assets totaling approximately $274 million, and liabilities totaling approximately $293.5 million. For the eight months ended August 31, 2009, the Debtors' net sales were $90.3 million with an EBITDA loss of $(24.8) million.

9. As of December 31, 2008, the Debtors had 849 active employees in North America. As of the Petition Date, the Debtors had 579 active employees in North America. Specifically, the Debtors employed 579 individuals in seven states, of which 577 were full-time employees and 2 were part-time employees. As of the Petition Date the Debtors had 275 employees who were represented by unions.[2]

### B. Prepetition Capital Structure

10. As of the Petition Date, the Debtors' total consolidated funded debt obligations were $180,868,883.29 and consisted of, among other things, revolving credit, term loans, and secured notes payable to Black Diamond affiliated entities, including Black Diamond Commercial Finance, L.L.C. (as Agent under the ABL Credit Agreement, as defined below); BDC Finance, L.L.C.; BDCM opportunity Fund, L.P.; Black Diamond International Funding LTD (collectively, "<u>Black Diamond</u>"); The CIT Group Business Credit, Inc.; Grand Central Asset Trust, BDC Series; and The Bank of New York Mellon (f/k/a The Bank of New York) (as Agent under the Term Loan (A) Agreement and Term Loan (B) Agreement, each as defined below) (collectively, the "<u>Prepetition Lenders</u>"). The major components of the Debtors' consolidated funded debt obligations are described in greater detail below.

---

[2] The Debtors' union employees are represented by the United Steelworkers, the Teamsters, and the Metal Fabricators.

a. <u>ABL Credit Facility</u>. On July 25, 2006, PTC and each of the Debtors, as borrowers, the institutions from time to time party thereto as lenders, and Black Diamond Commercial Finance, L.L.C., as administrative agent for the lenders, entered into that certain Credit Agreement (as amended and modified prior to the date hereof, the "<u>ABL Credit Agreement</u>"), providing for a credit facility in the aggregate principal amount not to exceed $70,000,000, which credit facility consists of (i) a revolving credit facility in an aggregate principal amount not to exceed $40,000,000, including a letter of credit subfacility of $5,000,000 and (ii) a term loan facility in an aggregate principal amount not to exceed $30,000,000. The ABL Credit Agreement is secured by a lien on substantially all of the assets of the Debtors, with a first priority lien on current assets of the Debtors. As of the Petition Date, outstanding principal obligations (including outstanding letters of credit) under the ABL Credit Agreement were $41,279,000.

b. <u>Term Loan (A) Agreement</u>. On July 25, 2006, PTC, each of the Debtors, other than PT/VW Corporation, as borrowers, the institutions from time to time party thereto as lenders, and The Bank of New York Mellon (f/k/a The Bank of New York), as administrative agent for the lenders, entered into that certain Term Loan (A) Agreement (as amended and modified prior to the date hereof, the "<u>Term Loan (A) Agreement</u>"), providing for term loan promissory notes in the original principal amount of $76,524,688.82 governed by the terms and conditions set forth in the Term Loan (A) Agreement. The Term Loan (A) Agreement is secured by a lien on substantially all of the assets of the Debtors, other than PV/VW Corporation, with a first priority lien on fixed assets of the Debtors, other than PT/VW Corporation. As of the Petition Date, outstanding principal obligations under the Term Loan (A) Agreement were

$76,524,688.82. Black Diamond affiliated entities hold all debt outstanding under the Term Loan (A) Agreement.

  c. <u>Term Loan (B) Agreement</u>. On July 25, 2006, PTC and each of the Debtors, other than PT/VW Corporation, as borrowers, the institutions from time to time party thereto as lenders, and The Bank of New York Mellon (f/k/a The Bank of New York), as administrative agent for the lenders entered into that certain Term Loan (B) Agreement (as amended and modified prior to the date hereof, the "<u>Term Loan (B) Agreement</u>"), providing for new term loan promissory notes in the original principal amount of $46,112,163.30 governed by the terms and conditions set forth in the Term Loan (B) Agreement. The Term Loan (B) Agreement is secured by a third priority lien on substantially all of the assets of the Debtors, other than PT/VW Corporation. As of the Petition Date, outstanding principal obligations under the Term Loan (B) Agreement were $63,065,194.47. Black Diamond affiliated entities hold all debt outstanding under the Term Loan (B) Agreement.

11. Three shareholders, including two Black Diamond affiliated entities, own 100% of the stock of PTC. The equity in PTC is owned as follows: BD PAC Holdings LLC (66.09%); BD PAC Holdings 2 LLC (31.247%); and Peter Whiting (2.656%).

**C. The 2006 Bankruptcy Case**

12. On May 10, 2006, PTC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>2006 Case</u>") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "<u>Western District of Pennsylvania Bankruptcy Court</u>"). The 2006 Case was necessary in order to restructure the Company's balance sheet. At the time, PTC had four outstanding classes of preferred stock and two classes of common stock. Prior to the filing of the 2006 Case, PTC reached a consensual agreement with its primary secured lender and

preferred equity holder, Black Diamond Commercial Finance, L.L.C., to restructure the balance sheet and simplify PTC's equity structure. Black Diamond acted as the debtor-in-possession financing lender and plan sponsor for PTC's assets in a structure whereby Black Diamond's secured loans and matured preferred interests then due would be converted in large part to common equity and in part to new operational term loans, and Black Diamond's existing equity would be cancelled. PTC's employees were not affected by the 2006 Case and the collective bargaining agreements with the unions were wholly unaffected. Unsecured creditors were either paid in full or their claims were reinstated during the 2006 Case. The pre-negotiated chapter 11 plan in the 2006 Case was accepted by 100% of the voters in the classes entitled to vote on it, and was confirmed by the Western District of Pennsylvania Bankruptcy Court on July 14, 2006.

### D. Events Leading to Chapter 11 Filing

13. The goals of the 2006 Case were realized and the reorganized business was initially a success. In the two years following the 2006 Case, the Debtors grew their business from an EBITDA of $41.7 million at the end of 2006, to $44.1 million in 2007, and up to $57.4 million in 2008.

14. While the reorganization accomplished in the 2006 Case was a success, the reorganized company could not anticipate the severity and effect of the global recession on the automotive, manufacturing, mechanical, and construction industries, the core of the Company's customer base. As a direct consequence of the global recession, beginning in the fourth quarter of 2008, the Debtors' revenue fell dramatically. Net sales fell from an all-time high of $378.6 million in 2008 to a projected $135.5 million in 2009. Further, the Company was saddled with surplus inventory.

{00001556.2 }                                - 7 -

US_ACTIVE-102425750.5-AMTONTI

15. In an effort to address the economic challenges it faced, the Company took significant actions to reduce expenses. For example, the Company idled plants in Hopkinsville, Kentucky; Jane Lew, West Virginia; and East Chicago, Illinois. The Debtors reduced their employee head count from 849 to 579 between December 31, 2008 and August 31, 2009. As part of the reduction in its labor force, the Debtors reduced management positions. As a result of workforce reductions, the Debtors realized significant savings.

16. In addition to workforce reductions, the Debtors undertook a comprehensive program to reduce costs across their organizations. Through salary reductions and reductions in gainsharing, bonuses, fringe benefits, and overtime pay, the Debtors reduced their costs by more than $14.5 million in 2009. By making difficult decisions, realizing and capitalizing on efficiencies, halting capital expenditures, and undertaking a thorough review of their costs, the Debtors were able to achieve a total savings of nearly $35 million in 2009.

17. Notwithstanding the Debtors' ability to achieve impressive cost savings, they have not been able to overcome the impact of the severely decreased revenues. Moreover, many of the Debtors' obligations could not be reduced and remained unchanged or increased. As of the Petition Date, the Debtors are burdened with approximately $61 million in pension liabilities, of which approximately $25 million is currently unfunded. The Debtors also have $40 million of OPEB (unfunded post-retirement medical benefits) liabilities. Approximately $4.2 million and $5.5 million of pension funding requirements are scheduled for fiscal years 2010 and 2011, respectively. This compares to no funding requirement in fiscal years 2008 and 2009.

18. The Debtors have defaulted on certain covenants under the ABL Credit Agreement, further compounding the Debtors' financial difficulties. Despite extensive

{00001556.2 } - 8 -

US_ACTIVE-102425750.5-AMTONTI

discussions with the Debtors' lenders, the Debtors were unable to achieve any long-term relief under its loan obligations. Accordingly, the Debtors began exploring all available options to save the enterprise, including a sale of the Company.

19. Beginning in August 2009, facing the loss of financing as a result of defaults under their prepetition indebtedness, the Debtors retained Candlewood to act in an advisory capacity to evaluate strategic alternatives. As part of this evaluation, the Debtors and Candlewood prepared a marketing strategy to aggressively pursue a sale of the Assets.

20. As of the Petition Date, as part of their marketing efforts, the Debtors and Candlewood identified approximately 143 potential financial and strategic counterparties and contacted 117 of these potential counterparties.[3] As of the Petition Date, eleven of these parties have entered into confidentiality agreements with the Debtors and have been provided with a confidential information memorandum and detailed financial data. Going forward, as appropriate, interested parties will be provided with extensive due diligence materials on an electronic data site (the "Data Site"), as well as the opportunity to speak with the Debtors and their advisors and to conduct site visits with respect to the Assets. In parallel with the marketing of their assets for sale and the continuation of their restructuring efforts, the Debtors initiated substantive discussions with Black Diamond Commercial Finance, L.L.C. (as agent under the ABL Credit Agreement) and certain other Black Diamond affiliates that own substantially all of the equity in the Debtors (BD PAC Holdings LLC owns 66.09% and BD PAC Holdings 2 LLC owns 31.247%).

21. As it became clear that a sale to a third-party operator would not occur and as it became apparent that the Debtors would remain in default on their existing indebtedness, the

---

[3] The additional prospective counterparties will be contacted after the filing of this Motion.

Debtors and Black Diamond accelerated these discussions. Black Diamond agreed to act as the stalking horse bidder for the Assets in a structure whereby Black Diamond's debts would once again be converted in large part to equity and Black Diamond's existing equity would be cancelled. Importantly, Black Diamond also agreed to continue to operate the Debtors' businesses post-Sale, resulting in the maintenance of the Debtors' businesses as a going concern and the preservation of jobs for many of the Debtors' employees.

22. As a result of these arms' length negotiations, and in light of the fact that no other viable third-party purchasers have emerged as a result of the Debtors' marketing efforts, the Debtors entered into the Asset Purchase Agreement and commenced these chapter 11 cases in order to complete the Sale as contemplated in this Motion.

23. Over the last several months the Debtors have also engaged in negotiations with the Purchaser with respect to the sale of the Assets. The Debtors then entered into the Asset Purchase Agreement and commenced these Cases in order to complete the Sale as contemplated in this Motion.

### III. RELIEF REQUESTED

24. The Debtors desire to employ and retain Candlewood as their Investment Banker and Financial Advisor during the pendency of these cases, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016, and to obtain approval of the terms under which Candlewood will be compensated. Additionally, pursuant to Local Rule 2016-2(g), the Debtors request a waiver and modification of the application of certain of the information reporting requirements contained in Local Rule 2016-2 including, specifically, any requirement that it be required to file time records in accordance with Bankruptcy Rule 2016(a), Local Rule 2016-2, and the United States Trustee Fee Guidelines.

## IV. BASIS FOR RELIEF REQUESTED

25. Under section 327(a) of the Bankruptcy Code, a debtor in possession may employ a professional person that does not hold or represent an interest adverse to the estate and that is a disinterested person, to assist the debtor in carrying out its duties under the Bankruptcy Code. In addition, section 328(a) of the Bankruptcy Code provides that:

> The trustee ... with the court's approval, may employ or authorize the employment of a professional person under section 327 ... on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.

11 U.S.C. §328 (a). Bankruptcy Rule 2014 requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, and any other party in interest, their respective attorneys and accountants, the United States Trustee, or any other person employed in the office of the United States Trustee.

Fed. R. Bankr. Proc. 2014.

26. As noted above, prior to the Petition Date, the Debtors entered into an engagement letter with Candlewood, dated August 5, 2009 (the "Engagement Agreement"), a copy of which is annexed to the Pollack Declaration as **Exhibit 1.** Pursuant to the Engagement Agreement, Candlewood was retained to provide financial and strategic advice in connection with a potential restructuring, sale and/or financing.

27. The Debtors desire to continue to employ Candlewood post-petition pursuant to the Engagement Letter because of Candlewood's substantial expertise in investment banking and financial restructuring service. In consideration of the familiarity and institutional knowledge of the Debtors that Candlewood has gained from its prepetition relationship with the

Debtors, the Debtors submit that retention of Candlewood is in the best interests of their estates and their creditors and should be approved *nunc pro tunc* to the Petition Date. Candlewood has been diligently working on these matters for which it was engaged since the Petition Date.

## V. QUALIFICATIONS

28. The Debtors have selected Candlewood because, among other things, Candlewood has considerable experience in providing investment banking and financial advisory services. Furthermore, it has performed work for the Debtors prior to the Petition Date, and is therefore familiar with the Debtors' assets and their value to potential third party purchasers. As set forth in the Pollack Declaration, Candlewood does not hold or represent any interest adverse to the Debtors or their estates.

## VI. SERVICES TO BE RENDERED

29. As set forth in the Engagement Agreement[4], the Debtors contemplate that Candlewood shall be their exclusive financial advisor and investment banker and will provide the following services:

> a. Familiarize itself, to the extent Candlewood deems appropriate and feasible, with the business, operations, properties, financial condition and prospects of the Debtors;
>
> b. Develop and, at the Debtors' direction, execute a strategic plan to market and sell the Debtors' assets, in one or more transactions, pursuant to section 363 of the Bankruptcy Code;
>
> c. Assist the Debtors in preparing presentations, discussions and due diligence materials relating to the sale;
>
> d. Assist the Debtors in the preparation of a confidential information package describing the Debtors and in the preparation and negotiations of any confidentiality agreements to be entered into by third

---

[4] Any and all descriptions of the terms of the Engagement Agreement in this Application are provided as a convenience only.

parties potentially interested in entering into the sale, all of which shall be subject to approval by the Debtors;

    e.    At the board's request (i) render an opinion in writing addressed to the Board as to the fairness, from a financial point of view, of the sale or (ii) advise the board that Candlewood is unable tor render such an opinion, which opinion, if rendered, shall be in customary form with such customary qualifications as deemed appropriate by Candlewood; and

    f.    At the Debtors' request, make presentations to the Debtors' senior management and/or Board of Directors of the company on the status of any negotiations or discussions regarding the same; and

    g.    Provide such other financial advisory and investment banking services as are customary for similar transactions and as may be mutually agreed upon by the Debtors and Candlewood, including but not limited to appearing in court to testify with respect to the services rendered by Candlewood if and when requested by the Debtors.

## VII. **COMPENSATION**

30.    Subject to the Court's approval, and in accordance with section 328(a) of the Bankruptcy code, Candlewood will be paid post petition pursuant to the terms of the Engagement Agreement as follows:

    a.    Monthly Retainer Fee of $50,000.00

    b.    If the Debtor completes, or enters into a definitive agreement to complete, any Sale with any party or parties during the Term of this Modified Agreement or with a Covered Party within 12 months following the termination of this Modified Agreement pursuant to paragraph 5 of the Engagement Letter, the Debtor shall pay Candlewood a fee (the "Sale Fee") equal to (i) if the Sale is to an existing Lender, then $350,000 plus three percent (3.0%) of the total aggregate Consideration in excess of the Credit Bid (as defined in the Engagement Letter) (the "Percentage Fee A"); (ii) if the Sale is to a purchaser unaffiliated with an existing Lender, then $150,000 plus one percent (1.0%) of the total aggregate Consideration in excess of ten million dollars ($10,000,000) (the "Percentage Fee B"). The Sale Fee shall be fully earned, due and payable no later than the closing of the Sale (i.e., the execution of unconditional documentation with respect thereto). Any order of the United States Bankruptcy Court approving a Sale under section 363 of the Bankruptcy Code shall provide that the Sale Fee shall be paid out of the Sale proceeds.

    c. To the extent that Candlewood is entitled to a Sale Fee, fifty percent (50%) of the Monthly Retainer Fee paid to Candlewood shall be credited against the Sale Fee.

31. Prior to the Petition Date, Candlewood received $220,000 from the Debtors, which included the payment of (a) the Monthly Retainer Fee for August, September and October, (b) $20,000 expense reimbursement, and (c) a $50,000 deposit.

32. Candlewood also will be reimbursed for reasonable out-of-pocket expenses incurred in connection with this engagement, such as travel, lodging, duplicating, research, messenger, and telephone charges. The compensation arrangement set forth in the Engagement Agreement is herein after referred to as the "Fee Structure."

33. The overall compensation structure described above is comparable to compensation generally charged by corporate finance firms of similar stature to Candlewood for comparable engagements, both in and out of court. Candlewood's restructuring expertise, as well as its capital markets knowledge, financing skills and merger and acquisition capabilities, some or all of which may be required by the Debtors during the term of Candlewood's engagement, were important factors in Candlewood's determination of the amount of its fees, and the Debtors believe that the ultimate benefit to the Debtors of Candlewood's services hereunder cannot be measured merely by reference to the number of hours to be expended by Candlewood's professionals in the performance of services.

34. Candlewood seeks compensation for professional services rendered and reimbursement of expenses incurred in connection with these Cases consistent with the terms for compensation set forth in the Engagement Letter. Further, because the Debtors are seeking to retain Candlewood under section 328(a) of the Bankruptcy Code, the Debtors believe that Candlewood's compensation and expenses (including, without limitation, the Fee Structure) should not be subject to the standard of review under section 330 of the Bankruptcy Code.

35. By this Application, the Debtors request that the Court approve the compensation arrangements described in the Engagement Agreement pursuant to section 328(a) of the Bankruptcy Code. The compensation arrangements contained in the Engagement Agreement are highly beneficial to the Debtors' estates as they provide certainty and proper inducement for Candlewood to act expeditiously and prudently with respect to the matters for which it will be employed.

36. The Debtors request approval of the employment of Candlewood *nunc pro tunc* to the Petition Date. Such relief is warranted by the extraordinary circumstances presented by this case. The Third Circuit has identified "time pressure to begin service" and absence of prejudice as factors favoring *nunc pro tunc* retention. *See Matter of Arkansas Co.*, 798 F.2d 645, 650 (3d Cir. 1986); *see also In re Indian River Homes, Inc.*, 108 B.R. 46, 52 (D. Del. 1989), *app. dismissed*, 909 F.2d 1406 (3d Cir. 1990). The complexity, intense activity and speed that have characterized this case have necessitated that the Debtors, Candlewood, as well as the Debtors' other professionals, focus their immediate attention on time-sensitive matters, and promptly devote substantial resources to the sale(s) of the Debtors' assets pending submission and approval of this Application.

### 1. **Modification Of Local Rule 2016-2(d)**

37. Bankruptcy Rule 2016 and Local Rule 2016-2 require retained professionals to submit applications for payment of compensation in chapter 11 cases. Further, Local Rule 2016-2(d) requires retained professionals to submit detailed time entries which set forth, among other things: a detailed description of each activity performed, the amount of time spent on the activity (in tenth of an hour increments), the subject matter of the activity, and the parties

involved with the activity at issue. However, Local Rule 2016-2(g) allows a retained professional to request a waiver of the requirements of Local Rule 2016-2, for cause.

38. The Debtors submit that the requirements of Local Rule 2016-2(d) should be modified for Candlewood due to the nature of Candlewood's engagement and its compensation structure. Candlewood has requested, pursuant to section 328(a) of the Bankruptcy Code, payment of its fees, including the Monthly Retainer Fee and Sales Fees, on a fixed fee and percentage fee basis. Pursuant to the Engagement Agreement, Candlewood's Fee Structure shall be paid as part of any Order authorizing a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. As such, the submission of detailed time entries, pursuant to Local Rule 2016-2(d), are unnecessary, and the Debtors request a waiver of such reporting requirements. Candlewood will nonetheless maintain records (in summary format) of time spent by its professionals in connection with the rendering of services for the Debtors by category and nature of the services rendered and reasonably detailed descriptions of those services provided on behalf of the Debtors, the approximate time expended in providing those services and the individuals who provided professional services on behalf of the Debtors and will present such records to the Court.

39. Notwithstanding the terms of the Engagement Agreement, the Debtors propose that Candlewood will file interim and final fee applications as required by the Local Rules and Order of this Court, including detailed descriptions of the expenses for which Candlewood has been paid, but Candlewood will only provide reasonable descriptions of the work it has performed.

40. Based on the foregoing, the Debtors request a modification of the informational requirements of Local Rule 2016-2(d).

US_ACTIVE-102425750.5-AMTONTI

## VIII. DISINTERESTEDNESS

41. Candlewood does not hold any pre-petition claim against the Debtors. To the best of the Debtors' knowledge, information, and belief, and based upon the Pollack Declaration, Candlewood is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.

42. As described in detail in the Pollack Declaration, Candlewood has, among other things, searched its client databases to determine whether it represents, or has represented, certain of the Debtors' creditors or other parties in interest in these proceedings, and/or matters wholly unrelated to these proceedings. Due to the number of creditors and other parties in interest involved in these cases, however, Candlewood may have represented certain of the Debtors' creditors or other parties in interest in matters wholly unrelated to the Chapter 11 Cases. Except as may be described in the Pollack Affidavit, Candlewood does not, to its knowledge, represent any party with an interest materially adverse to the Debtors or their estates.

## IX. INDEMNIFICATION

43. The Debtors have agreed to indemnify and hold harmless Candlewood and its affiliates and their respective directors, officers, employees, agents and controlling persons as set forth in paragraph 9 incorporating Exhibit A of the Engagement Agreement. Acts including willful misconduct or gross negligence are not included in the coverage of the indemnification provisions.

## X. NO PRIOR REQUEST

44. No prior request for the relief sought in this Application has been made to this or any other court.

## XI. NOTICE

45. Notice of this Application has been provided to: (a) the Office of the United States Trustee; (b) the Debtors' consolidated 30 largest unsecured trade creditors; (c) counsel to Black Diamond Commercial Finance, L.L.C., as Administrative Agent under the prepetition senior secured revolving and term loan credit facility and the postpetition debtor-in-possession credit facility; and (d) counsel to The Bank of New York Mellon, as Administrative Agent under the prepetition Term Loan A and Term Loan B credit facilities. Notice of this Application will be given to those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these Cases. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, based on the facts and disclosures above, the Debtors respectfully request: (a) authority to employ and retain Candlewood as their Investment Banker and Financial Advisor *nunc pro tunc* to the Petition Date; (b) that the Court approve the terms of employment set forth in the Engagement Letter, pursuant to the provisions of sections 327(a) and 328(a) of Bankruptcy Code and Bankruptcy Rule 2014; and (c) that the Court grant such other and further relief as is just and proper.

Dated: October 5, 2009

PTC Alliance Corp.

_____
Thomas W. Crowley
On behalf of Debtors and Debtors in Possession